**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE A2P SMS<br>ANTITRUST LITIGATION | MASTER FILE:  12 CV 2656 (AJN)<br><br>**ECF Case** |
| THIS DOCUMENT RELATES TO:<br>All Actions | |

**MEMORANDUM IN SUPPORT OF CARRIER DEFENDANTS'**
**MOTION TO COMPEL ARBITRATION**

August 14, 2012

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES . ......................................................................................... ii

I.   INTRODUCTION AND SUMMARY OF THE ARGUMENT ....................................1

II.   BACKGROUND ........................................................................................................4

III.   ARGUMENT ..............................................................................................................5

      A.   The FAA Embodies A Strong Federal Policy Favoring The Enforcement Of Arbitration Agreements, Including Those Requiring Individual Arbitration...........................................................................................................5

      B.   Carrier Defendants Have The Right To Enforce The CSC Agreement Arbitration Clause Against These Plaintiffs ......................................................6

            1.   Carrier Defendants May Enforce The CSC Arbitration Agreement Under The Equitable Estoppel Doctrine. ......................................9

            2.   Carrier Defendants Also May Enforce The CSC Arbitration Agreement As Third-Party Beneficiaries.....................................15

      C.   Carrier Defendants May Enforce The Arbitration Clauses In The Aggregator Agreements With The Named Plaintiffs.............................................17

            1.   Carrier Defendants May Enforce The OpenMarket And mBlox Arbitration Clauses Under Equitable Estoppel Principles........................18

            2.   Carrier Defendants May Enforce The OpenMarket Agreement Under Third-Party Beneficiary Principles. .................................21

      D.   *Stolt-Nielsen* Requires That Arbitration Must Be Conducted On An Individual Rather Than Class-Wide Basis ..........................................................23

IV.   CONCLUSION...........................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*Alghanim v. Alghanim*,
  828 F. Supp. 2d 636 (S.D.N.Y. 2011)....................................................................2, 7, 24

*American Bankers Insurance Group, Inc. v. Long*,
  453 F.3d 623 (4th Cir. 2006) ...........................................................................9, 10, 12, 21

*In re American Express Merchants' Litigation*,
  667 F.3d 204 (2d Cir. 2011)..........................................................................................25

*In re American Express Merchants' Litigation*,
  681 F.3d 139 (2d Cir. 2012)..........................................................................................25

*In re Apple & AT&TM Antitrust Litigation*,
  826 F. Supp. 2d 1168 (N.D. Cal. 2011) .........................................................................14

*Arthur Andersen LLP v. Carlisle*,
  556 U.S. 624 (2009)....................................................................................................6, 7

*AT&T Mobility LLC v. Concepcion*,
  131 S. Ct. 1740 (2011)..................................................................................................3, 5

*Bostic v. Global Strategies Group, Inc.*,
  Civ. A. No. 96-1090-A, 1996 WL 729853 (E.D. Va. Nov. 22, 1996).....................................15

*Brantley v. Republic Mortgage Insurance Co.*,
  424 F.3d 392 (4th Cir. 2005) .............................................................................................9

*Crewe v. Rich Dad Education, LLC*,
  No. 11 Civ. 8301, 2012 WL 3240185 (S.D.N.Y. Aug. 3, 2012) ............................................9

*In re Currency Conversion Fee Antitrust Litigation*,
  265 F. Supp. 2d 385 (S.D.N.Y. 2003)..................................................................................7

*Dean Witter Reynolds, Inc. v. Byrd*,
  470 U.S. 213 (1985)..........................................................................................................6

*Denney v. BDO Seidman, LLP*,
  412 F.3d 58 (2d Cir. 2005)....................................................................................9, 13, 21

*Gilmer v. Interstate/Johnson Lane Corp.*,
  500 U.S. 20 (1991)............................................................................................................5

*Grigson v. Creative Artists Agency LLC*,
  210 F.3d 524 (5th Cir. 2000) ................................................................6, 10, 14

*JLM Industries Inc. v. Stolt-Nielsen SA*,
  387 F.3d 163 (2d Cir. 2004).................................................................6, 7, 13

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*
  473 U.S. 614 (1985).......................................................................................16

*Moses H. Cone Mememorial Hospital v. Mercury Construction Corp.*,
  460 U.S. 1 (1983)..............................................................................................5

*Ragone v. ESPN,*
  595 F.3d 115 (2d Cir. 2010).......................................................6, 9, 11, 20

*Safra National Bank v. Penfold Investment Trading, Ltd.*,
  No. 10 Civ. 8255 (RWS), 2011 WL 1672467 (S.D.N.Y. Apr. 20, 2011)...............................23

*Scherk v. Alberto-Culver Co.*,
  417 U.S. 506 (1974).........................................................................................5

*Spear, Leeds & Kellogg v. Central Life Assurance Co.*,
  85 F.3d 21 (2d Cir. 1996) ............................................................................22

*Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*,
  130 S. Ct. 1758 (2010)........................................................................ *passim*

*WorldCrisa Corp. v. Armstrong*,
  129 F.3d 71 (2d Cir. 1997)........................................................................7, 24

### STATE CASES

*Almeter v. Virginia Department of Taxation*,
  53 Va. Cir. 429 (2000)..................................................................................24

*Casey v. Merck & Co.,*
  722 S.E.2d 842 (Va. 2012)...........................................................................24

*Commonwealth v. Supportkids, Inc.*,
  77 Va. Cir. 155 ( 2008) .................................................................................24

*Crawford v. Feldman*,
  604 N.Y.S.2d 585 (App. Div. 1993) ...........................................................21

*Decisive Analytics Corp. v. Chikar*,
  75 Va. Cir. 337, 2008 WL 6759965 (2008) ..............................................10

*First Security Federal Savings Bank, Inc. v. McQuilken,*
    480 S.E.2d 485 (Va. 1997)........................................................................15

*Levine v. Selective Insurance Co. of America,*
    462 S.E.2d 81 (Va. 1995)..........................................................................15

*Mendel v. Henry Phipps Plaza West, Inc.,*
    844 N.E.2d 748 (N.Y. 2006)................................................................22, 23

*Schatz v. Blanchard,*
    664 N.Y.S.2d 46 (App. Div. 1997)............................................................21

*Ward v. Ernst & Young,*
    435 S.E.2d 628 (Va. 1993).........................................................................15

## FEDERAL STATUTES AND REGULATIONS

9 U.S.C. § 2......................................................................................................5

9 U.S.C. § 3......................................................................................................6

## STATE STATUTES

Va. Code Ann. § 55–22....................................................................................15

## OTHER AUTHORITIES

Kent Sinclair & Leigh B. Middleditch, Jr., Virginia Civil Procedure § 3.11 (5th ed. 2003).........24

Defendants AT&T Mobility LLC, Cellco Partnership d/b/a Verizon Wireless ("Verizon Wireless"), Sprint Nextel Corporation, T-Mobile USA, Inc., and U.S. Cellular Corporation (collectively, "Carrier Defendants") respectfully submit this Memorandum in support of their Motion to Compel Arbitration pursuant to Section 3 of the Federal Arbitration Act ("FAA"). Carrier Defendants respectfully request that the Court stay the instant suit and compel Plaintiffs to participate in individual arbitration with Carrier Defendants.

