**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: SMS. ANTITRUST LITIGATION | ) MASTER FILE: 12 CV 2656 (AJN) |
| | ) |
| _____ | ) |
| | ) |
| THIS DOCUMENT RELATES TO: | ) |
| All Actions | ) |
| _____ | ) |

## SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs TextPower, Inc. ("TextPower"), Club Texting, Inc. ("Club Texting") and

iSpeedbuy LLC ("iSpeedbuy") (collectively "Plaintiffs"), by and through undersigned counsel,

on behalf of themselves and all others similarly situated, allege as follows against defendants

AT&T Mobility LLC, Cellco Partnership d/b/a/ Verizon Wireless, Sprint Nextel Corporation,  T-

Mobile USA, Inc., U.S. Cellular Corporation, CTIA-The Wireless Association, Air2Web Inc.,

Ericsson Inc., Mblox Incorporated, OpenMarket, Inc., Vibes Media, Sybase Inc., Soundbite

Communications, Inc., Syniverse Technologies, Inc., 2ergo Americas Inc., 3Cinteractive, LLC,

and WMC Global, Inc. (collectively "Defendants"):

## NATURE OF ACTION

1.      Plaintiffs bring this suit against Defendants for their violations of Sections 1 and 2

of the Sherman Act of 1890 (the "Sherman Act"), 15 U.S.C. §§ 1 and 2.

2.      Text messages are short electronic messages transmitted over a cellular network,

generally to cell phones, but also from, to or between other wireless communications devices.

Text messages are sometimes called SMS (for short message service).

3.      Text messages may be either person-to-person ("P2P") or application-to-person

("A2P"), that is, between businesses or institutions and consumers.  Thus, a transmission of a

text message between consumers and businesses or institutions is here called an "A2P SMS" transmission.  Such messages can be transmitted using five-, six- or ten-digit numbers.

4.     A2P SMS may be sent to many customers when those customers have indicated a willingness to receive such messages.  A2P SMS are opt-in, meaning that the recipient requests the content and consents to receiving the A2P SMS.

5.     A2P SMS are often, but not always, sent at a high volume per minute, such as when a non-profit entity sends an update to many interested contributors, an emergency message is sent from a school to students and parents, or many consumers send a message to a business for information on a service.

6.     Defendants AT&T Mobility LLC, Cellco Partnership d/b/a/ Verizon Wireless, Sprint Nextel Corporation, T-Mobile USA, Inc., U.S. Cellular Corporation and Alltel Wireless (until it was acquired by Verizon Wireless on January 9, 2009) (referred to collectively as the "Carrier Defendants") conspired to set up a system in 2003 under which persons transmitting A2P SMS could not use inexpensive ten-digit telephone numbers, but were forced to use "common short codes" ("CSCs") – five-digit (and later six-digit) numbers – at materially higher lease and transmission charges with additional fees for connectivity and content review, all of which resulted in substantial overcharges to persons transmitting A2P SMS ("CSC Lessees") and materially higher revenues for the Carrier Defendants and other Defendants.

7.     The Carrier Defendants used their control of Defendant CTIA-The Wireless Association (the "CTIA"), the trade association to which the vast majority of the carriers in the United States belong, to cause the CTIA to issue guidelines and rules prescribing the use of five-digit (and later six-digit) CSCs for transmission of A2P SMS, inhibiting the use of standard ten-

ten-digit numbers for transmission of A2P SMS, and imposing volume limits on text messages sent from ten-digit numbers.

8.      Through the CTIA, the Carrier Defendants established co-conspirator Neustar, Inc. ("Neustar") as the "CSC Administrator," the only entity that could issue CSCs with access to the Carrier Defendants.

9.      The Carrier Defendants agreed to prohibit users of CSCs from sending A2P SMS directly to the Carrier Defendants and instead required them to send such messages through a limited number of companies known as aggregators.  The Carrier Defendants entered into contracts with these aggregators controlling the per-message transmission prices to be charged to CSC Lessees, requiring the aggregators to enforce the system by blocking all A2P SMS sent from standard ten-digit telephone numbers, and requiring the aggregators to collect for the Carrier Defendants unnecessary program review fees from CSC Lessees.

10.     Defendants (except WMC Global, Inc. ("WMC")) and co-conspirator Neustar collectively imposed connection, transmission, lease and review fees upon CSC Lessees that previously did not exist or were far higher than what CSC Lessees would have paid if CSC Lessees were allowed to use ten-digit numbers and standard transmission procedures.  The conspirators have thus been able to reap and divide supra-competitive profits from their conspiracy.

11.     On behalf of the Carrier Defendants and the CTIA, Defendant WMC has audited the content of A2P SMS.  The CTIA, the Carrier Defendants and the aggregators named as Defendants also audit the content of A2P SMS.  If CSC Lessees are deemed to be non-compliant with certain content guidelines, their CSCs may be blocked.  This threat artificially increases the number of CSCs a CSC Lessee must obtain in order to avoid losing its ability to transmit content.

12.     The establishment of the CSC system, which generates approximately $2.3 billion in revenues annually and continues to this day, has permitted the Defendants and co-conspirator Neustar to jointly control and anti-competitively exploit the transmission of A2P SMS and to eliminate the lower-priced ten-digit telephone number alternative for use in A2P SMS transmission.

13.     Plaintiffs, CSC Lessees who transmit large volumes of A2P SMS, have been forced to pay excessive, inflated and unnecessary charges.

14.     Plaintiffs seek to represent a class of CSC Lessees who, on or after April 5, 2008, leased CSCs from Neustar and sent A2P SMS through one or more aggregators (the "Class").

15.     Plaintiffs on their own behalf and on behalf of the Class bring this class action seeking treble damages, injunctive relief and any other relief the Court deems proper.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act of 1914 (the "Clayton Act"), 15 U.S.C. §§ 15, 26, and Sections 1331 and 1337 of the United States Judicial Code, 28 U.S.C. §§ 1331 and 1337.

17.     Venue is appropriate in this district pursuant to Sections 4(a), 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 22 and 26, and Sections 1391(b), (c) and (d) of the United States Judicial Code, 28 U.S.C. § 1391(b), (c) and (d), because one or more of the Defendants reside, are licensed to do business, are doing business, transact business, are found or have agents in this district, and because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district.

18.     Personal jurisdiction over each of the Defendants is proper in this district pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, in that each of the Defendants resides, is found, transacts business, or has an agent in this district.

19.     Personal jurisdiction over each of the Defendants is also proper in New York in that the claims asserted here arise from one or more of the following acts:

a.   Each of the Defendants, in person or through an agent, transacts business within New York or has consented to supply services in New York; or

b.   Each of the Defendants, in person or through an agent, has committed a tortious act within New York; or

c.   Each of the Defendants, in person or through an agent, committed a tortious act outside New York causing injury to persons or property within New York and regularly does or solicits business in New York; or

d.   Each of the Defendants, in person or through an agent, committed a tortious act outside New York causing injury to persons or property within New York; each expected or should reasonably have expected the act to have consequences in the State of New York; and each derived substantial revenue from interstate or international commerce.

