UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE A2P SMS ANTITRUST LITIGATION | Master File 12 CV 2656 (AJN) |
| THIS DOCUMENT RELATES TO: All Actions | |

## DECLARATION OF ROBIN THOMPSON IN SUPPORT OF MOTION OF DEFENDANT WMC GLOBAL, INC. TO COMPEL ARBITRATION

Robin Thompson declares, pursuant to 28 U.S.C. § 1746, that:

1. I am a resident of the Commonwealth of Virginia and am over the age of 18. I am Vice President – Business Development of Wireless Media Consulting, Inc. d/b/a WMC Global, sued herein as WMC Global, Inc. ("WMC"). I am fully familiar with the facts and circumstances set forth below.

2. I make this declaration in support of WMC's motion to compel arbitration of all claims asserted by plaintiffs TextPower, Inc., Club Texting, Inc. and iSpeedbuy LLC against WMC in the Consolidated Amended Class Action Complaint filed on June 14, 2012 (the "CAC").

**WMC**

3. WMC is a Virginia corporation that was incorporated on February 9, 2007. None of the other defendants named in the CAC owns any of WMC's stock.

4. WMC and its affiliates provide various mobile data services to clients located in the United States, Europe, Asia and elsewhere. Among other things, WMC's lines of

business include mobile application certification, fraud detection, billing inaccuracy reports, partner validation (vetting prospective business partners), and compliance assurance. WMC does not compete with the carriers, aggregators, or plaintiffs who are parties to this lawsuit.

**Common Short Codes and A2P Messaging**

5. Nowadays there are many uses for application-to-person ("A2P") messaging using common short codes ("CSCs"). For example, a television program may solicit "votes" or other feedback from viewers through text messages sent to a specified CSC. The voter would be charged a specified fee for the submission of his or her vote. An advertiser may offer a free ringtone or other gift to wireless subscribers (individuals who own a cellphone and subscribe to a plan for wireless service with Verizon, AT&T, or another carrier) who send a text message to a CSC displayed in an advertisement, if the wireless subscriber agrees to receive further communications and advertisements from the advertiser. Or, a charity may solicit donations by asking wireless subscribers to text a message to a CSC, with the amount of the donation added to the subscribers' bill. Wireless subscribers generally pay fees for the text messages they send or receive on their mobile devices. In addition, any other charges incurred by wireless subscribers (*e.g.* for participation in television voting programs or donations to charities) are billed through their carrier's billing system.

6. Every person that wishes to use a CSC in connection with a mobile marketing campaign must apply to Neustar, Inc. ("Neustar"), CTIA's designated agent, to obtain a lease to a CSC. Often advertisers and other content providers ("Content Providers") do not hold leases to CSCs themselves. Instead, Content Providers contract with firms that provide text messaging marketing services, such as the plaintiffs (referred to in the CAC as "CSC Lessees"), to lease and manage the CSCs and to work with Aggregators to transmit the Content Providers' text messages.

7. WMC was not even created until 2007, four years after the system for the leasing of CSCs was established in 2003. WMC did not begin to provide monitoring and auditing services to CTIA until we won a contract in 2009. WMC has never had anything to do with setting prices for the leasing of CSCs or the carriers' alleged refusal to allow use of 10-digit telephone numbers for A2P messaging.

8. The sequence for sending an A2P message, including WMC's monitoring role (as described below), is as follows:



9. Every CSC Lessee agrees to comply with the terms and conditions set forth in a standard agreement called the CSC Registrant Sublicense Agreement, the current version of which is publicly available at http://www.usshortcodes.com/csc_subLeaseAgree.html (referred to herein as the "CSC Agreement"). The CSC Agreement provides for the term of the lease, registration requirements, security and privacy terms, and other terms and conditions that govern the lease. I understand that the plaintiffs agreed to this version of the CSC Agreement when they leased CSCs.

10. The CSC Agreement also provides that CSC Lessees must comply with an Acceptable Use Policy ("AUP") and other rules and policies set by the CTIA. The AUP

identifies certain uses of CSCs that are prohibited. The CSC Agreement also provides that (i) the CTIA and its subcontractors have the right to monitor the use of CSCs and to enforce the standards set by the CTIA; (ii) the lease may be terminated on specified grounds; and (iii) any and all disputes arising out of the lease must be submitted to arbitration. *See, e.g.*, CSC Agreement at §§ 5, 8, 19.

### Monitoring of Advertising and Messages for Compliance Purposes

11.     The carriers have an inherent interest in protecting their subscribers from fraudulent, misleading, unsolicited or offensive commercial calls and messages. Such messaging reflects poorly on the carriers, because many wireless subscribers associate their carrier with the message and/or the associated fee. Aside from the content, machine-generated commercial messages can result in additional charges and fees to wireless subscribers. Because any fees and charges related to such messages appear on bills generated by the carrier, complaints regarding such items are generally directed to the carrier and often lead to higher rates of refunds from the carrier to complaining customers. They can also result in the cancellation of contracts by wireless subscribers who switch to other carriers out of frustration (sometimes referred to as a carrier's "churn rate"). For example, wireless subscribers could be misled by an advertisement that solicits text messages by offering a free service but does not fully disclose that such messages will incur additional fees or subscription charges to the subscriber.