## I.   INTRODUCTION AND SUMMARY OF THE ARGUMENT

Simply put, the claims against Carrier Defendants have been brought in the wrong forum. Plaintiffs allege an unlawful agreement among Carrier Defendants, CTIA – The Wireless Association ("CTIA"), Neustar, Inc. ("Neustar"), WMC Global, Inc. ("WMC"), and a group of messaging aggregators.  The alleged antitrust conspiracy was formed to require bulk commercial text messages to be sent using a special five- or six-digit code rather than a standard ten-digit phone number.  Plaintiffs further contend that Carrier Defendants, through their control of CTIA and Neustar, then set anticompetitive terms and prices for the use of these five- or six-digit codes, often referred to as "common short codes" or "CSCs."

But under the Federal Arbitration Act, 9 U.S.C. §§ 1-16, this Court need not—and in fact, should not—reach the merits of those claims.  That is because, as part of their participation in the CSC system, each one of the three named Plaintiffs agreed to individual arbitration of any disputes arising out of or relating to their use of short codes.  They also expressly agreed that any challenge to the validity of the Common Short Code Registrant Sublicense Agreement ("CSC Agreement"), which set the prices and terms for common short codes, would be brought in individual arbitration, not as a class action in federal court.

First, each Plaintiff entered into the CSC Agreement with CTIA and its agent, Neustar, to register and lease a particular short code.  The CSC Agreement requires arbitration of "[a]ny

dispute, controversy, or claim arising out of or relating to this Agreement or the breach, termination, non-renewal of this Agreement or any CSC, refusal to grant new CSCs, or the validity of this Agreement[.]"  Declaration of Luke Connelly ("Connelly Decl.") Ex. A ¶ 19.  As this Court has recognized, the "arising out of or relating to" type language is "the paradigm of a broad clause."  *Alghanim v. Alghanim*, 828 F. Supp. 2d 636, 652 (S.D.N.Y. 2011).

There can be no doubt that the allegations in the Consolidated Amended Class Action Complaint ("Complaint" or "CAC") "aris[e] out of or relat[e] to" the CSC Agreement; indeed, that Agreement provides the prices and terms for short code leases that form the legal predicate for Plaintiffs' Complaint.  Connelly Ex. A ¶ 19.  Further, the CSC Agreement is the vehicle through which CTIA, purported co-conspirator Neustar, and Carrier Defendants allegedly exercised unlawful monopoly power over prices and terms for the lease of short codes.  Carrier Defendants are alleged throughout the CAC to have "dominated and controlled" CTIA and to have used CTIA (a party to the CSC Agreement) to consolidate market power and create the alleged antitrust conspiracy.  CAC ¶¶ 7, 47.  Further, all three of the counts in the CAC attack the "validity" of the CSC Agreement and therefore fall under another category of disputes expressly covered by the arbitration clause.  *Id.* ¶ 19.  Carrier Defendants' participation in the performance of the CSC Agreements is evinced by the defined term "Participating Carrier" in the agreement and the central role Carrier Defendants play in the entire CSC system.  Under both principles of equitable estoppel and third-party beneficiary law, Carrier Defendants are entitled to enforce the arbitration clause of the CSC Agreement.

Although the Court need go no further than the CSC Agreement to compel Plaintiffs to arbitrate their claims with CTIA, WMC, and all the Carrier Defendants in Virginia in accord with the American Arbitration Association ("AAA") rules, there is an alternative basis to compel

Plaintiffs to arbitrate their claims against Carrier Defendants.  It can be found in Plaintiffs' contracts with two named Aggregator Defendants, OpenMarket and mBlox (the "Aggregator Agreements").  Just like the CSC Agreement, these agreements require individual arbitration through similarly broad arbitration clauses.  And both of these agreements include Carrier Defendants as a defined term.  Carrier Defendants play a central role in performance of both the CSC and the aggregator agreements  Indeed, one of the aggregators' chief purposes is to bundle the commercial messages of Plaintiffs, transmit them to Carrier Defendants, and then collect and distribute any sales revenue from the Carriers to Plaintiffs.  The CAC alleges that the aggregators conspired with CTIA and Carrier Defendants to enforce the terms of the alleged antitrust conspiracy.  Thus, in the alternative, Carrier Defendants are entitled to enforce the arbitration clauses in the Aggregator Agreements against these Plaintiffs.[1]

Neither the CSC Arbitration Agreement nor the Aggregator Arbitration Agreements authorize any class or collective treatment of claims.  The Supreme Court has categorically held that, when an arbitration clause is silent as to class treatment, it must be interpreted to authorize only individual arbitration.  *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1775 (2010).  In addition, the CSC Arbitration Agreement mandates individual arbitration because it requires the arbitrator to apply Virginia law and procedure, which do not recognize class actions of any kind.  Thus, this clause prohibits class treatment of claims every bit as much as the one involved in *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1751 (2011).

For these reasons, this case should be stayed under Section 3 of the FAA and Plaintiffs should be compelled to engage in individual arbitration with Carrier Defendants.

---

[1]    Consistent with the Court's July 31 Order, Carrier Defendants have simultaneously filed motions to dismiss but, in so doing, do not waive their right to compel arbitration.  Carrier Defendants respectfully suggest, under the FAA, the Court should consider this Motion before addressing any part of the merits, including the Carrier Defendants' Rule 12(b)(6) motion.

## II.   **BACKGROUND**

For the sake of brevity, Carrier Defendants adopt the Background set forth in the Memorandum in Support of CTIA's Motion to Compel Arbitration ("CTIA Brief") and the Statement of Facts in the Memorandum of Law of Defendant Wireless Media Consulting, Inc. in Support of its Motion to Compel Arbitration in their entirety.  In addition, Carrier Defendants state as follows:  The CSC system is created by a web of interwoven agreements between CTIA, Neustar, Plaintiffs, Aggregator Defendants, and Carrier Defendants.  Carrier Defendants play a central role in performance under each of these agreements.  Indeed, without their participation, those agreements would be meaningless.

As alleged, each of Plaintiffs entered into a CSC Agreement with Defendant CTIA and its agent Neustar.  CAC ¶¶ 51, 67; CTIA Br. at 6.  Carrier Defendants adopt the description of the CSC Agreement set forth in the CTIA Brief.  *See* CTIA Br. at 6-7.  As contemplated by that Agreement, Plaintiffs entered into contractual relationships with one or more Aggregator Defendants in order to transmit their A2P text messages.  CAC ¶¶ 21-23.  Carrier Defendants adopt the description of the operative relationships and agreements set forth in the Memorandum in Support of Joint Motion of Defendants mBlox Inc. and OpenMarket, Inc. To Stay Pending Arbitration and to Dismiss the Consolidated Amended Class Action Complaint ("Joint Aggregators' Brief") at 3-6.[2]

---

[2]   Carrier Defendants understand that the Aggregator Agreements will be filed under seal due to non-disclosure clauses in both agreements.  Carrier Defendants thus have not directly quoted any provision of the Aggregator Agreements in this filing, other than the arbitration clauses in those agreements (which have not been filed under seal).  Nonetheless, the Aggregator Agreements are properly before the Court, *see* Joint Aggregators' Brief at 4 n.5, and Carrier Defendants reserve the right to rely upon the specific text of any provision of those agreements.

This interrelated network of agreements contains several arbitration clauses.  Each such clause requires individual arbitration of disputes under the commercial arbitration rules of the AAA.  The clauses also require arbitration of Plaintiffs' claims against Carrier Defendants.