20.     The activities of the Defendants and their co-conspirators were within the flow of, and were intended to, and did, have direct, substantial and reasonably foreseeable effects on the interstate commerce of the United States.

## PARTIES

### Plaintiffs

21.    Plaintiff Club Texting is a New York corporation with its principal place of business at 100 Hudson Street, 2nd Floor, Hoboken, New Jersey 07030.  Club Texting provides a platform for marketing goods and services via text messaging.  During 2008 through 2012, Club Texting 1) leased approximately nine CSCs from Neustar; 2) purchased A2P SMS from one or more of the aggregators named as Defendants in this Complaint; 3) sent its A2P SMS through one or more of the aggregators named as Defendants in this Complaint; 4) transmitted A2P SMS that reached customers of the Carrier Defendants; and 5) received A2P SMS from customers of the Carrier Defendants.  Club Texting has paid CSC lease fees, per-message fees, connectivity fees and program-review fees during the time relevant to this Complaint.   Club Texting is subject to content audits and any sanctions associated with content audits.

22.    Plaintiff TextPower is a California corporation established in 2008 with its principal place of business at 27134-A Paseo Espada, Suite 324, San Juan Capistrano, California 92675.  TextPower transmits content via A2P SMS.  TextPower 1) during 2009 through 2012, leased seven CSCs from Neustar; 2) in January 2010 entered into a contract with defendant aggregator OpenMarket, Inc., under which TextPower purchased and sent A2P SMS in 2010 through 2012; 3) in 2010 through 2012 , purchased A2P SMS from one or more of the aggregators named as Defendants in this Complaint; 4) in 2010 through 2012, sent its A2P SMS through one or more of the aggregators involved in the conspiracy; 5) in 2010 through 2012, transmitted A2P SMS that reached customers of the Carrier Defendants; and 6) in 2010 through 2012, received A2P SMS from customers of the Carrier Defendants.  TextPower has paid CSC lease fees, per-message fees, connectivity fees, and program-review fees during the time period

relevant to this Complaint.  TextPower is subject to content audits and any sanctions associated with content audits.

23.     Plaintiff iSpeedbuy is a Maryland limited liability company established in 2008 with its principal place of business at 14830 Sapling Way, Glenelg, Maryland 21737.  iSpeedbuy transmits content via A2P SMS.  During 2009 through 2012, iSpeedbuy 1) leased one CSC from Neustar; 2) purchased A2P SMS from one or more of the aggregators named as Defendants in this Complaint; 3) sent its A2P SMS through one or more of the aggregators involved in the conspiracy; 4) transmitted A2P SMS that reached customers of the Carrier Defendants; and 5) received A2P SMS from customers of the Carrier Defendants.  iSpeedbuy has paid CSC lease fees, per-message fees, connectivity fees, and program-review fees during the time period relevant to this Complaint.  iSpeedbuy is subject to content audits and any sanctions associated with content audits.

**Defendants**

24.     Defendant Cellco Partnership d/b/a/ Verizon Wireless ("Verizon Wireless") is a Delaware partnership with its principal place of business at 1 Verizon Wireless Way, Basking Ridge, New Jersey 07920.  It is a joint venture of Verizon Communications Inc. (55%), which has its principal place of business at 140 West Street, New York, New York 10007, and Vodafone Group PLC (45%), which has its principal place of business at Newbury, Berkshire RG14 2FN, England.  Verizon Wireless is registered to do business in New York.  Verizon Wireless's telecommunications network has the largest number of subscribers in the United States.  At all relevant times, Verizon Wireless customers received and sent A2P SMS.

25.     On or about January 9, 2009, Verizon Wireless acquired Alltel Wireless ("Alltel"), the then fifth largest provider of wireless services in the United States.  At all relevant times until January 9, 2009, Alltel customers received and sent A2P SMS.

26.     Defendant AT&T Mobility LLC ("AT&T") is a Delaware corporation with its principal place of business at 5565 Glenridge Connector, Atlanta, Georgia 30342.  AT&T is registered to do business in New York.  It is the second largest provider of wireless services in the United States.  Until January 2007, AT&T Mobility was known as Cingular Wireless LLC. At all relevant times, AT&T customers received and sent A2P SMS.

27.     Defendant Sprint Nextel Corporation ("Sprint") is a Kansas corporation with its principal place of business at 650 Sprint Parkway, HL-5A STX, Overland Park, Kansas 66251. It is the third largest provider of wireless services in the United States.  Sprint was formed in August 2005 after the acquisition of Nextel Communications by Sprint Corporation.  At all relevant times, Sprint customers received and sent A2P SMS.

28.     Defendant T-Mobile USA, Inc. ("T-Mobile") is a Delaware corporation with its principal place of business at 12920 SE 38th Street, Bellevue, Washington 98006.  T-Mobile is registered to do business in New York.  It is the fourth largest provider of wireless services in the United States.  At all relevant times, T-Mobile customers received and sent A2P SMS.

29.     Defendant U.S. Cellular Corporation ("U.S. Cellular") is a Delaware corporation with its principal place of business at 8410 W. Bryn Mawr, Chicago, Illinois, 60631.  U.S. Cellular is the sixth largest provider of wireless services in the United States and services more than 200,000 customers in the State of New York.  On its current website, U.S. Cellular states: "U.S. Cellular has a high-speed nationwide network with operations in the following 26 states: California, Illinois, Indiana, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Missouri,

Nebraska, New Hampshire, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia and Wisconsin." *See* http://www.uscellular.com/uscellular/support/faq/faqDetails.jsp?topic=press-room.html#a5 (last visited September 16, 2012). U.S. Cellular operates under a unified brand name and logo (U.S. Cellular) across all its markets. U.S. Cellular groups its markets into five geographic areas, one of which is New York, to offer its customers large service areas that primarily use U.S. Cellular's network. U.S. Cellular has sought, and received, designation as a telecommunications carrier eligible to receive universal service support payments to provide specified services in "high cost" areas in 16 states, including New York, and, in 2011, received $160.5 million in such payments for providing such service in those states. At all relevant times, U.S. Cellular customers received and sent A2P SMS.

30.    U.S. Cellular has several wholly-owned subsidiary companies organized and doing business in the State of New York: Champlain Cellular Inc., Crown Point Cellular Inc., Newport Cellular Inc., and Westelcom Cellular Inc. Each of these corporations has represented that its Chairman is LeRoy T. Carlson, Jr. and its President is Mary N. Dillon, who are also chairman and president, respectively, of U.S. Cellular. In addition, each of these corporations shares several executive officers with members of U.S. Cellular's "Leadership Team" (*i.e.*, management). U.S. Cellular and its wholly-owned subsidiaries operate as one reportable segment.