12.     Accordingly, the carriers and CTIA instituted rules to prohibit use of their networks for certain of these offensive practices, including the rules set forth in the AUP referred to in the CSC Agreement

> (1) You will comply with the terms of the Registrant Sublicense Agreement.
>
> (2) You will comply with the terms of any applicable policies of the wireless carriers, including, but not limited to, the terms of

> each wireless carrier's documentation regarding CSC and short code campaigns.
>
> (3) You will comply with the recommendations and requirements contained in the Mobile Marketing Association's "Code of Conduct for Mobile Marketing", "Mobile Advertising Guidelines", Mobile Financial Services Best Practices", and "Consumer Best Practices Guidelines for Cross-Carrier Mobile Content Programs".
>
> (4) You will not use a CSC for any illegal purpose.
>
> (5) You will not use a CSC in a manner that violates the legal rights of any person (including, but not limited to, intellectual property or privacy rights).
>
> (6) You will not use a CSC for the purpose of facilitating the sending of spam or other unlawful unsolicited messages to wireless subscribers.
>
> (7) You will not use a CSC for the purpose of facilitating the sending of messages that are unlawful, defamatory, obscene, harassing, threatening, abusive, or fraudulent.
>
> (8) You will ensure that your CSC program (including all advertising and promotional material) clearly discloses the material terms and conditions of the program, including pricing and fees, in accordance with the requirements contained in the documents referenced in sections (1), (2), and (3) above.
>
> (9) You will ensure that your CSC campaign complies with all applicable requirements for consent, opt-in, and opt-out by a wireless subscriber (including those requirements contained in the documents referenced in sections (1), (2), and (3) above).
>
> (10) You will ensure that your CSC campaign complies with all applicable requirements for disclosure of fees (including both fees imposed by You and any fees that may be imposed by a wireless carrier) to a wireless subscriber (including those requirements contained in the documents referenced in sections (1), (2), and (3) above).

CSCA AUP, *available at* http://www.ctia.org/business_resources/short_code/index.cfm/AID/11650 (accessed on August 7, 2012).

13. Carriers have good reason to monitor and restrict these unauthorized uses of CSCs, because permitting such actions on their wireless networks would expose carriers to

investigations and potential liability. Indeed, certain of the carriers named as defendants here have previously been the subject of investigations by state Attorneys General regarding third-party wireless content (*i.e.* messages from content providers and CSC Lessees). As a result of these investigations, certain carriers agreed to (i) create industry-leading disclosure standards; (ii) include certain prohibitions in future contracts with third-party content providers; and (iii) to monitor compliance with those standards and prohibitions by content providers and advertisers. Some of the standards created as a result of these investigations are contained in the Consumer Best Practices Guidelines for Cross-Carrier Mobile Content Programs (the "CBP") and other guidelines referred to in paragraph (3) of the AUP.

14. As provided by Section 8 of the CSC Agreement, CTIA retained an outside firm to conduct monitoring of the use of CSCs and to notify the CSC Lessees of any violations of the AUP and other rules that CSC Lessees agree to comply with pursuant to the CSC Agreement.

15. On June 1, 2009, WMC entered into a contract (the "WMC Subcontract") with CTIA to take over monitoring and reporting relating to CSC Lessees' compliance with the CTIA's rules governing the use of CSCs. WMC has also entered into separate contracts with Defendants AT&T Mobility LLC ("AT&T"), Cellco Partnership d/b/a Verizon Wireless ("Verizon") and Sprint Nextel Corporation ("Sprint")[1] for the provision of monitoring, reporting and compliance services relating to CSCs on their respective networks.

---

[1] Collectively, AT&T, Verizon, Sprint, T-Mobile USA, Inc. ("T-Mobile") and U.S. Cellular Corporation ("U.S. Cellular") are referred to as the "Carriers" or the "Carrier Defendants".

## Plaintiffs' Claims Against WMC Are Intertwined With the CSC Agreement

16.  I understand that in evaluating WMC's request to compel arbitration of the claims against WMC, one thing the Court will consider is the extent to which the claims are intertwined with the contract that contains the agreement to arbitrate, which here is the CSC Agreement. Both the allegations about the conspiracy overall and WMC's alleged role in it are "intertwined" with and arise out of the CSC Agreement. Firms such as plaintiffs lease CSCs pursuant to the CSC Agreement so that they can sell their customers, the content providers, the ability to send the bulk A2P text messages that WMC monitors.