## III.  ARGUMENT

### A.  The FAA Embodies A Strong Federal Policy Favoring The Enforcement Of Arbitration Agreements, Including Those Requiring Individual Arbitration.

Congress enacted the FAA to "revers[e] centuries of judicial hostility to arbitration agreements."  *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 510 (1974).  As the Supreme Court recently explained, it is "beyond dispute that the FAA was designed to promote arbitration.  [Our cases] have repeatedly described the Act as 'embod[ying] [a] national policy favoring arbitration,' ... and 'a liberal federal policy favoring arbitration agreements ... .'"  *Concepcion*, 131 S. Ct. at 1749 (citations omitted).  The FAA established "a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act."  *Moses H. Cone Mem'l Hosp. v. Mercury Contsr. Corp.*, 460 U.S. 1, 24 (1983).

Section 2 is the "primary substantive provision" of the FAA.  *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991).  It declares all arbitration agreements "valid, irrevocable, and enforceable" as a matter of federal law.  9 U.S.C. § 2.  When Congress enacted the FAA, it necessarily contemplated *individual* arbitration; "class arbitration was not even envisioned" at that time.  *Concepcion*, 131 S. Ct. at 1749, 1752.  Accordingly, the Supreme Court has held both that the enforceability of arbitration agreements cannot be conditioned on the availability of class procedures, *id.* at 1748-49, and that "a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party agreed to do so."  *Stolt-Nielsen*, 130 S. Ct. at 1775.

Section 3 of the FAA—the statute's key enforcement provision—requires a federal district court to stay litigation when any issue therein is referable to arbitration:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement.

9 U.S.C. § 3. This language "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on any issue as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

### B. Carrier Defendants Have The Right To Enforce The CSC Agreement Arbitration Clause Against These Plaintiffs.

Consistent with the FAA, arbitration agreements may be enforced by non-signatories. In *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009), the Supreme Court explained that state law "is applicable to determine which contracts are binding under § 2 and enforceable under § 3." *Id.* at 631-32. "Because 'traditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel,'" *id.* at 631 (quoting 21 R. Lord, Williston on Contracts § 57:19, at 183 (4th ed. 2001)), a litigant who is not a formal signatory to an arbitration agreement may invoke § 3 of the FAA. *Id.* at 632. In addition, consistent with Section 2's "creat[ion] [of] substantive federal law regarding the enforceability of arbitration agreements," *id.* at 630, federal courts have applied a form of equitable estoppel to allow a non-signatory to enforce an arbitration agreement in order to prevent a signatory from circumventing its obligations under the FAA, *see, e.g.*, *Ragone v. ESPN*, 595 F.3d 115 (2d Cir. 2010); *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163 (2d Cir.

2004); *Grigson v. Creative Artists Agency LLC*, 210 F.3d 524 (5th Cir. 2000).  The equitable estoppel doctrine is designed to prohibit artful pleading around an arbitration clause by, for example, naming non-parties and artificially avoiding naming signatories in the complaint. Thus, whenever a non-signatory may claim third-party beneficiary status under state law, or where the plaintiff has knowledge of its obligation to arbitrate the transaction at issue and attempts by artifice of pleading to avoid this obligation, the FAA requires a court to refer the plaintiff's claims to arbitration and stay any further judicial action.  *Carlisle*, 556 U.S. at 632.

Here, there can be no dispute that the substance of Plaintiffs' claims is covered by the broadly-written CSC Arbitration Agreement, which applies to "[a]ny dispute, controversy or claim arising out of or relating to this Agreement or the breach, termination, non-renewal of this Agreement or any CSC, refusal to grant new CSCs, or the validity of this Agreement[.]" Connelly Ex. A ¶ 19.  This Court has recognized that "[a]n arbitration clause covering '[a]ny claim or controversy arising out of or relating to th[e] agreement,' is the paradigm of a broad clause."  *Alghanim*, 828 F. Supp. 2d at 652 (citation and internal quotation marks omitted). Plaintiffs' antitrust challenge to the CSC system unquestionably "aris[es] out of or relat[es] to" the CSC Agreement, *see id.*; indeed, that Agreement either contains or authorizes the prices and terms for short code leases that form the predicate for all of Plaintiffs' claims.  In addition, the rule in this Circuit is that "the existence of a broad agreement" like this one "creates a presumption of arbitrability which is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir. 1997).

Moreover, the entire CAC is a challenge to "the validity" of the CSC Agreement.  *See, e.g.*, *JLM Indus.*, 387 F.3d at 167, 178 (Sherman Act claims fell within scope of arbitration

clause because the dispute "'ar[ose] out of'" various shipping charters and "[defendant's] entry into the charters containing allegedly inflated price terms ... g[a]ve[] rise to the claimed injury"); *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 410 (S.D.N.Y. 2003) (Sherman Act claims "'touch matters' covered by the cardholder agreements" where "Plaintiffs allege a conspiracy to fix currency conversion fee prices" which "appear on plaintiffs' credit card accounts").  It is the CSC Agreement that names Neustar as the Registry Operator, which can only be described as the "hub" of any alleged CSC antitrust conspiracy.  Any argument that Plaintiffs' Sherman Act claims somehow fall outside the terms of the CSC Arbitration Agreement runs headlong into Plaintiffs' own allegations, the terms of the CSC Agreement, and governing precedent requiring this Court to apply a strong presumption in favor of arbitration.

Defendant CTIA is a party to the CSC Agreement and therefore plainly is entitled to compel each Plaintiff to arbitrate its claims against CTIA on an individual basis.  Carrier Defendants are equally entitled to invoke the CSC Agreement's broad arbitration provision to compel arbitration of Plaintiffs' claims.  Carrier Defendants, although not signatories, are repeatedly named in the CSC Agreement and even have their own defined term in that agreement: "Participating Carriers."  The CSC Agreement specifies that the "Participating Carriers and other[s] ... have appointed the CTIA ... to serve as their Common Short Code Administrator, and CTIA, acting in that capacity, has granted [Neustar] a license to assign CSCs in the manner described in this Agreement."  Connelly Ex. A ¶ 2.  The CSC Agreement is aimed at allowing for the assignment of CSCs "that are interoperable across communication service providers in the United States that are participating in CSC services"—*i.e.*, the "Participating Carriers."  *Id.*  Carrier Defendants' participation is essential to the delivery of Plaintiffs' commercial messages to the Carrier Defendants' subscribers.  Carriers bill their subscribers

directly for purchases from short code users, such as Plaintiffs, and then remit a percentage to the aggregators who distribute sales revenue to entities like these Plaintiffs.  Carrier Defendants also receive benefits from Plaintiffs' CSC Agreements, such as the right to audit content and to charge fees for those audits.

### 1. Carrier Defendants May Enforce The CSC Arbitration Agreement Under The Equitable Estoppel Doctrine.

A non-signatory to an arbitration agreement may rely on principles of equitable estoppel to compel a signatory to arbitrate a dispute.  Courts typically consider two criteria in determining whether equitable estoppel applies.  *First*, a signatory may be required to arbitrate claims against a non-signatory if those claims are "intertwined" with the agreement containing the arbitration clause and there is "a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with'" a third-party.  *Ragone*, 595 F.3d at 127 (internal quotation marks omitted); *accord Am. Bankers Ins. Grp., Inc. v. Long*, 453 F.3d 623, 627 (4th Cir. 2006).  "'When each of a signatory's claims against a non-signatory makes reference to ... the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate.'"  *Am. Bankers*, 453 F.3d at 627 (quoting *Brantley v. Republic Mortg. Ins. Co.*, 424 F.3d 392, 396 (4th Cir. 2005)).