31.    U.S. Cellular directly and through its wholly-owned New York subsidiaries is a majority partner with Verizon Wireless in New York partnerships doing business in New York. U.S. Cellular owns 60% of St. Lawrence Seaway RSA Cellular Partnership and, through its

wholly-owned New York subsidiaries, approximately 57% of New York RSA 2 Cellular

Partnership.

32.     Defendant CTIA is a trade organization with its principal place of business at

1400 16th Street, NW, Suite 600, Washington, D.C. 20036.  The Carrier Defendants have all

been members of the CTIA Board of Directors during the entire relevant time period.  At all

relevant times, the Carrier Defendants dominated and controlled the CTIA's activities through its

Board of Directors and through its budget.  At all relevant times, the CTIA acted as the agent of

the Carrier Defendants.  At all relevant times, the CTIA through Neustar controlled the use of

CSCs at the direction of the Carrier Defendants.

33.     Defendant Air2Web Inc. ("Air2Web") is a Georgia corporation with its principal

place of business at 250 14th Street, NW, Suite 4001, Atlanta, Georgia 30318.  Air2Web is a

CSC connection aggregator, a company that at all relevant times has provided connection

services between CSC Lessees and the networks controlled by the Carrier Defendants.

34.     Defendant Ericsson Inc. ("Ericsson") is a Swedish corporation.  Ericsson's United

States headquarters are at 6300 Legacy Drive, Plano, Texas 75024.  Ericsson is registered to do

business in New York.  Ericsson is a CSC connection aggregator, a company that at all relevant

times has provided connection services between CSC Lessees and the networks controlled by the

Carrier Defendants.

35.     Defendant MBlox, Incorporated ("MBlox") is a Delaware corporation with its

principal place of business at 430 N. Mary Avenue, Suite 100, Sunnyvale, California 94085.

MBlox is a computer software company and a CSC connection aggregator, a company that at all

relevant times has provided connection services between CSC Lessees and the networks

controlled by the Carrier Defendants.

36.     Defendant OpenMarket, Inc. ("OpenMarket") is a Michigan corporation with its principal place of business at 2211 Elliott Avenue, Suite 400, Seattle, Washington 98121. OpenMarket is registered to do business in New York.  OpenMarket is a CSC connection aggregator, a company that at all relevant times has provided connection services between CSC Lessees and the networks controlled by the Carrier Defendants.  On March 23, 2010, OpenMarket acquired MX Telecom, Inc., a CSC connection aggregator, a company that, at all relevant times until March 23, 2010, had provided connection services between CSC Lessees and the networks controlled by the Carrier Defendants.

37.     Defendant Sybase, Inc. ("Sybase") is a Delaware corporation with its principal place of business at One Sybase Drive, Dublin, California 94568.  Sybase is a large, multi-national computer software company and CSC connection aggregator, a company that at relevant times has provided connection services between CSC Lessees and the networks controlled by the Carrier Defendants.

38.     Defendant Syniverse Technologies, Inc. ("Syniverse") is a Delaware corporation with its principal place of business at 8125 Highwoods Palm Way, Tampa, Florida 33647. Syniverse is registered to do business in New York.  Syniverse is a CSC connection aggregator, a company that at all relevant times has provided connection services between CSC Lessees and the networks controlled by the Carrier Defendants.

39.     Defendant Vibes Media ("Vibes Media") is a Delaware corporation with its principal place of business at 300 W. Adams Street, 7th Floor, Chicago, Illinois 60606.  Vibes Media is a CSC connection aggregator, a company that at all relevant times has provided connection services between CSC Lessees and the networks controlled by the Carrier Defendants.

40.     Defendant 2ergo Americas Inc. ("2ergo") is District of Columbia corporation with its principal place of business at 2020 14th Street North, Suite 500, Arlington, Virginia 22201. Until February 27, 2012, 2ergo was a CSC connection aggregator, a company that at all relevant times until then provided connection services between CSC Lessees and the networks controlled by the Carrier Defendants.

41.     Defendant Soundbite Communications, Inc. ("Soundbite") is a Delaware corporation with its principal place of business at 22 Crosby Drive, Bedford, Massachusetts 01730.  On February 27, 2012, Soundbite acquired all the assets of 2ergo and, upon information and belief, the liability of 2ergo to the Plaintiffs and the Class in this action.  Soundbite is a CSC connection aggregator, a company that at all relevant times at least since February 27, 2012, has provided connection services between CSC Lessees and the networks controlled by the Carrier Defendants.

42.     Defendant 3Cinteractive, L.L.C. ("3Cinteractive") is a Delaware company with its principal place of business at 750 Park of Commerce Boulevard, Suite 400, Boca Raton, Florida, 33487.  3Cinteractive is a CSC connection aggregator, a company that at all relevant times has provided connection services between CSC Lessees and the networks controlled by the Carrier Defendants.

43.     Air2Web, Ericsson, Mblox, OpenMarket, Sybase, Syniverse, Vibes Media, 2ergo, Soundbite, and 3Cinteractive are referred to collectively as the "Aggregator Defendants."

44.     Defendant WMC is a Virginia company with its principal place of business at 601 Pennsylvania Avenue NW, South Building, Washington, D.C. 20004.  Since 2009, WMC has been retained by the CTIA and the Carrier Defendants to monitor the content being transmitted

from CSCs and to discipline CSC Lessees.  At relevant times, the Carrier Defendants and the CTIA have dominated and controlled WMC's activities.

## CO-CONSPIRATORS

45.     Neustar has conspired with Defendants (i) to require CSC Lessees to acquire CSC leases and (ii) to fix or coordinate prices for CSC leases.  Neustar is a Delaware corporation with its principal place of business at 21575 Ridgetop Circle, Sterling, Loudon County, Virginia 20166.  Neustar is the "CSC Administrator" and has been since CSCs were created in 2003. Neustar is the exclusive provider of leases for CSCs in the United States.  It is the only entity authorized to lease CSCs to CSC Lessees.  At all relevant times, the Carrier Defendants and the CTIA have dominated and controlled Neustar's activities with regard to its leasing of CSCs.

46.     Various persons and firms not named in this Complaint have conspired with Defendants (i) to require CSC Lessees to acquire CSC leases, purchase aggregator services, and submit to program review and audits and (ii) to fix or coordinate prices for CSC leases and CSC program review.  Various persons and firms not named in this Complaint have conspired with Defendants to engage in a concerted refusal to deal with CSC Lessees using ten-digit telephone numbers.  Various persons and firms not named in this Complaint have also aided Defendants in their efforts to conspire to monopolize the A2P SMS transmission market.