17.  Another way in which WMC is intertwined with the agreement to arbitrate is that plaintiffs have alleged that we conspired with Neustar and CTIA, the counter-parties to the CSC Agreement, to force plaintiffs and other CSC Lessees to use those CSCs rather than 10-digit phone numbers. I do not understand how WMC is alleged to have furthered the interests of the alleged conspiracy, but the CAC refers to the audits that WMC conducts, and how that somehow gives the carriers the power to deter challenges to the CSC system.

18.  I understand that by agreeing to the CSC Agreement, CSC Lessees agree to abide by guidelines for content established by CTIA (*e.g.*, the AUP and CBP described above), to be subject to monitoring of their message content, and to be subject to penalties for violations. Pursuant to the WMC Subcontract, WMC agreed to monitor on behalf of the CTIA various forms of advertising that use CSCs and that are distributed on, among other things, broadcast networks, cable networks, radio stations, printed publications, the internet, email marketing communications, and mobile internet sites. The WMC Subcontract provides that WMC will review the use of CSCs in such advertisements for compliance with audit standards

set by the CTIA. WMC does so by sampling numerous advertisements according to a prescribed system.

19. When WMC detects an advertisement that is not in compliance with the applicable standards, WMC prepares a "Program Violation Notice" that sets forth the following information: (i) the date of the notice; (ii) the identities of the CSC Lessee of the CSC (referred to in the notice as the content provider) and aggregators; (iii) each of the violations found in the advertisement; (iv) the severity of each violation; (v) the corrective actions necessary to remove each violation, (vi) the date by which the violations must be cured; and (vii) a screenshot of the advertisement.

20. Once a Program Violation Notice is created, WMC sends an email to the relevant CSC Lessee, aggregators, carriers and the CTIA with a link to the notice. WMC then works with the CSC Lessee to assist it in resolving the violations, closing the audit and continuing to use the CSC for the advertisement at issue.

21. If a CSC Lessee is unable to close all violations within the permitted time, WMC sends a report to the CTIA and the relevant carriers. Upon receipt of a violation report, the CTIA may restrict the CSC Lessee from renewing its lease to the CSC in question or from leasing additional CSCs. The carriers may use information from WMC's reports when determining on their own whether to suspend use of the CSC at question on the carriers' individual networks. WMC itself has no capability or authority to disconnect or block CSCs for the failure to cure program violations.

**Plaintiffs Are Aware of the Relationships Among
CSC Lessees, WMC and the CTIA**

22. It is my understanding that the named plaintiffs in this action agreed to the terms of the CSC Agreement, which would have put them on notice that a subcontractor to the CTIA, such as WMC, would conduct audits of the messages transmitted by them.

23. Plaintiffs also continue to lease CSCs knowing that WMC conducts audits on behalf of the CTIA. WMC has issued program violation notices to each of the named Plaintiffs. A review of WMC's records shows that from June 29, 2009 through May 7, 2012, WMC issued a total of 228 Program Violation Notices to the named Plaintiffs in this action. Each of those Program Violation Notices bears the CTIA's logo and was sent by an email that made clear that WMC conducts its audits on behalf of the CTIA.

24. For example, on August 29, 2011, WMC intercepted an advertisement displaying a CSC leased by plaintiff Club Texting. WMC determined that the advertisement did not comply with the applicable standards because it failed to notify wireless subscribers that they might be billed fees for the text messages sent or received to the CSC displayed in the advertisement. The advertisement was also out of compliance because it failed to provide wireless subscribers with the appropriate command to opt-out of receiving further communications from that CSC. Other commonly identified violations include (i) failure to provide consumers with an appropriate way to contact the Content Provider with questions through help commands, a toll-free number or an email address; and (ii) failure to properly notify the consumer of the number of items or the frequency of services they will receive in connection with their communications with the Content Provider that is using the CSC.

25. WMC issued a program violation notice which lists each of the violations associated with the advertisement and the actions required to bring the advertisement into

compliance and bears CTIA's logo. WMC sent an email to Club Texting, the relevant aggregators, OpenMarket and MX Telecom, the CTIA and each of the Carriers containing a link to Notice 10087316. The email states that "CTIA has found shortcodes in violation of MMA Consumer Best Practices, CTIA policies, or both."

26.     On October 11, 2011, Shane Neman, from Club Texting, responded to WMC's email stating that Club Texting had notified the relevant Content Provider of the violations. Mr. Neman also stated that Club Texting does not control the website containing the non-compliant advertisement and requesting WMC's advice "on what to do in this case. . . ." Eventually, the Content Provider made changes to the advertisement to remove the violations, WMC retested the advertisement and the audit was closed.

27.     Club Texting, the CSC Lessee with whom WMC communicated regarding the violations discussed above, is one of the named Plaintiffs in this Action. The Program Violation Notices that WMC issued to TextPower and iSpeedbuy also bore CTIA's logo and made clear that WMC was conducting the audits at issue on behalf of CTIA.

28.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 13, 2012 at Fairfax, Virginia

By: _____
        Robin Thompson