*Second*, equitable estoppel applies when the signatory "'raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.'"  *Am. Bankers*, 453 F.3d at 627 n.3 (quoting *Brantley*, 424 F.3d at 396); *accord Denney v. BDO Seidman, LLP*, 412 F.3d 58, 70 (2d Cir. 2005) (same); *Crewe v. Rich Dad Educ., LLC*, No. 11 Civ. 8301, 2012 WL 3240185, at *10 n.6 (S.D.N.Y. Aug. 3, 2012).  Were it otherwise, a plaintiff could simply add non-signatories to its lawsuit, and "'arbitration

proceedings between the two signatories would be rendered meaningless and the federal policy

in favor of arbitration effectively thwarted.'" *Brantley*, 424 F.3d at 396.  Ultimately, "[t]he

linchpin for equitable estoppel is equity—fairness." *Grigson*, 210 F.3d at 528.[3]  Both criteria for

finding equitable estoppel are satisfied here.

*Claims Intertwined With CSC Agreement.*  Plaintiffs' claims against Carrier Defendants

"arise out of and relate directly to" the CSC Agreement.  *Am. Bankers*, 453 F.3d at 627.  Indeed,

Plaintiffs assert that Carrier Defendants actually created the short code system they complain of

through their complete control over a party to the CSC Agreement, namely CTIA.  CAC ¶¶ 7,

47.  Each part of the CSC system that Plaintiffs complain of, its pricing, the terms of use, the

content audits, non-transferability of short codes, and the need to use the services of the

aggregators is either required or authorized by the CSC Agreement.

For example, Plaintiffs allege that Carrier Defendants, CTIA, and co-conspirator Neustar

"collectively imposed" lease fees, CAC ¶ 10, on CSC Lessees in the amount of "$500 per month

for randomly selected CSCs and $1,000 per month for specific CSCs," *id.* ¶ 68.  Plaintiffs agreed

to these specific fees under the CSC Agreement.  Connelly Ex. A ¶ 9.  Similarly, Plaintiffs assert

that "[i]f CSC Lessees are deemed to be non-compliant with certain content guidelines, their

CSCs may be blocked," CAC ¶ 11.  This too is a condition established by the CSC Agreement.

Connelly Ex. A ¶ 5 ("[A] violation of the [Acceptable Use Policy ("AUP")] ... may result in

Participating Carriers restricting your ability to use the CSC.").  In addition, Plaintiffs claim that

"CSCs must be leased in increments of at least three months," CAC ¶ 71, and cannot "be

---

[3]      Virginia courts have imported these FAA principles into their own equitable estoppel
analysis.  *See, e.g.*, *Decisive Analytics Corp. v. Chikar*, No. CL 2008-6171, 2008 WL 6759965,
at *5-8 (Va. Cir. Ct. July 15, 2008) (applying inquiry articulated by the Fourth Circuit in
*American Bankers* and *Brantley* to compel arbitration).

purchased or transferred between CSC Lessees," *id.* ¶ 72. These allegations likewise arise directly from the provisions of the CSC Agreement. Connelly Ex. A ¶ 7(e); *id.* ¶ 7(h).

Each of the three counts in the CAC is substantially intertwined with the CSC Agreement. Plaintiffs' refusal-to-deal claim, CAC ¶¶ 121-29, involves allegations of "audit[ing]" and "blocking [of] CSC" Lessees, *id.* ¶ 124; *see also id.* ¶ 127, as well as "inflated CSC lease fees," *id.* ¶ 126, all of which, as explained above, "arise out of" the CSC Agreement, *see* Connelly Ex. A ¶¶ 5, 9. Plaintiffs' refusal-to-deal claim hinges upon the role of Neustar as the exclusive Registry Operator for common short codes—a status conferred by the CSC Agreement. *Compare* CAC ¶ 66, *with* Connelly Ex. A ¶ 2. Similarly, Plaintiffs' price-fixing claim, CAC ¶¶ 130-138, concerns allegations that Defendants "force[d] would-be CSC Lessees to lease CSCs through co-conspirator Neustar at artificially fixed ... prices," *id.* ¶ 131, and assertions of "audit[ing]" and "blocking CSCs," *id.* ¶ 134, and various unnecessary fees, *id.* ¶¶ 131-32. Plaintiffs' price-fixing claim thus squarely implicates the CSC Agreement, which all CSC Lessees accept in order to lease a CSC.

So too with Plaintiffs' conspiracy-to-monopolize claim, CAC ¶¶ 139-153. In support of this claim, Plaintiffs allege that Defendants "requir[ed] the transmission of A2P SMS through CSCs leased on coordinated terms through a joint selling agent, Neustar," *id.* ¶ 145, and along with "Neustar have imposed on CSC Lessees supra-competitive CSC lease fees" and other "unnecessary" fees, *id.* ¶ 148, as well as audits and blocking, *id.* ¶ 149. Here again, Plaintiffs' conspiracy-to-monopolize claim depends on the existence of the CSC Agreement.

Moreover, the close relationship between Defendant CTIA and alleged co-conspirator Neustar on one hand and Carrier Defendants on the other "justifies a conclusion that [Plaintiffs] should be estopped from denying an obligation to arbitrate" the *very same dispute* with Carrier

Defendants.  *See Ragone*, 595 F.3d at 127.  Plaintiffs well understood the close nature of this relationship at the time they entered into the CSC Agreement.  The Agreement itself informed Plaintiffs that CTIA and Neustar administered CSCs and operated the CSC registry, respectively, *for the benefit of Carrier Defendants* (who provide network infrastructure for delivery of CSC messages).  *See* Connelly Ex. A ¶ 2.  Indeed, the CSC Agreement expressly references Carrier Defendants (denominated "Participating Carriers") *eighteen times*, conferring various rights and benefits on them, including:

- The right to restrict use of a CSC if the CSC Lessee violates the AUP, *id*. ¶¶ 5, 7(b);

- Limitation of liability for claims against the CSC Lessee relating to the CSC, *id*. ¶ 10, and for damages, *id*. ¶ 15; and

- Indemnification from claims or demands made by third-parties "arising out of or relating to" the CSC, *id*. ¶ 16.

That this relationship is reflected throughout the CSC Agreement conclusively demonstrates that Plaintiffs, as sophisticated business entities understood—or should be charged with understanding—that any attack on the CSC Agreement would be subject to arbitration with CTIA and the Carrier Defendants.

   ***Alleged Interdependent and Concerted Misconduct.***  Plaintiffs also "'raise[] allegations of substantially interdependent and concerted misconduct by" Carrier Defendants, CTIA, and Neustar.  *Am. Bankers*, 453 F.3d at 627 n.3.  Plaintiffs allege a conspiracy in violation of the Sherman Act and, thus, the Complaint in its entirety alleges "interdependent and concerted misconduct."  *See id.*  In particular, Plaintiffs allege that the Carrier Defendants dominated and controlled CTIA and that they "agreed that they would cause the CTIA to contract with Neustar to act as the lessor of all CSCs on uniform, non-negotiable terms."  CAC ¶ 51; *see also id.* ¶ 66. Plaintiffs also assert that CTIA enabled the conspiracy, *id*. ¶ 48, while "Carrier Defendants ...

controlled the CTIA and its operation of the CSC system and set the rates in CTIA's contract with Neustar," *id.* ¶ 75.