47.     In agreeing to and operating the CSC system, each of the Defendants acted on behalf of itself and at the direction, under the control, at the request, or on behalf of other Defendants, including U.S. Cellular.

48.     Each of the Defendants, including U.S. Cellular, had an awareness that the CSC system would have effects in New York.  The activities of the Defendants in New York were for the benefit of all Defendants, including U.S. Cellular.

## FACTUAL ALLEGATIONS

**A.     The CTIA**

49.     The CTIA, the cellular telecommunications and wireless services trade association, at all relevant times has counted among its members the vast majority of the carriers providing most of the telecommunications services in the United States, including the Carrier Defendants.

50.     Since 2002, the presidents and CEOs of the Carrier Defendants or their predecessors have continuously sat on the CTIA Board of Directors and served as officers of the CTIA.  The current Chairman Emeritus of the CTIA Board of Directors is the CEO of Sprint, the current Vice Chairman is the President and CEO of U.S. Cellular, and the current Secretary is the President and CEO of Verizon Wireless.  The President and CEO of T-Mobile and the CEO and President of AT&T are also members of the Board.

51.     Eighty to ninety percent of the CTIA's dues revenues have come from the Carrier Defendants.  The Carrier Defendants have also, throughout the relevant time period, contributed the majority of the CTIA's other revenue sources, largely for purposes of research and lobbying.

52.     The Carrier Defendants have dominated and controlled the CTIA through their financial contributions to the organization's budget and through their occupation of at least 50% of the titled officer positions on the CTIA Board of Directors in virtually every year since 2002.

53.     The CTIA and its internal working groups have provided the Defendants with the ability to interact at meetings, conferences and trade shows to address common issues and to carry out a conspiracy such as the one alleged in this Complaint.

**B.     The Effectuation of Defendants' Scheme**

54.     Defendants engaged in a four-step plan to create a system to extract the maximum amount of inflated fees from their customers.

55.     The Carrier Defendants and the CTIA created CSCs and agreed to refuse transmission to any transmitter seeking to send A2P SMS from ten-digit numbers.

56.     The Carrier Defendants agreed that they would cause the CTIA to contract with Neustar to act as the lessor of all CSCs on uniform, non-negotiable terms, including non-cost-based prices, and the Carrier Defendants would not independently lease CSCs outside Neustar.

57.     Defendants (except WMC) required all CSC Lessees to transmit their A2P SMS through aggregators enabling each of the Aggregator Defendants to charge CSC Lessees unnecessary connectivity fees and exorbitantly high per-message fees.  Revenues from these fees are shared between the Aggregator Defendants and the Carrier Defendants.

58.     Having eliminated the alternative to CSCs, Defendants set per-message fees for CSCs exponentially higher than what they had been for ten-digit numbers and added new inflated connectivity charges and program review fees and imposed unnecessary audits, through the Aggregator Defendants and WMC.

59.     Each of the Defendants, including WMC, joined the CSC system intending to participate in and further the plan and purpose of the CSC system to extract exorbitant and unnecessary fees for their benefit.

**C.     Creation of the CSC System and Boycott of Ten-Digit Numbers**

60.     In 2003, the CTIA Board of Directors, then largely comprised of the CEOs of the Carrier Defendants and other carriers, agreed to and began setting in motion a concerted

approach to A2P SMS. On March 15, 2003, the CTIA Board voted to create and implement the CSC system.

61.     Having realized that text messages were being used as a way for businesses to communicate with consumers, the Carrier Defendants decided to take advantage of the expansion of text message transmissions.

62.     The Carrier Defendants and the CTIA agreed that they would not permit the use for A2P SMS of ten-digit telephone numbers issued under the North American Numbering Plan ("NANP") and regulated by the Federal Communications Commission ("FCC"). Ten-digit numbers had been used and could continue to be used to transmit text messages. Ten-digit numbers were also being effectively used to transmit A2P SMS to reach customers outside the United States.

63.     Instead of being allowed to use 10-digit numbers regulated by the FCC, businesses would be forced into a privately-administered system using the new five-digit (later also six-digit) CSCs. The members of the CTIA, led by the Carrier Defendants, agreed that the CTIA and they would only permit the transmission of A2P SMS through five-digit (and later six-digit) CSCs; would refuse to transmit any A2P SMS through ten-digit numbers, although P2P messages would still be allowed to be transmitted through ten-digit numbers; and would require aggregators to block or restrict A2P SMS coming from ten-digit numbers. Ten-digit numbers were restricted to non-commercial P2P.

64.     At all relevant times, including since April 5, 2008, each Carrier Defendant has refused to deal with any CSC Lessee seeking to use ten-digit numbers.

65.     At all relevant times, in accordance with their agreements with the Carrier Defendants, each Aggregator Defendant has refused to deal with any CSC Lessee seeking to use

ten-digit numbers, including refusing to allow CSC Lessees to use ten-digit numbers since April 5, 2008.  In particular, since April 5, 2008, the Aggregator Defendants have falsely told customers that the transmission of A2P SMS in bulk using ten-digit numbers was illegal.

66.     Thus, any CSC Lessee seeking to reach the subscribers of any of the Carrier Defendants or any other carrier members of the CTIA (which carriers collectively control almost the entire subscriber base CSC Lessees wish to access) have had to use CSCs at all relevant times, including from April 5, 2008 to the present.

67.     The general manager of Aggregator Defendant OpenMarket, Jay Emmet, confirmed Defendants' boycott of ten-digit numbers in a May 7, 2012 interview:  "Q: Where do you stand on the long code debate? A: While long codes can offer useful capabilities, particularly in markets outside of the U.S., currently they are not authorized by U.S. carriers."

68.     Defendants' boycott has not been necessary for spam prevention, especially when less restrictive methods than a boycott have been available for management of spam.  Spam transmission is already controlled by federal law, which carries significant penalties for its violation.

69.     Users of ten-digit numbers have been just as easy to identify and prosecute for spam as users of CSCs, as ten-digit numbers have been traceable to their users.  Each carrier has records of the users assigned to each ten-digit number and has had the ability to easily identify any violator.

70.     Defendants have, without obtaining legal authorization, formed an extra-governmental agency, which has prescribed rules for the regulation and restraint of interstate commerce and provided extra-judicial methods for determination and punishment of violations, including denial of access to the Carrier Defendants' networks.

71.    The central purpose of Defendants' combination has been the achievement of economic advantage and the destruction of competition between ten-digit numbers and CSCs.

72.    The Carrier Defendants' and Aggregator Defendants' refusals to deal at all relevant times and, in particular, since April 5, 2008, have denied CSC Lessees access to ten-digit A2P SMS transmission.  Many CSC Lessees at relevant times in the past (including since April 5, 2008) and currently have desired access to ten-digit A2P SMS transmissions, because they would have been much less expensive than A2P SMS transmission via CSCs and they would have been able to be used almost immediately after the number had been obtained by the lessee.