For its part, Neustar, oddly denominated a "co-conspirator" in the CAC, is essentially the hub of the alleged conspiracy. Plaintiffs make a variety of allegations that Defendants and Neustar acted in concert to accomplish the alleged violations of law in each count of the CAC. For example, Plaintiffs allege that

> Defendants and co-conspirator Neustar collectively imposed connection, transmission, lease and review fees upon CSC Lessees that previously did not exist or were far higher than what CSC Lessees would have paid .... The Conspirators have thus been able to reap and divide supra-competitive profits from their conspiracy.

CAC ¶ 10. In addition, Plaintiffs claim that "Defendants and co-conspirator Neustar ... jointly control and anti-competitively exploit the transmission of A2P SMS," *id.* ¶ 12, and that "Neustar has conspired with Defendants (i) to require CSC Lessees to acquire CSC leases and (ii) to fix or coordinate prices for CSC leases," *id.* ¶ 42. The Complaint further alleges that Neustar played a central role in the allegedly unlawful CSC leasing scheme and in collecting (and profiting from) the revenues generated by that alleged scheme. *See id.* ¶¶ 66-79.

The CAC also focuses on the business arrangements between Carrier Defendants, CTIA, and Neustar. Plaintiffs claim that "[t]hrough the CTIA, the Carrier Defendants established co-conspirator Neustar, Inc. ... as the 'CSC Administrator,'" CAC ¶ 8, and that "Carrier Defendants would not independently lease CSCs outside Neustar," *id.* ¶ 51; s*ee also id.* ¶ 67. Plaintiffs allege that "Carrier Defendants and the CTIA have dominated and controlled Neustar's activities with regard to its leasing of CSCs." *Id.* ¶ 42; *see also id.* ¶ 47. Having made these allegations, among others, *see id.* ¶¶ 10, 12, 48, 66-79, Plaintiffs "cannot now escape the consequences ... by arguing that [defendants] lack the requisite close relationship, or that [Plaintiffs'] claims against

[Carrier Defendants] are not connected to [Carrier Defendants'] relationship with [CTIA and Neustar]." *Denney*, 412 F.3d at 70; *see also JLM Indus.*, 387 F.3d at 178 n.7.

Finally, Plaintiffs sue for the alleged acts of Neustar and acknowledge its role as a co-conspirator. Neustar is referred to 36 times in the CAC; yet it is not named as a Defendant. The only logical explanation is that Plaintiffs came upon the arbitration clause in the CSC Agreement and avoided naming Neustar in an attempt to evade arbitration. Such gamesmanship is precisely what equitable estoppel principles are intended to prevent. *Grigson*, 210 F.3d at 528 ("[I]t would be especially inequitable [to deny arbitration] where, as here, a signatory non-defendant is charged with interdependent and concerted misconduct with a non-signatory defendant.").[4]

Under similar circumstances, the Northern District of California recently compelled arbitration of claims alleging that Apple and AT&T had violated the antitrust laws when they agreed that AT&T would serve as the exclusive carrier of the iPhone for a given period of time. *In re Apple & AT&TM Antitrust Litig.*, 826 F. Supp. 2d 1168 (N.D. Cal. 2011). Applying Ninth Circuit precedent that, in turn, "relied upon" the "Second Circuit's reasoning," *id.* at 1177, that court concluded that plaintiffs were equitably estopped from denying their obligation to arbitrate their antitrust claims against Apple under the terms of AT&T's wireless service agreement. As the court explained: "Plaintiffs themselves have contended throughout this litigation that their antitrust and related claims against Defendant [AT&T] and Defendant Apple arise from their respective [AT&T] service contracts." *Id.* at 1178. And "Plaintiffs themselves have alleged that there is a 'relationship' between [AT&T] and Apple, inasmuch as Plaintiffs' claim against

---

[4]     Carrier Defendants agree with CTIA that Neustar may be an indispensable party under Rule 19 in the event that this action proceeds in federal court. *See* CTIA Brief at 9 n.8. Yet, the Court need not resolve that issue in order to find that Plaintiffs must individually arbitrate their claims against CTIA, WMC, and the Carrier Defendants.

Defendant Apple centers on their allegations that Defendants ... entered into an [exclusivity] agreement prior to the commercial release of the iPhone." *Id.*

The same is true here. Plaintiffs' claims are intertwined with and entirely dependent on the existence of the CSC Agreement. Plaintiffs entered that agreement knowing that Carrier Defendants played an essential role in performance of that agreement and were granted substantial rights and benefits by that agreement. Plaintiffs, sophisticated business entities, approved an arbitration clause that used the broadest of language regarding scope and did not even limit its application to parties to the CSC Agreement. Plaintiffs also agreed that any challenge to the validity of the CSC Agreement would be heard in individual arbitration in the Commonwealth of Virginia under Virginia procedural and substantive law. Accordingly, Plaintiffs should not be allowed to evade their obligation to arbitrate under the agreement and the FAA by naming only non-signatories as defendants and artificially excluding signatories from defendant status with the fig leaf "co-conspirator."

## 2. Carrier Defendants Also May Enforce The CSC Arbitration Agreement As Third-Party Beneficiaries.

In the alternative, the Court should compel Plaintiffs to arbitrate their claims with Carrier Defendants as third-party beneficiaries to the CSC Arbitration Agreement. It is well established under Virginia law that "under certain circumstances, a party may sue to enforce the terms of a contract even though he is not a party to the contract." *Levine v. Selective Ins. Co. of Am.*, 462 S.E.2d 81, 83 (Va. 1995); *see also* Va. Code Ann. § 55–22. A third party may enforce a contract when "the third party ... show[s] that the parties to the contract clearly and definitely intended it to confer a benefit upon him." *Ward v. Ernst & Young*, 435 S.E.2d 628, 634 (Va. 1993) (internal citation omitted). "To determine the parties' intent, the Court considers the contract in light of all surrounding circumstances to qualify that party as a third party beneficiary." *Bostic v. Global*

*Strategies Grp., Inc.*, Civ. A. No. 96-1090-A, 1996 WL 729853, at *1 (E.D. Va. Nov. 22, 1996) (citation omitted); *see also First Sec. Fed. Savs. Bank, Inc. v. McQuilken*, 80 S.E.2d 485, 488 (Va. 1997) ("the language of the ... agreement established that the parties intended to confer a benefit" on third parties).  "[A]s with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability."  *Mitsubishi Motor Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985).