### D.    Joint Leasing of CSCs at Non-Negotiable Prices and Refusals To Deal

73.    The Carrier Defendants and the CTIA decided that, not only would they require all transmitters of A2P SMS to use CSCs, but also that they would require that CSCs be leased from their joint selling agency, co-conspirator Neustar, under non-negotiable terms, with no possibility for any CSC Lessee to approach any Carrier Defendant directly to obtain a CSC.

74.    At all relevant times, including since April 5, 2008, all CSC Lessees have been required to lease a CSC from co-conspirator Neustar to transmit A2P SMS to any Carrier Defendant and have been unable to deal with any Carrier Defendant on a direct basis.

75.    CSC Lessees must pay, have paid until the present, and continue to pay Neustar arbitrary, non-negotiable lease rates of $500 per month for randomly selected CSCs and $1,000 per month for specific CSCs (CSCs selected by the CSC Lessee), in contrast to the $1 or less per month charged for rental of a ten-digit code.

76.    At present, approximately 4,200 CSCs are being leased from Neustar – about 40% of them specific and about 60% random.

77.     The lease rates have been and continue to be the same for every CSC Lessee leasing a CSC from Neustar, regardless of which carriers the CSC Lessee has sought to access or how the CSC has been used, and separate rates have not been available for different carriers. The rates cannot be bargained for or changed.  It has cost a CSC Lessee $500 or $1,000 per month per CSC to reach any of the Carrier Defendants' customers through A2P SMS.  These arbitrary rates have not changed since 2003 until the present, and they are not cost-based.

78.     CSCs must be leased in increments of at least three months.  For example, no CSC Lessee can lease a CSC for one month.   This restriction has unreasonably inflated costs for, and, at all relevant times, including since April 5, 2008, injured small or start-up companies that have had great difficulty in paying or could not afford to pay the costs of leasing a CSC.

79.     CSCs can never be purchased or transferred between CSC Lessees, even though CSC Lessees have sought to transfer CSC leases at relevant times, including since April 5, 2008. They can only be leased from Neustar on restricted terms.

80.     The Carrier Defendants' and the CTIA's joint sales arrangement for CSCs through Neustar is unreasonable on its face in intended and actual effect.  Neustar's prices have been unrelated to costs or value added, and the lease-only policy and refusal to allow transfer of numbers between CSC Lessees have rendered the joint sales arrangement unreasonable.

81.     The CSC lease rates Neustar has charged CSC Lessees to the present have been set in the CTIA's contract with Neustar.

82.     The Carrier Defendants have controlled the CTIA and its operation of the CSC system and set the rates in the CTIA's contract with Neustar.

83.     The CTIA has to the present collected royalty payments from all CSC leases administered by Neustar.

84.     Neustar has paid and continues to pay the CTIA millions of dollars annually in such royalties.

85.     Neustar generated approximately $15 million in the last year from the leasing of random CSCs and $20 million from the leasing of specific CSCs, a portion of which profits it has remitted in royalties to the CTIA.

86.     Neustar's revenues from CSCs have increased by millions of dollars every year for the last five years as result of increases in the number of registered CSCs.

### E.     Addition of Program Review Fees, High Per-Message Fees and Connectivity Fees

87.     In order to glean maximum profits from the CSC system, the Defendants added certain requirements and increased certain existing fees to rates far above what they had been with ten-digit numbers.

### 1.     Program Review Fees

88.     One such requirement was the program review system, to which, at all relevant times and, in particular, since April 5, 2008, each of the Plaintiffs and CSC Lessees have been subject.

89.     Unlike a user of a ten-digit code, a CSC Lessee that has paid for a CSC cannot use that CSC until the CSC Lessee has had its proposed content reviewed and approved by the Carrier Defendants.

90.     This review is accomplished through a program review system established by an agreement among the Carrier Defendants.  The review involves the evaluation of a CSC Lessee's program brief describing the proposed content of the CSC Lessee's text messages.

91.     The CSC Lessee must pay separately for each carrier's review of the CSC
Lessee's program brief, and Plaintiffs and CSC Lessees have made such payments since April 5,
2008.

92.     Program review fees have been coordinated among the Carrier Defendants, who
have all acted collectively to achieve and mandate program review fees within a certain range.
At all relevant times, and, in particular, since April 5, 2008, the Aggregator Defendants have
collected program review fees for the Carrier Defendants paid by Plaintiffs and CSC Lessees.

93.     Even after paying for a review, CSC Lessees are not guaranteed permission to
transmit their content.  Any carrier can reject a program brief for any reason based on its
subjective evaluation of the proposed content and require the submission of a new program brief
with an accompanying further payment.  For example, on August 13, 2012, the CTIA on behalf
of itself and wireless service providers, such as the Carrier Defendants, sought to preserve before
the Federal Election Commission their right "to decide with which political committees to do
business," that is, to reject content of text messages of any politician or political action
committee at a carriers' whim or its own political agenda.  A rejection is not always explained,
so that CSC Lessees can continue submitting program briefs indefinitely without being told what
is wrong with their proposed content and can continue paying the Carrier Defendants' program
review fees.  At relevant times and, in particular, since April 5, 2008, CSC Lessees have had
program briefs rejected with no or an insufficient explanation but have been forced to continue to
pay program review fees.

94.     At relevant times, including since April 5, 2008, Plaintiffs and CSC Lessees also
have had to lease their CSCs in advance and continue paying lease fees while they have waited

for their program briefs to be approved and for permission to begin using their CSCs.  At times, this process has taken more than one year.

95.     If the relevant carriers approve the content described in a CSC Lessee's program brief, that CSC Lessee has permission to transmit *only that content*.  If a carrier says it has reason to believe based on its sole and unilateral interpretation that a CSC Lessee has transmitted content not described in its program brief, that CSC Lessee's connection will be terminated regardless of whether transmission of that content resulted in any harm.  That CSC Lessee will then have to reapply for permission to transmit its content and submit to a new set of program brief reviews with the attendant additional fees.

96.     Since April 5, 2008, CSC Lessees have been told by Aggregator Defendants on behalf of Carrier Defendants that the CSC Lessee had transmitted content that was not permitted, and the Aggregator Defendants on behalf of themselves or the Carrier Defendants have threatened to, and in some instances actually, cut off a CSC Lessee's use of a CSC.

97.     The program review system thus gives the Carrier Defendants not only the ability to charge expensive program review fees, but also the power to deter challenges to the CSC system and to arbitrarily disconnect CSC Lessees.

98.     Content monitoring is not necessary to protect users from spam, because federal law already prohibits the transmission of spam.  Nor have any governmental bodies authorized Defendants to review and monitor content.

99.     The central reason the program review system exists and its main effect has been to generate exorbitant fees for the Carrier Defendants from firms trapped in the CSC system.