Here, it is plain from the face of the CSC Agreement that the signatories intended to confer numerous rights and benefits directly on the Carrier Defendants.  In particular, the agreement provides that Carrier Defendants may restrict a CSC registrant's ability to use a CSC if that registrant provides inaccurate, incomplete, or out-dated information in establishing an account, Connelly Ex. A ¶ 3, or if the registrant violates CTIA's AUP, *id.* ¶¶ 5, 7(b).  By the agreement, CSC registrants, such as these Plaintiffs, "consent to the disclosure of any Data or other information to any governmental agency ... to protect the rights or property of" Carrier Defendants, among others.  *Id.* ¶ 6.  The agreement also disclaims any responsibility on the part of Carrier Defendants for any conflict, dispute, or claim against the CSC registrant relating to a CSC, such as trademark infringement or defamation, among other claims.  *Id.* ¶ 10.  Further, it expressly limits the liability of CTIA and each of its Members—namely, Carrier Defendants— for damages.  *Id.* ¶ 15.  Finally, CSC Lessees agree "to indemnify, defend and hold harmless ... the 'Participating Carriers' ... from any claim or demand ... made by any third party due to or arising out of or relating to" the CSC, among other things.  *Id.* ¶ 16.  As written and alleged, the CSC Agreement exists in large part for the benefit of Carrier Defendants.

Finally, the broad scope of the arbitration provision evidences an intent to bring all disputes bearing some connection to the CSC Agreement within its coverage.  The arbitration

agreement extends to "[a]ny dispute, controversy, or claim arising out of or relating to th[e] Agreement," Connelly Ex. A ¶ 19, without any stated limit on the persons or entities authorized to invoke it.  In short, Carrier Defendants are obvious third-party beneficiaries of the CSC Agreement and are entitled to enforce the terms of the exceedingly broad arbitration provision contained in that agreement.

The Court need not go further than the CSC Agreement to grant Carrier Defendants' Motion to Compel Arbitration and stay further proceedings in this case.  CTIA, WMC, and Carrier Defendants all have the right to compel individual arbitration against each of the named Plaintiffs in Loudoun County, Virginia before a panel of three arbitrators applying Virginia law.

### C. **Carrier Defendants May Enforce The Arbitration Clauses In The Aggregator Agreements With The Named Plaintiffs.**

The CSC Agreement, placed in the record by CTIA, and the CAC are all the Court need review in order to compel arbitration as to CTIA, WMC, and Carrier Defendants.  In the alternative, Plaintiffs' agreements to arbitrate with Aggregator Defendants, Open Market and mBlox, provide an independent basis for this Court to compel Plaintiffs to arbitrate their claims with Carrier Defendants.  Equally important, the presence of these arbitration agreements in contracts that further establish the workings of the CSC system reinforces the point that Plaintiffs were well aware that any challenges to the CSC system, as against CTIA, the carriers or the aggregators, would be subject to individual arbitration in some forum.  The presence of arbitration clauses in the CSC Agreement and the mBlox and OpenMarket agreements precludes any argument that Plaintiffs had an expectation they could seek any form of relief in this Court.

Aggregators "provide[] connectivity from wireless carriers' subscribers for the purpose of connecting to CSC campaigns."  Connelly Ex. A ¶ 1; *accord* Joint Aggregators' Brief, Emmett Ex. A ¶ 3.33; Joint Aggregators' Brief, Cowell Ex. A ¶¶ 1.1.17-.18; CAC ¶¶ 31-39.  Plaintiffs

signed commercial services agreements to transmit CSCs with Aggregator Defendants OpenMarket and/or mBlox.  These agreements contain broad arbitration clauses to which Plaintiffs are bound.  Aggregator Defendants plainly may avail themselves directly of these arbitration clauses, and all of Plaintiffs' claims fall squarely within the scope of these provisions. *See supra* at 7-8; *see also* Joint Aggregators' Brief at 11-17.

Carrier Defendants likewise may enforce these arbitration clauses through two independent doctrines of third-party enforcement: equitable estoppel and third-party beneficiary theory.  Although not signatories, here again, Carrier Defendants are specifically identified by their own defined terms in these agreements, *see* Joint Aggregators' Brief, Emmett Ex. A ¶ 3.23; Joint Aggregators' Brief, Cowell Ex. A ¶ 1.1.19, sometimes even referred to specifically by name, *see* Joint Aggregators' Brief, Emmett Ex. A, Addendum ¶ 5.[5]  The Aggregator Agreements govern the connectivity of CSCs traveling onto the carriers' networks.  The CSC Agreement denominates the players in the CSC system, defines their general roles, and sets certain price terms and conditions of use of common short codes.  The Aggregator Agreements (which are specifically contemplated in the CSC Agreement) govern the final links in the chain, transmission of content from the content providers through the Aggregator Defendants to the Carrier Defendants.  In essence, there exists a web of interrelated agreements, each one of which requires arbitration of Plaintiffs' claims.

### 1. Carrier Defendants May Enforce The OpenMarket And mBlox Arbitration Clauses Under Equitable Estoppel Principles.

As discussed above, Plaintiffs will be required to arbitrate their claims against non-signatories if those claims are "intertwined" with the contract that contains the arbitration

---

[5]      The same Addendum contains a specific mention of the CSC Lease Agreement and the obligation of the content provider to abide by the terms of that agreement.  *Id.* ¶ 9.

provision and if Plaintiffs allege "substantially interdependent and concerted misconduct" by the non-signatory and signatories to the contract. *See supra* at 9-10.[6]

*Intertwinement with Agreement.* Plaintiffs' claims "arise out of and relate directly to" their contractual relationships with Defendants OpenMarket and mBlox. Plaintiffs allege that each Aggregator, including OpenMarket and mBlox, "has provided connection services between CSC Lessees and the networks controlled by the Carrier Defendants," CAC ¶¶ 33-34, and the Aggregator Agreements govern these relationships, *see* Joint Aggregators' Brief, Emmett Ex. A ¶¶ 3.33, 7.2; Joint Aggregators' Brief, Cowell Ex. A ¶ 1.1.16.

Plaintiffs also allege substantial intertwinement between Carrier Defendants and Aggregator Defendants. As alleged, "all CSC Lessees had to transmit their A2P SMS through aggregators." CAC ¶ 92; *accord id.* ¶ 94. Simply put, if not for the aggregators, Plaintiffs could not have sent the short code communications that form the basis for their claims. Plaintiffs allege that Aggregator Defendants collect various fees for Carrier Defendants, *id.* ¶¶ 85, 96. Plaintiffs also contend that Aggregator Defendants and Carrier Defendants "agreed upon" the per-message fees "universally imposed on CSC Lessees," *id.* ¶ 98, and split those fees between them, *id.* ¶ 97. Not surprisingly, Plaintiffs are obligated to pay such fees under their agreements with OpenMarket and mBlox. Joint Aggregators' Brief, Emmett Ex. A ¶¶ 3.12, 3.24, 4.1; Joint Aggregators' Brief, Cowell Ex. A ¶¶ 1.1.17-18, 5.4.

Further, Plaintiffs claim that Aggregator Defendants audit CSC Lessees' content, CAC ¶ 96, and "terminated or threatened to terminate the connections of any CSC Lessee" in certain circumstances, *id.* ¶ 102. Yet, the Aggregator Agreements plainly contemplate a role for

---

[6]     Although Plaintiff iSpeedBuy has no identified contractual relationship with any Aggregator Defendant, iSpeedBuy's claims are fully arbitrable just the same as the claims of Plaintiffs Club Texting and Text Power. *See* Joint Aggregators' Brief 14-16.