2.      **Connecting to Aggregators**

100.    The conspirators added a further requirement to their scheme to further enrich the scheme's participants: all CSC Lessees had to transmit their A2P SMS through aggregators.

101.    Unlike users of ten-digit numbers, CSC Lessees cannot send their text messages directly to customers of carriers.

102.    At all relevant times, and, in particular, after April 5, 2008, the Carrier Defendants have refused to connect directly with any CSC Lessees except a select few, such as Facebook and Twitter (and several others), who are favored for their brand recognition and their volume. All CSC Lessees, besides Facebook, Twitter and a few others, must employ a small group of aggregators, which includes the Aggregator Defendants.

103.    At relevant times, including after April 5, 2008, each of the Aggregator Defendants has contracted and conspired with each of the Carrier Defendants to connect CSC Lessees to the Carrier Defendants.

104.    Pursuant to their agreements with the Carrier Defendants, each of the Aggregator Defendants has charged and continues to charge CSC Lessees unnecessary connectivity fees, as well as exorbitantly high per-message fees, and has conducted and continues to conduct audits of CSC Lessees' content.

105.    The Aggregator Defendants and the Carrier Defendants have split the per-message fees, with the Carrier Defendants to this day receiving the majority of the per-message fees.

106.    Per-message fees have been and continue to be universally imposed on CSC Lessees at rates agreed upon among the Carrier Defendants and the Aggregator Defendants at all relevant times, including after April 5, 2008.

107.    These per-message fees have been and continue to be a high multiple of the fees charged for transmitting text messages from ten-digit numbers.  CSC Lessees have paid as much as $0.03 per message, whereas users of ten-digit numbers may obtain unlimited messaging for approximately $20 per month.

108.    At relevant times, including since April 5, 2008, CSC Lessees have also been charged and continue to be charged additional fees each time they change aggregators.  If a CSC Lessee decides to change aggregators, even though it will continue submitting content to the same carriers, at relevant times, including since April 5, 2008, the CSC Lessee has been obliged to submit a new program review brief and pay to the aggregators, including to the Aggregator Defendants where applicable, the program review fee anew.

109.    In addition to charging CSC Lessees per-message fees and connectivity fees and collecting program review and per-message fees for the Carrier Defendants, at relevant times, including since April 5, 2008, by agreement with the Carrier Defendants, each of the Aggregator Defendants has also acted as an enforcer of the CSC system and Defendants' conspiracy.

110.    At relevant times, and, in particular, since April 5, 2008, the Aggregator Defendants have monitored the volume per minute of messages transmitted by CSC Lessees and terminated or threatened to terminate the connections of any CSC Lessee they catch transmitting A2P SMS from ten-digit numbers.

111.    In particular, since April 5, 2008, at trade shows and otherwise, the Aggregator Defendants have exchanged with other Aggregator Defendants and Carrier Defendants the identities of CSC Lessees who attempted 10-digit transmission of text messages (referred to by the Aggregator Defendants as "cheaters") to enable the Carrier Defendants and Aggregator Defendants to terminate the "cheaters'" use of CSCs.

24

112.    The Aggregator Defendants have not only profited from the conspiracy and aided in its enforcement, they have also understood that they play an instrumental role in the illegal conspiracy.  Each Aggregator Defendant has known that: (a) each Carrier Defendant has required aggregators to enforce the restrictions against use of ten-digit codes for A2P SMS; (b) each Carrier Defendant has contracted with the other Aggregator Defendants to require each other Aggregator Defendant to disconnect any CSC Lessee attempting to transmit A2P SMS from ten-digit numbers; and (c) the other Aggregator Defendants have enforced the policy of disconnecting any CSC Lessee attempting to use ten-digit numbers to transmit A2P SMS.

**F.    Abuse of Market Power Through Content Audits and Resultant Unnecessary, Inflated Fees**

113.    Unlike users of ten-digit numbers, CSC Lessees have faced at relevant times, including since April 5, 2008, and continue to face constant content audits by WMC, the CTIA, the Carrier Defendants and the Aggregator Defendants, with attendant threats of disconnection, as described in the next six paragraphs.

114.    Since entering into its agreement with the CTIA and joining the conspiracy in 2009, WMC has performed and continues to perform audits of CSC Lessees, including Plaintiffs, on behalf of the CTIA and the Carrier Defendants to enforce the CSC system about which it knew prior to joining the conspiracy.  At relevant times, and, in particular, since April 5, 2008, the Carrier Defendants, CTIA and Aggregator Defendants have also performed content audits to enforce the CSC system.  The audits ostensibly have been intended to monitor the content being transmitted via A2P SMS, as well as the print and media advertising that references a CSC, but, in reality, as all participants (including all Defendants) in the audits understand, they are meant to maintain the CSC system and profits.

115.    At all relevant times, including since April 5, 2008, if an audit has resulted in a finding of noncompliance as to the A2P SMS content or advertising, the Carrier Defendants have blocked the CSC that the CSC Lessee has paid for.  In other words, the CSC Lessee no longer has been able to send messages to or receive messages from the blocking Carrier Defendants' customers using the blocked CSC.  Blocking has often occurred, including since April 5, 2008, with no warning or opportunity to correct any allegedly noncompliant A2P SMS content or advertising.

116.    At all relevant times, including since April 5, 2008, this audit process has been and continues to be enforced in an arbitrary and discriminatory fashion.  The decisions regarding which CSC Lessees are audited and threatened with blocking are unclear and not explained.

117.    The audit process has given the Carrier Defendants and the CTIA the power to deter challenges to the CSC system and to arbitrarily disconnect CSC Lessees, which the Aggregator Defendants and WMC knew when they joined the conspiracy and have enforced since.

118.    No statute, government agency or business clearance has given the Defendants the right to implement their auditing practices.

119.    As a result of the constant threat of blocking because of the audit process, at relevant times, including since April 5, 2008, CSC Lessees have often leased multiple CSCs as standby resources in case a CSC is blocked as a result of an allegedly noncompliant audit.  Also, CSC Lessees using one CSC for multiple customers have been forced to lease extra, stand-by CSCs.  These practices have artificially increased the number of CSCs that must be leased at inflated prices and decreased efficiencies that could have been achieved through CSC sharing.

## CLASS ACTION ALLEGATIONS

120.    Plaintiffs bring this class action lawsuit on behalf of themselves and proposed

Class members under Federal Rules of Civil Procedure 23(a), (b)(1)(A), (b)(2), and (b)(3).

121.    Plaintiffs seek certification of the following class (the "Class"):

All entities and persons who leased a Common Short Code from Neustar, Inc. at any time
from April 5, 2008, to the present (the "Class Period") and have sent or received A2P
SMS through one or more aggregators.

The Class excludes government entities and Defendants, as well as Defendants' parents,
affiliates, subsidiaries, officers and directors.