Aggregator Defendants (*and* Carrier Defendants) in approvals and content monitoring.   Joint Aggregators' Brief, Emmett Ex. A ¶¶ 3.31, 6.2.2, 9.1, 9.2; Joint Aggregators' Brief, Cowell Ex. A ¶¶ 3.9.   Moreover, the Aggregator Agreements expressly authorize the Aggregators to terminate their agreements with content providers, such as Plaintiffs, for violations of content restrictions adopted by the Carrier Defendants.   *See* Joint Aggregators' Brief, Emmett Ex. A ¶ 5.3.1; Joint Aggregators' Brief, Cowell Ex. A ¶ 10.2.1.

Both the terms of the OpenMarket and mBlox Agreements, as well as Plaintiffs' allegations in the CAC, reveal the existence of a sufficiently close relationship between Carrier Defendants and these aggregators such that Plaintiffs "should be estopped from denying an obligation to arbitrate" the *same dispute* with the Carrier Defendants.   *See Ragone*, 595 F.3d at 127.   If nothing else, Plaintiffs can be charged with awareness that the Carrier Defendants enjoyed their own defined terms under both the mBlox and OpenMarket agreements.   The OpenMarket Agreement directly references Carrier Defendants *61 times* throughout the entire agreement.   *See generally* Joint Aggregators' Brief, Emmett Ex. A.   The mBlox Agreement similarly mentions Carrier Defendants *55 times*.   *See generally* Joint Aggregators' Brief, Cowell Ex. A.   Plaintiffs did not contract with the Aggregator Defendants for any purpose other than to get their messages before the Carrier Defendants' subscribers.   It is hard to conceive of more "intertwinement."   Equitable considerations compel Plaintiffs to adhere to their agreements to arbitrate as to all players in this web of contractual obligations.

***Alleged Interdependent and Concerted Misconduct.***   In addition, Plaintiffs allege that Aggregator Defendants and Carrier Defendants were integral parts of the same alleged conspiracy.   The Complaint dubs Aggregator Defendants the "enforcers of the CSC system and

Defendants' conspiracy[.]" CAC ¶ 101.[7]  It asserts that each Aggregator Defendant "contracted and conspired with the Carrier Defendants to connect CSC Lessees to the Carrier Defendants," *id*. ¶ 95.  And Aggregator Defendants allegedly "also understood that they play an instrumental role in the illegal conspiracy," *id*. ¶ 103.  Indeed, Plaintiffs allege that the terms of the OpenMarket and mBlox Agreements are dictated by agreements between Carrier Defendants and Aggregator Defendants.  *See, e.g.*, *id*. ¶¶ 95-96.  On Plaintiffs' own allegations, a relationship among the parties exists such that Plaintiffs should be estopped from denying an obligation to arbitrate with non-aggregator defendants.  Indeed, these "allegations of substantially interdependent and concerted misconduct by" Carrier Defendants and Aggregator Defendants establish that equitable estoppel is warranted under the second criterion as well.  *See Am. Bankers*, 453 F.3d at 627 n.3.

### 2.  Carrier Defendants May Enforce The OpenMarket Agreement Under Third-Party Beneficiary Principles.

Carrier Defendants also are entitled to compel TextPower to arbitrate its claims as third-party beneficiaries of the OpenMarket Agreement.  New York courts have held that a non-signatory may enforce an arbitration provision if the non-signatory is a "third-party intended beneficiary" of the agreement.  *Schatz v. Blanchard*, 664 N.Y.S.2d 46, 47 (App. Div. 1997); *see also Crawford v. Feldman*, 604 N.Y.S.2d 585, 587 (App. Div. 1993).  To do so, a third-party beneficiary must establish that (1) a valid, binding contract exists between other parties, (2) the parties intended that the contract benefit the third-party, and (3) the benefit to the third-party "is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting

---

[7]     Carrier Defendants do not vouch for the accuracy of Plaintiffs' allegations.  Rather, they rely on the allegations solely to illustrate that, having alleged concerted action, Plaintiffs must be estopped from arguing that their "claims against [Carrier Defendants] are not connected to [Carrier Defendants'] relationship with [Aggregator Defendants]."  *See Denney*, 412 F.3d at 70.

parties of a duty to compensate [them] if the benefit is lost." *Mendel v. Henry Phipps Plaza W., Inc.*, 844 N.E.2d 748, 786 (N.Y. 2006).   An intended third-party beneficiary need not be identified specifically in the agreement. *Spear, Leeds & Kellogg v. Cent. Life Assurance Co.*, 85 F.3d 21, 27 (2d Cir. 1996) (citing Rest. (2d) Contracts § 308 cmt a (1981)).

Carrier Defendants are entitled to compel arbitration of TextPower's claims because they are intended third-party beneficiaries of the OpenMarket Agreement.   A valid and binding contract exists between TextPower and OpenMarket.   Plaintiffs cannot contend otherwise, as at least one named Plaintiff "sent its A2P SMS through" OpenMarket.   *See* CAC ¶¶ 21-23.   In addition, the OpenMarket Agreement plainly reveals the intent of the parties to benefit wireless carriers.   As noted above, Carrier Defendants have their own defined term in the agreement, and that term is used *61 times* in the agreement to assign numerous economic and non-economic rights and benefits to the Carrier Defendants.   *See generally* Joint Aggregators' Brief, Emmett Ex. A.   OpenMarket  transmits data to and/or from wireless carriers' networks, *id*. ¶ 3.33, and the Agreement contemplates that OpenMarket and, indirectly, CSC Lessees will pay fees to carriers for the service, *id*. ¶ 3.24.   The OpenMarket Agreement requires CSC Lessees to comply with carriers' policies, terms and conditions, *id*. ¶ 10.5; *accord id*. ¶¶ 6.1.2, 6.1.4, and provides for suspension or termination and damages *for carriers* upon breach or non-compliance with such policies, *id*. ¶¶ 5.2, 5.3.1, 6.1.2-.4.   It contemplates a right for carriers to review and approve content before a CSC is activated, *id*. ¶¶ 9.1-9.2, and limits carriers' liability for A2P SMS messages that are deleted or which do not reach their intended recipients, irrespective of the reason, *id*. ¶ 10.1.1.   Finally, under the OpenMarket Agreement, carriers have the right to intercept messages sent over their networks in certain circumstances, *id*. ¶ 10.3.

Further, the OpenMarket Agreement benefits Carrier Defendants in a "sufficiently immediate," and not merely "incidental," way. *Mendel*, 844 N.E.2d at 786. Like the CSC Agreement clause, the OpenMarket arbitration clause does not purport to limit the right to arbitrate to "parties" or "signatories." Rather, its broad language provides that "[*a*]*ny claim* arising out or relating to this Agreement not resolved by good faith negotiations shall be resolved exclusively by arbitration[.]" Joint Aggregators' Brief, Emmett Ex. A ¶ 14.5 (emphasis added). Thus, in the alternative, TextPower must arbitrate its claims with Carrier Defendants under the OpenMarket Agreement.

### D. *Stolt-Nielsen* Requires That Arbitration Must Be Conducted On An Individual Rather Than Class-Wide Basis.

Because none of the arbitration agreements at issue here authorizes any form of class or collective treatment of claims, Plaintiffs must pursue their disputes against Carrier Defendants via individual arbitration. Whether class arbitration is authorized is an issue for the Court to decide, *see, e.g.*, *Safra Nat'l Bank v. Penfold Invest. Trading, Ltd.*, 2011 WL 1672467, at *3 (S.D.N.Y. Apr. 20, 2011), and must be guided by the Supreme Court's holding that "silence on the issue of class-action arbitration" is not a legitimate basis from which to infer "[a]n implicit agreement to authorize class-action arbitration[.]" *Stolt-Nielsen,* 130 S. Ct. at 1775-76.