122.    The Class comprises thousands of CSC Lessees.  The Class is so numerous that

joinder of all members is impracticable.

123.    Common questions of law and fact exist as to Plaintiffs and all Class members

and predominate over any questions that affect only individual members of the Class.  The

common questions of law and fact include, without limitation:

a)      Whether Defendants concertedly denied CSC Lessees the ability to transmit A2P

SMS through ten-digit numbers and boycotted and refused to deal with CSC

Lessees seeking to use ten-digit numbers to send A2P SMS;

b)      Whether Defendants engaged in a combination or conspiracy to require CSC

Lessees to lease CSCs at agreed-upon supra-competitive prices, to pay

unnecessary connectivity fees and inflated per-message fees, and to submit

program review briefs at unnecessary and excessive prices;

c)      Whether Defendants abused their market power by requiring CSC Lessees to

submit to an arbitrary process of auditing content of A2P SMS;

d)      Whether Defendants intentionally conspired to monopolize, maintain a monopoly

and exploit the A2P SMS transmission market;

e)    What has been the duration and extent of Defendants' anti-competitive behavior;

f)    Whether Plaintiffs and Class members suffered injury as a result of Defendants' conduct;

g)    What is the appropriate measure of compensatory damages for inflated, unnecessary and fixed fees paid as a result of Defendants' anti-competitive conduct; and

h)    Whether Plaintiffs and Class members are entitled to injunctive relief.

124.    Plaintiffs' claims for damages and injunctive relief are typical of the claims of Class members arising out of Defendants' common course of anti-competitive conduct in violation of the law.

125.    Plaintiffs are fair, adequate, and typical representatives of the Class and have no interests adverse to the interests of absent Class members.  Plaintiffs have retained counsel who have substantial experience and success in the prosecution of complex class actions and antitrust litigation.

126.    A class action is superior to other available means for the fair and efficient adjudication of this controversy since individual joinder of all Class members is impracticable. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of effort and expense that numerous actions would engender.  If Class members prosecuted separate actions against the Defendants, there would be a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.  The expenses of and burdens on individual litigants and the lack of knowledge of Class members regarding Defendants' activities make it

difficult or impossible for individual Class members to redress the wrongs done to them, while

an important public interest will be served by addressing the matter as a class action.  The trial

and litigation of Plaintiffs' and Class members' claims will be manageable.

## TRADE AND COMMERCE

127.    During the relevant time, Defendants and co-conspirator Neustar leased a

substantial number of CSCs and sold and performed a substantial amount of aggregation,

program review and audit services, and the Carrier Defendants transmitted a substantial number

of A2P SMS within the continuous and uninterrupted flow of interstate commerce.

128.    During the Class Period, Plaintiffs and Class members directly paid Neustar to

lease a CSC in interstate commerce, sent A2P SMS in interstate commerce through one or more

aggregators and carriers, paid the Carrier Defendants through aggregators program review and

per-message fees in interstate commerce, directly paid the Aggregator Defendants or their co-

conspirators per-message and connectivity fees in interstate commerce, and suffered program

audits by the Defendants in interstate commerce.

129.    Defendants' actions were intended to substantially affect interstate commerce and

did affect interstate commerce.

130.    There are hundreds of thousands of customers who send or receive A2P SMS text

messages within the State of New York and who have been affected by the combination or

conspiracy among the Defendants.  Those text messages originate from CSC Lessees and are

sent through the wireless data facilities of all the Carrier Defendants, including U.S. Cellular, and

customers are billed for the A2P SMS service by the Carrier Defendants, including U.S. Cellular.

131.    There are numerous CSC Lessees that are headquartered in New York and that

use the A2P SMS network to send and receive A2P SMS text messages to reach customers

serviced by all the Carrier Defendants, including U.S. Cellular.  Among these CSC Lessees are A&E; ABC Inc.; American Express; Colgate Palmolive Company; Discovery Communications; ESPN; General Electric; The Hearst Corporation; Home Box Office Inc.; JPMorgan Chase; Lerner New York; Major League Baseball; Major League Soccer; NBC Universal; New York Times Inc.; and Time Inc.  All these CSC Lessees were affected in New York by the combination or conspiracy among the Defendants.

### FIRST CLAIM
### Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)
### Boycott and Concerted Refusal to Deal

132.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in paragraphs 1 through 131.

133.    In violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, the Defendants agreed to and did refuse to deal during the Class Period with any CSC Lessees seeking to transmit A2P SMS through ten-digit numbers.

134.    At all relevant times, including after April 5, 2008, the Defendants attended CTIA and other meetings, trade shows and conferences and engaged in numerous communications to discuss and effectuate their agreement to refuse to deal with any CSC Lessees seeking to transmit A2P SMS using ten-digit numbers or to allow transmission of A2P SMS sent by any CSC Lessee using ten-digit numbers.

135.    The Defendants have enforced and continue to enforce their combination or conspiracy, among other things, through the audit process conducted by WMC and other Defendants and by blocking CSCs.

136.    Plaintiffs and Class members have been injured as a proximate result of the Defendants' combination or conspiracy.

137.    The combination or conspiracy carried out by the Defendants resulted in Plaintiffs and Class members having to pay unreasonable, unnecessary and inflated CSC lease fees, per-message fees, program review fees and connectivity fees.

138.    The combination or conspiracy carried out by Defendants also resulted in a number of Class members losing their connections to the Carrier Defendants and the Aggregator Defendants as punishment for their attempted use of the prohibited ten-digit numbers or for having allegedly improper content.

139.    Plaintiffs and Class members have been deprived of the benefits of free and open competition.  The Defendants' combination or conspiracy is an unreasonable restraint of competition.

140.    Plaintiffs and Class members are entitled to treble damages and injunctive relief to remedy the injuries they have suffered and continue to suffer as a result of the Defendants' violations of Sherman Act § 1.

**SECOND CLAIM**
**Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**
**Price-Fixing and Other Collusive Agreements**
**Limiting the Provision of CSCs**

141.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in paragraphs 1 through 131.

142.    During the Class Period, the Defendants (except WMC) engaged in a contract, combination or conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1: (a) to force (and did force) would-be CSC Lessees to lease CSCs through co-conspirator Neustar at artificially fixed, maintained, inflated or stabilized prices; (b) to force (and did force) all CSC Lessees to connect to the Carrier Defendants through the Aggregator Defendants and pay

unnecessary connectivity fees and inflated per-message fees; and (c) to charge (and did charge) program review fees to CSC Lessees at unnecessary and inflated prices.