In *Stolt-Nielsen*, the Supreme Court held that "a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party agreed to do so." 130 S. Ct. at 1775. As the Court explained, "class-action arbitration changes the nature of arbitration to such a degree that it cannot be presumed the parties consented to it by agreeing to submit their disputes to an arbitrator." *Id.* Indeed, the Court opined that, "[i]n bilateral arbitration, parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed, and

the ability to choose expert adjudicators to resolve specialized disputes." *Id.*   In contrast, the Court reasoned, the "relative benefits of class-action arbitration are much less assured, giving reason to doubt the parties' mutual consent to resolve disputes through class-wide arbitration." *Id.* at 1775-76.   Because of the "fundamental changes brought about by the shift from bilateral arbitration to class-action arbitration," no intent to require class arbitration can be presumed if an agreement is silent with respect to class procedures.   *Id.* at 1776.

None of the three arbitration agreements in question here authorizes or even mentions collective treatment of claims.    Under *Stolt-Nielsen*, that fact alone would preclude class arbitration of the claims in the CAC.    Moreover, the CSC Arbitration Agreement expressly adopts Virginia's state procedural rules to govern the conduct of the arbitration.    Connelly Ex. A ¶ 19.   It is well-settled that Virginia does not provide for class proceedings, *see, e.g.*, *Casey v. Merck & Co.*, 722 S.E.2d 842, 846 (Va. 2012) ("Virginia jurisprudence does not recognize class actions."); *Commonwealth v. Supportkids, Inc.*, 77 Va. Cir. 155 (2008); *Almeter v. Va. Dep't of Taxation*, 53 Va. Cir. 429 (Va. Cir. Ct. 2000); *see also* Kent Sinclair & Leigh B. Middleditch, Jr., Virginia Civil Procedure § 3.11 (5th ed. 2003).   By adopting Virginia law for "all questions of arbitral procedure, arbitral review, scope of arbitral authority, and arbitral enforcement," Connelly Ex. A ¶ 19, the CSC Arbitration Agreement thus operates to preclude class treatment of claims in a manner consistent with both *Stolt-Nielsen* and *Concepcion*.   This Court should thus stay this action pursuant to Section 3 of the FAA and compel Plaintiffs to arbitrate their claims against Carrier Defendants on an individual basis.[8]

---

[8]        Carrier Defendants believe that each of the pending motions to compel arbitration is meritorious and should be granted.   However, in the unlikely event the Court finds any claims against Carrier Defendants non-arbitrable, a stay of any further litigation against Carrier Defendants in this Court would nonetheless be appropriate pending arbitration of claims as against any Defendant.   *See WorldCrisa*, 129 F.3d at 76; *Alghanim*, 828 F. Supp. 2d at 664.

* * *

Plaintiffs have indicated that they intend to rely on *In re American Express Merchants' Litigation*, 667 F.3d 204, *reh'g den.*, 681 F.3d 139 (2d Cir. 2012) ("*Amex III*"), in an attempt to avoid arbitration. Under *Amex III*, Plaintiffs bear the burden of making a significant and detailed evidentiary showing that the cost of proving their antitrust claims so far exceeds the potential damages as to make it unrealistic for them to vindicate those claims on an individual basis in arbitration. If Plaintiffs invoke *Amex III*, Carrier Defendants stand ready to refute any such showing on numerous grounds. More importantly, a petition for certiorari in *Amex III* was filed at the Supreme Court on July 30, 2012. The possibility of further review by the High Court is substantial, given the number and fervency of dissents and the conflict in the Circuits identified by the dissenters from the denial of *en banc* review. *See In re Am. Express Merchs.' Litig.*, 681 F.3d 139, 143 (2d Cir. 2012) (Jacobs, C.J., dissenting from the denial of rehearing *en banc*); *see also id.* at 149 (Cabranes, J., dissenting from the denial of rehearing *in banc*); *id.* (Raggi, J., dissenting from the denial of rehearing *en banc*). Carrier Defendants agree with the *en banc* dissenters that *Amex III* is contrary to Supreme Court precedent and wrongly decided, and thus expressly preserve this issue for further proceedings. The petition in *Amex III* is likely to be acted upon by the Supreme Court in mid-October—before briefing is even completed on Defendants' motions to compel arbitration, and if granted, may necessitate a stay of this Motion pending resolution of that case by the Supreme Court.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Carrier Defendants respectfully request that the Court grant this Motion, compel Plaintiffs to arbitrate all claims set forth in the Consolidated Amended Class Action Complaint on an individual basis, and stay this litigation pending arbitration.

Dated: New York, New York         Respectfully submitted,
      August 14, 2012

CELLCO PARTNERSHIP, D/B/A VERIZON    T-MOBILE USA, INC.
WIRELESS

/s/ Andrew G. McBride          Christopher B. Hockett (admitted pro hac vice)
Andrew G. McBride (AM1966)     Micah G. Block (admitted pro hac vice)
WILEY REIN LLP         DAVIS POLK & WARDWELL
1776 K Street, NW        1600 El Camino Real
Washington, DC 20006      Menlo Park, CA 94025
Telephone: (202) 719-7000     Telephone: (650) 752-2009
Email: amcbride@wileyrein.com    Email: chris.hockett@davispolk.com
                   micah.block@davispolk.com

Luke A. Connelly         Joel M. Cohen
WINSTON & STRAWN LLP     DAVIS POLK & WARDWELL
MetLife Building         450 Lexington Avenue
200 Park Avenue        New York, NY 10017
New York, New York 10166    Telephone: (212) 450-4592
Telephone: (212) 294-6882    Email: joel.cohen@davispolk.com
Email: lconnelly@winston.com

Thomas J. Frederick       SPRINT NEXTEL CORPORATION
WINSTON & STRAWN LLP
35 West Wacker Drive       John E. Schmidtlein (admitted pro hac vice)
Chicago, Illinois 60601      Michael V. Pinkel (admitted pro hac vice)
Telephone: (312) 558-5983     Megan A. Hughes
Email: tfrederick@winston.com    WILLIAMS & CONNOLLY LLP
                 725 Twelfth Street, N.W.
Of Counsel:          Washington, D.C. 20005
Aaron M. Panner        Telephone: (202) 434-5000
Brendan J. Crimmins       Email: jschmidtlein@wc.com
KELLOGG, HUBER, HANSEN,          mpinkel@wc.com
TODD, EVANS & FIGEL, P.L.L.C.         mhughes@wc.com
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Email: apanner@khhte.com
      bcrimmins@khhte.com

(cont.)

Thomas R. McCarthy
Christiane M. McKnight
WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
Telephone: (202) 719-7000
Email:  tmccarthy@wileyrein.com
        cmcknight@wileyrein.com


AT&T MOBILITY LLC

Steven M. Bierman
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
E-mail: sbierman@sidley.com

John W. Treece
Linton J. Childs
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
E-mail: jtreece@sidley.com
        lchilds@sidley.com


U.S. CELLULAR CORPORATION

Lawrence Kill
Carrie Maylor DiCanio
ANDERSON KILL & OLICK P.C.
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 278-1000
Email: lkill@andersonkill.com
        cdicanio@andersonkill.com