143.    At all relevant times, including after April 5, 2008, the Defendants attended CTIA and other meetings, trade shows and conferences and engaged in numerous communications to discuss and effectuate their illegal contract, combination or conspiracy: (a) to force all CSC Lessees to lease a CSC at fixed, maintained, inflated or stabilized prices applicable to all CSC Lessees, regardless of the Carrier Defendant to which a CSC Lessee connected through an aggregator; (b) to require all CSC Lessees to connect to the Carrier Defendants through the Aggregator Defendants and to pay unnecessary connectivity fees and inflated per-message fees; and (c) to require the submission of program briefs by all CSC Lessees for unnecessary and inflated fees.

144.    The Defendants have enforced their contract, combination or conspiracy by policing CSC Lessees attempting to transmit A2P SMS from ten-digit numbers.

145.    The Defendants have also enforced their contract, combination or conspiracy, among other things, through the audit process conducted by WMC and the other Defendants and by blocking CSCs.

146.    Plaintiffs and Class members have been injured as a proximate result of Defendants' contract, combination or conspiracy.

147.    The contract, combination or conspiracy carried out by the Defendants resulted in payment by Plaintiffs and Class members of unnecessary and artificially inflated prices for leasing CSCs, unreasonable and unnecessary program review and connectivity fees, and inflated per-message fees.

148.    Plaintiffs and Class members have been deprived of the benefits of free and open competition.  The contract, combination or conspiracy carried out by the Defendants is an unreasonable restraint of competition.

149.    Plaintiffs and Class members are entitled to treble damages and injunctive relief to remedy the injuries they have suffered and continue to suffer as a result of the violations of Sherman Act § 1 carried out by the Defendants.

**THIRD CLAIM**
**Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)**
**Conspiracy to Monopolize and Maintain Monopoly**

150.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in paragraphs 1 through 131.

151.    The relevant market is the A2P SMS transmission market in the United States.

152.    During the relevant time, the Carrier Defendants collectively have had the majority of wireless subscribers in the United States, have controlled more than 70% of the subscriber base, and have had access to more than 70% of A2P SMS recipients.

153.    During the relevant time, the Carrier Defendants have controlled more than 70% of the United States A2P SMS transmission market.

154.    There are no close substitutes for the transmission of A2P SMS to and from individual subscribers of carriers in the United States, because any entity wishing to send or receive an A2P SMS to or from an individual must obtain A2P SMS transmission by connecting to that individual through the carrier network to which that individual subscribes.

155.    During the Class Period, the Defendants intentionally conspired to monopolize the market for transmission of A2P SMS through the use of exclusionary practices in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

156.    The Defendants have specifically intended to, conspired to, and did eliminate competition and maintain their monopoly power in the A2P SMS transmission market by prohibiting the transmission of A2P SMS from ten-digit numbers and requiring the transmission of A2P SMS through CSCs leased on coordinated terms through a joint selling agent, Neustar, which was granted a monopoly over CSC leases.  By this means, the Defendants and co-conspirator Neustar specifically intended to eliminate and did eliminate the use of the ten-digit number system, in which the Carrier Defendants competed against one another, and specifically intended to and did replace it with the CSC system, in which the Carrier Defendants offer their services jointly through the Aggregator Defendants on fixed terms at supra-competitive prices.

157.    The Defendants specifically intended to and did deny Plaintiffs and Class members a low-priced alternative to the CSC system so as to maintain the Defendants' ability to charge unnecessary fees and supra-competitive prices for services related to the use of the CSC system.

158.    The Carrier Defendants and Aggregator Defendants specifically intended to refuse and have refused to deal with any CSC Lessee who has sought to send its text messages through ten-digit numbers, disconnecting or threatening to disconnect any CSC Lessees or potential CSC Lessees using ten-digit numbers.

159.    During the Class Period, Defendants and co-conspirator Neustar have specifically intended to and did impose on CSC Lessees supra-competitive CSC lease fees and per-message fees and unnecessary connectivity and program review fees.

160.    During the Class Period, the Defendants have specifically intended to and did enforce their combination or conspiracy to monopolize the A2P SMS transmission market,

among other things, through the audit process conducted by WMC and other Defendants and by blocking certain CSCs.

161.    Each of the Defendants has engaged in overt acts in support of the combination or conspiracy to monopolize the A2P SMS transmission market in the United States with the specific intent to monopolize that market.

162.    Defendants' conspiracy to monopolize the A2P SMS transmission market has proximately injured Plaintiffs and Class members.

163.    Plaintiffs and Class members have been deprived of the benefits of fair and open competition.

164.    Plaintiffs and Class members are entitled to treble damages and injunctive relief to remedy the injuries they have suffered and continue to suffer as a result of Defendants' violation of Sherman Act § 2.

## DEMAND FOR JURY TRIAL

165.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims asserted in this Complaint so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for the following relief:

A.  That the Court declare that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, appoint Plaintiffs as the Class representatives and appoint Plaintiffs' counsel as Class counsel;

B.  That the Court adjudge the conduct described in this Complaint to involve unlawful restraints of trade in violation of Sherman Act § 1 and award Plaintiffs and Class members appropriate damages, trebled;

C.  That the Court adjudge the conduct described in this Complaint to involve

monopoly offenses in violation of Sherman Act § 2 and award Plaintiffs and Class

members appropriate damages, trebled;

D.  That the Court permanently enjoin Defendants and any of Defendants'

subsidiaries or affiliates from engaging in any of the conduct described herein;

E.  That the Court award Plaintiffs and the Class the costs of this suit, including

reasonable attorneys' fees; and

F.  That the Court award Plaintiffs and the Class such other relief as the Court may

deem just and proper.

Dated:   September 17, 2012                         Respectfully submitted,


**KAPLAN FOX & KILSHEIMER LLP**


By: _Gregory K. Arenson_
       Robert N. Kaplan
       Richard J. Kilsheimer
       Gregory K. Arenson
       Elana Katcher
850 Third Avenue
14th Floor
New York, NY 10022
Telephone:  (212) 687-1980
Facsimile: (212) 687-7714
Emails: rkaplan@kaplanfox.com
       garenson@kaplanfox.com
       rkilsheimer@kaplanfox.com
       ekatcher@kaplanfox.com

**CUNEO GILBERT & LADUCA, LLP**

Jonathan W. Cuneo
Joel Davidow
Victoria Romanenko
507 C Street, N.E.
Washington, D.C.  20002
Telephone: (202) 789-3960
Facsimile: (202) 789-1813
Emails:  jonc@cuneolaw.com
        joel@cuneolaw.com
        vicky@cuneolaw.com

Michael Flannery
Cuneo Gilbert & LaDuca, LLP
300 North Tucker Boulevard
No. 801
St. Louis, MO 63101
Phone: (202) 789-3960
Fax: (202) 789-1813
Email: Mflannery@cuneolaw.com

**KOHN SWIFT & GRAF, P.C.**

Joseph C. Kohn
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
Fax: (215) 238-1968
Email: jkohn@kohnswift.com

*Attorneys for Plaintiffs*