USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: SEP 1 6 2013

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------X
IN RE A2P SMS                    :
ANTITRUST LITIGATION             :
                                 :
_____      :
                                 :
THIS DOCUMENT RELATES TO:        :
                                 :
ALL ACTIONS                      :
_____X

MASTER FILE: 12 CV 2656 (AJN)


MEMORANDUM
AND OPINION

ALISON J. NATHAN, District Judge:

Plaintiffs Club Texting, Inc. ("Club Texting"), iSpeedbuy LLC ("iSpeedbuy"), and

TextPower, Inc. ("TextPower") (collectively "Plaintiffs"), bring this putative class action

alleging violations of Sections 1 and 2 of the Sherman Act of 1890 (the "Sherman Act"), 15

U.S.C. §§ 1 and 2.  Plaintiffs bring these claims, as alleged in their second amended complaint

("SAC"), against the following Defendants: CTIA-- The Wireless Association ("CTIA");

Wireless Media Consulting, Inc. d/b/a WMC Global ("WMC"); AT&T Mobility LLC

("AT&T"); Cellco Partnership d/b/a Verizon Wireless ("Verizon"); Sprint Nextel Corporation

("Sprint"); T-Mobile USA, Inc. ("T-Mobile"); U.S. Cellular Corporation ("USCC"); Air2Web,

Inc. ("Air2Web");  Ericsson Inc. ("Ericsson"); Sybase, Inc. ("Sybase"); SoundBite

Communications, Inc. ("SoundBite"); 2ergo Americas, Inc. ("2ergo"); Syniverse Technologies

LLC ("Syniverse");[1] Vibes Media, LLC ("Vibes"); 3Cinteractive, LLC ("3Cinteractive");

mBlox, Inc. ("mBlox"); and OpenMarket, Inc. ("OpenMarket").

As discussed in more detail below, these Defendants can be grouped based on the various

functions they serve in the relevant market or on their relationships with the Plaintiffs.  Currently

before the Court are a number of motions that these Defendants have filed as individuals and as

groups.  Although these motions fall within two broad categories -- arbitration motions and

---

[1] Formerly known as, and sued as, Syniverse Technologies, Inc.

motions to dismiss -- the Court's Memorandum and Order addresses only the arbitration motions, filed pursuant to the Federal Arbitration Act, 9 U.S.C § 3 (the "FAA").  *See* Dkt. Nos. 159, 151, 162, 165, 171.  Having considered these motions, and for the reasons discussed below, the Court concludes that a number of Defendants can compel arbitration and that the current matter must be stayed pending such arbitration.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Except as otherwise noted, the following facts are undisputed.  This case relates to text messages or SMS ("short message service") -- short electronic messages transmitted over a cellular network, generally to cell phones, but also to other wireless communication devices. SAC ¶ 2.  Specifically, the case relates to application-to-person text messages ("A2P" or "A2P SMS").  Unlike the more commonly known person-to-person ("P2P") text messages, A2P text messages are sent from "applications" -- businesses and institutions -- to wireless subscribers, and are often sent simultaneously to a large number of recipients.  SAC ¶¶ 3, 4, 5.

Although some A2P are sent using traditional 10-digit telephone numbers, issued under the North American Numbering Plan ("NANP") and regulated by the Federal Communications Commission ("FCC"), the majority of A2P messages are sent using "common short codes" ("CSC").  CSCs are 5 or 6 digit numbers that are leased to businesses and institutions ("CSC Lessees") for the purpose of sending A2P SMS.  To obtain a CSC lease, prospective CSC Lessees must first submit a "Registrant Sublicense Agreement," (the "RS Agreement" or "RSA") through the Common Short Code Administration ("CSCA") website, which is operated by Neustar, Inc. ("Neustar").  The RS Agreement, which contains an arbitration provision, is at the heart of the current dispute regarding whether certain Defendants can compel arbitration of Plaintiffs' claims.

A. The Defendants

Prior to addressing the alleged scheme, it is prudent to define the various subsets of Defendants. It bears noting, initially, that Neustar, the only entity entitled to lease the CSCs at issue in this action and the direct signatory to the RS Agreement, SAC ¶ 8, is listed as a co-conspirator, but it is not a named Defendant in this action.

1. The Carrier Defendants

The "Carrier Defendants" consist of five of the six largest wireless service providers in the nation: AT&T, Verizon, Sprint, T-Mobile, and USCC. SAC ¶¶ 24-29. The Carrier Defendants' wireless subscribers are the end-point recipients of A2P SMS -- the "person" in "application-to-person." As described the RS Agreement, the Carrier Defendants appointed CTIA as their CSC Administrator, which in turn granted Neustar a license to lease CSCs to the businesses and institutions seeking to send A2P SMS to the Carrier Defendants' subscribers. RSA ¶ 2.

2. CTIA -- The Wireless Association

CTIA is the cellular telecommunications and wireless services trade association. As alleged in the SAC, at all relevant times the CTIA has counted among its members the vast majority of the carriers providing most of the telecommunications services in the United States, including all of the Carrier Defendants. SAC ¶ 49. Plaintiffs allege that since 2002, the presidents and CEOs of the Carrier Defendants[2] have continuously sat on the CTIA Board of Directors ("the Board") and served as officers of the CTIA, thereby dominating and controlling the CTIA's activities and its budget. SAC ¶¶ 32, 49, 50. Specifically, Plaintiffs allege that the CEO of Sprint serves as the Chairman Emeritus of the Board, the President and CEO of USCC serves as the Vice-Chairman of the Board, the President/CEO of Verizon serves as the Secretary

---

[2] Or their predecessors.

of the Board, and the Presidents and CEOs of T-Mobile and AT&T are members of the Board. SAC ¶ 50.

### 3. The Aggregators

The "Aggregator Defendants" consist of the following Defendants: Air2Web, Ericsson, Sybase, SoundBite, 2ergo, Syniverse, Vibes, and 3Cinteractive. Additionally, there are two Defendants -- mBlox and OpenMarket -- who serve as aggregators, but who have filed separate motions and are thus distinct from the general class of Aggregator Defendants. According to the SAC, aggregators serve as required intermediaries between CSC Lessees and the Carrier Defendants. SAC ¶ 102. As alleged, only a select few CSC Lessees are permitted to deal directly with the Carrier Defendants, while the vast majority must instead be connected to the Carrier Defendants through aggregators.[3]  SAC ¶ 102.

### 4. Wireless Media Consulting

WMC is a Virginia-based corporation that provides CSC monitoring and compliance services to CTIA. Dkt. No. 152 at 7. In this capacity, WMC reviews advertisements and other content to make sure that it is in compliance with CTIA's standards, as set forth in the RS Agreement and the Acceptable Use Policy ("AUP"), described and incorporated therein. RSA ¶ 5. If WMC detects a violation, they issue a notice of violation, which the offending CSC Lessee is required to fix within a set period of time. Dkt. No. 152 at 8. Violations can lead to the imposition of fees, a Carrier Defendant suspending a CSC Lessee from its individual network, or the general suspension or termination of the CSC lease. Id.; RSA ¶¶ 5, 8. According to WMC, during the relevant period, it issued 228 violation notices to Plaintiffs. Dkt. No. 152 at 8.

### B. The Alleged Conspiracy

---

[3] At the conference in this matter on July 30, 2012, defense counsel noted that aggregators "represent the connections, the end that connects entities known as content providers, those who produce the ring tones [and] text messages themselves, and the carriers on the other hand." July 30, 2012 Tr. 14: 4-6.

Plaintiffs allege that beginning in 2002 or 2003, Defendants engaged in a four-step plan to create a system to extract the maximum amount of inflated fees from their consumers by means of the CSC system. SAC ¶ 54. First, the Carrier Defendants and CTIA created the CSC system and agreed to refuse transmission to any transmitter seeking to send A2P SMS from ten-digit numbers. SAC ¶ 55. Second, the Carrier Defendants and CTIA created Neustar and granted it the exclusive right to lease CSCs, which Neustar did at non-price based costs and pursuant to agreements with uniform, non-negotiable terms. SAC ¶ 56. Third, Defendants required all CSC Lessees to transmit their A2P SMS through aggregators, who imposed on CSC Lessees unnecessary connectivity fees and exorbitantly high per-message fees, a portion of which were then passed on to CTIA and the Carrier Defendants. SAC ¶ 57. And finally, Defendants imposed unnecessary audits, conducted by WMC, further driving up profits to Defendants and costs to Plaintiffs. SAC ¶ 58.

C.  Plaintiffs' Claims

Plaintiffs' putative class consists of themselves and the thousands of CSC Lessees who leased CSCs from Neustar between April 5, 2008, and the present (the "Class Period") and who have sent or received A2P SMS through one or more aggregators. SAC ¶¶ 120, 121, 122. On behalf of themselves and this putative class, Plaintiffs bring three claims for violations of the Sherman Act, two pursuant to Section 1 and a third pursuant to Section 2. *See* 15 U.S.C. §§ 1, 2.

Plaintiffs' First Claim alleges that Defendants "agreed to and did refuse to deal during the Class Period with any CSC Lessees seeking to transmit A2P SMS through ten-digit numbers." SAC ¶ 133. Plaintiffs' Second Claim alleges that Defendants (except WMC) engaged in a conspiracy: "(a) to force . . . would-be CSC Lessees to lease CSCs through co-conspirator Neustar at artificially fixed, maintained, inflated or stabilized prices; (b) to force . . . all CSC

Lessees to connect to the Carrier Defendants through the Aggregator Defendants and pay unnecessary connectivity fees and inflated per-message fees; and (c) to charge . . . program review fees to CSC lessees at unnecessary and inflated prices." SAC ¶ 142. Finally, Plaintiffs' Third Claim alleges that Defendants "intentionally conspired to monopolize the market for transmission of A2P SMS," and that they did so by "prohibiting the transmission of A2P SMS from ten-digit numbers and requir[ing] the transmission of A2P SMS through CSCs leased on coordinated terms through a joint selling agent, Neustar, which was granted a monopoly over CSC leases." SAC ¶¶ 155, 156.

  D. Defendants' Motions

     Defendants, individually and as groups, argue that the claims are subject to arbitration, and, to the extent they are not, the matter should be stayed pending resolution of the claims that are subject to arbitration. The Court agrees.

## II.   GENERAL LEGAL STANDARD

     In general, "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Ala. v. Randolph,* 531 U.S. 79, 91 (2000). In resolving a defendant's "motion to compel arbitration, [the Court] accept[s] as true . . . factual allegations in the plaintiffs' complaint that relate to the underlying dispute between the parties." *Shcnabel v. Trilegian Corp.*, 697 F.3d 110, 113 (2d Cir. 2012); *Lismore v. Societe Generale Energy Corp.*, No. 11 Civ. 6705 (AJN), 2012 WL 3577833, at *1 (S.D.N.Y. Aug. 17, 2012). "Allegations related to the question of whether the parties formed a valid arbitration agreement . . . are evaluated to determine whether they raise a genuine issue of material fact that must be resolved by a fact-finder at trial," *Schnabel*, 697 F.3d at 113, "a standard similar to that applicable for a motion for summary judgment," *Bensadoun v. Jobe-Riat,*

316 F.3d 171, 175 (2d Cir. 2003).

"The threshold question facing any court considering a motion to compel arbitration is . . . whether the parties have indeed agreed to arbitrate." *Schnabel*, 697 F.3d at 118. "If the party seeking arbitration has substantiated the entitlement by a showing of evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried." *Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995)); *accord Dubois v. Macy's E. Inc.*, 338 F. App'x 32, 33 (2d Cir. 2009).

## III.   ARBITRATION UNDER THE FAA

The FAA, 9 U.S.C. §§ 1 *et seq.*, "creates a body of federal substantive law of arbitrability applicable to arbitration agreements . . . affecting interstate commerce." *Alliance Bernstein Inv. Research & Mgmt., Inc. v. Schaffran*, 445 F.3d 121, 125 (2d Cir. 2006) (internal quotation marks omitted). "Section 3 of the [FAA] entitles litigants in federal court to a stay of any action that is 'referable to arbitration under an agreement in writing.'" *Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 625 (2009) (quoting 9 U.S.C. § 3). "Th[is] provision requires the court, 'on application of one of the parties,' to stay the action if it involves an 'issue referable to arbitration under an agreement in writing.'" *Id.* at 630 (quoting 9 U.S.C. § 3). In effect, § 3 "allows litigants already in federal court to invoke agreements made enforceable under § 2," which itself "makes written arbitration agreements 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of a contract.'" *Id.* at 629-30 (quoting 9 U.S.C. § 2). This "substantive federal law regarding the enforceability of arbitration agreements, requir[es] courts 'to place such agreements upon the same footing as other contracts.'" *Id.* at 630 (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478

(1989) (internal quotation marks omitted)). There is no dispute that the agreements at issue in this dispute affect interstate commerce, and "no question that the FAA applies." *Id.*

Whether a dispute is arbitrable comprises two questions: "(1) whether there exists a valid agreement to arbitrate at all under the contract in question . . . and if so, (2) whether the particular dispute sought to be arbitrated falls within the scope of the arbitration agreement." *Nat'l Union Fire Ins. Co. v. Belco Petroleum Corp.,* 88 F.3d 129, 135 (2d Cir. 1996). Although "there is a strong and 'liberal federal policy favoring arbitration agreements,'" *Thomson-CSF, S.A. v. Am. Arbitration Ass'n,* 64 F.3d 773, 776 (2d Cir. 1995) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985)), because "[a]rbitration is a matter of contract . . . a party cannot be required to submit to arbitration any dispute which it has not agreed so to submit," *Ragone v. Atl. Video at Manhattan Center,* 595 F.3d 115, 126 (2010) (quoting *JLM Indus., Inc. v. Stolt-Nielsen SA,* 387 F.3d 163, 171 (2d Cir. 2004)) (alterations omitted). Rather, a court "should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement *nor* (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue." *Granite Rock Co. v. Int'l Bhd. of Teamsters,* 130 S. Ct 2847, 2858-59 (2010) (emphasis in original). "In this endeavor, as with any other contract, the parties' intentions control." *UBS Fin. Servs., Inc. v. W. Va. Univ.,* 660 F.3d 643, 661 (2d Cir. 2011) (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.,* 559 U.S. 662, 682 (2010).

## IV.   ARBITRATION UNDER THE RS AGREEMENT

The Carrier Defendants, CTIA, and WMC argue, *inter alia*, that Plaintiffs' claims must be arbitrated pursuant to the arbitration clause in the RS Agreement. They argue that although none of these Defendants are explicitly signatories of the RS Agreement, they may nonetheless

enforce the arbitration clause in that agreement under the common law principle of equitable estoppel or as third-party beneficiaries,[4] and that the dispute falls within the scope of the RS Agreement's arbitration provision.  For the reasons discussed below, the Court concludes that these Defendants -- the Carrier Defendants, CTIA, and WMC -- may enforce the RS Agreement's arbitration provision under the common law principle of equitable estoppel and that Plaintiffs' claims fall within the scope of the RS Agreement's arbitration clause. [5]

A. The RS Agreement

The Carrier Defendants, CTIA, and WMC seek to enforce the arbitration provision in the RS Agreement, which as noted above, is the agreement that prospective CSC Lessees must first agree to and sign in order to apply for a CSC lease.  Pursuant to its terms, the RS Agreement is a legally binding agreement between Neustar and the CSC Lessee.  RSA p. 1.  Accordingly, each of the Plaintiffs and each of the putative class members are or would be signatories to the RS Agreement.

In relevant part, the arbitration provision in the RS Agreement says:

> Any dispute, controversy or claim arising out of or relating to this Agreement or the breach, termination, non-renewal of this Agreement or any CSC, refusal to grant new CSCs, or the validity of this Agreement, shall be finally settled in accordance with the commercial arbitration rules of the American Arbitration Association (the "AAA").

RSA ¶ 19.  It also provides that "[t]he place of arbitration shall be the County of Loudoun, Virginia," that "arbitrators shall determine the matters in dispute in accordance with the internal law of the Commonwealth of Virginia," and that, to the extent permitted under law, "the internal

---

[4] CTIA's primary argument is that they may compel arbitration as a party to the RS Agreement.  The Court does not reach this argument, however, because it concludes that, regardless, CTIA may compel arbitration through equitable estoppel.

[5] Because the Court concludes that these Defendants can enforce the RS Agreement's arbitration clause on the basis of equitable estoppel, the Court does not reach the question whether they can compel arbitration as third-party beneficiaries of the RS Agreement or any of their arguments for compelling arbitration under the aggregator contracts discussed below.

procedural and substantive laws of Virginia and the [FAA] shall govern all questions of arbitral

procedure, arbitral review, scope of arbitral authority, and arbitral enforcement." RSA ¶ 19.

B. Equitable Estoppel

Although the Carrier Defendants, CTIA, and WMC are not signatories to the RS

Agreement, they seek to enforce the arbitration clause contained within that agreement against

the Plaintiffs who are signatories. Courts have "recognized a number of common law principles

of contract law that may allow non-signatories to enforce an arbitration agreement, including

equitable estoppel." *Ross v. Am. Express Co.,* 478 F.3d 96, 99 (2d Cir. 2007); *Int'l Paper Co. v.*

*Schwabedissen Maschinen & Anlangan GMBH*, 206 F.3d 411, 417-418 (4th Cir. 2000); *Decisive*

*Analytics Corp. v. Chikar*, 75 Va. Cir. 337, 2008 WL 6759965, at *6-7 (Va. Cir. Ct. July 15,

2008). If, as here, the question of estoppel goes to the overall arbitrability of the dispute, it is for

the Court to answer. *See Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 394 (2d Cir.

2011) (distinguishing between estoppel claims that go to a party's ability to "initiate arbitration,"

which should be decided by the Court, and those that undermine the agreement itself, which may

be more appropriate for the arbitrator).

Under principles of estoppel, "signatories to an arbitration agreement can be compelled to

arbitrate their claims with a non-signatory where a careful review of the relationship among the

parties, the contracts they signed . . . , and the issues that had arisen among them discloses that

the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement

that the estopped party has signed." *Denney v. BDO Seidman, L.L.P.*, 412 F.3d 58, 70 (2d Cir.

2005) (internal quotation marks omitted) (quoting *Choctaw Generation Ltd. P'ship v. Am. Home*

*Assurance Co.*, 271 F.3d 403, 406 (2d Cir. 2001)); *see also Ragone v. Atl. Video at Manhattan*

*Ctr.*, No. 07 Civ. 6084 (JGK), 2008 WL 4058480, at *8 (S.D.N.Y. Aug. 29, 2008) (collecting

cases applying this standard *aff'd, Ragone,* 595 F.3d 115; *Brantley v. Republic Mortg. Ins. Co.,* 424 F.3d 392, 395-96 (4th Cir. 2005) (applying the same general test in the Fourth Circuit); *Chikar,* 75 Va. Cir. 337, 2008 WL 6759965, at *7-8 (applying the test in Virginia state court). "This does not mean, however, 'that whenever a relationship of any kind may be found among the parties to a dispute and their dispute deals with the subject matter of an arbitration contract made by one of them, that party will be estopped from refusing to arbitrate.'" *Ragone*, 595 F.3d at 127 (quoting *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 359 (2d Cir. 2008)). Rather, "[i]n addition to the 'intertwined' factual issues, there must be a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement." *Sokol*, 542 F.3d at 359.

Courts in this district have distilled these requirements and established a two-part "intertwined-ness" test, under which they "examine whether: (1) the signatory's claims arise under the 'subject matter' of the underlying agreement, and (2) whether there is a 'close relationship' between the signatory and the non-signatory party." *Ragone,* 2008 WL 4058480, at *8 (quoting *Chase-Mortg. Co.-W. v. Bankers Trust Co.*, No. 00 Civ. 8150 (MBM), 2001 WL 547224, at *2-3 (S.D.N.Y. May 23, 2001)); *Lismore,* 2012 WL 3577833, at *7 (applying this test and collecting cases in which it was applied); *see also Brantley*, 424 F.3d at 395-96 (describing and applying the "intertwined claims test"). Applying that test here, the Court concludes that both prongs are satisfied and equitable estoppel is appropriate.

*1. The Subject Matter of the Underlying Agreement*

"The first question for the Court to consider when applying the equitable estoppel test is whether [Plaintiffs'] claims arise from the 'subject matter'" of the RS Agreement. *Lismore,*

2012 WL 3577833, at *7; *see also Ragone*, 595 F.3d at 128 (is the arbitrable dispute between the

signatories "factually intertwined with the dispute between [the signatory] and [the non-

signatory"). Here, the undisputed subject matter of the RS Agreement is the leasing, registration,

and terms of use of CSCs. The RS Agreement provides the definition of a CSC,[6] and describes

the operation of the CSC system, the relevant entities involved in that system, the terms of use

for CSCs, and the costs and fees associated with leasing CSCs. The RS Agreement not only

describes how to lease a CSC, but is itself a required step in the overall CSC leasing process.

Indeed, the RS Agreement tracks every step involved in the process of obtaining, using, and

retaining a CSC. It also discusses the entities involved in the CSC system: CTIA, which

signatories agree will "serves as their [CSC] Administrator;" the "Participating Carriers," who

are the "service providers in the United States that are participating in CSC services;" and the

"Aggregator[s]," which are "entit[ies] that provide[] connectivity from wireless carriers'

subscribers for the purpose of connecting to CSC campaigns." RSA ¶¶ 1, 2. Although the RS

Agreement does not discuss WMC by name, it does discuss the content audit and review process

and anticipates that this process will be completed by "CTIA *or its agents*," RSA ¶ 5 (emphasis

added), and WMC is an agent of CTIA.

     Plaintiffs' factual allegations alone demonstrate that the claims here arise directly from

the subject matter of the RS Agreement. Specifically, Plaintiffs allege that to effectuate their

anti-competitive scheme, Defendants: "voted to create and implement the CTIA system," SAC ¶

60; forced businesses into "using the new five-digit (later also six-digit) CSCs," SAC ¶ 63; "only

permit[ted] the transmission of A2P SMS through [CSCs]," SAC ¶ 63; "refuse[d] to deal with

any CSC Lessee seeking to use [non-CSC numbers]," SAC ¶¶ 64, 65; and "formed an extra-

---

[6] "CSCs are a string of numeric characters that are interoperable across communication service providers in the United States that are participating in CSC services ("Participating Carriers")." RSA ¶ 2.

governmental agency, which has prescribed rules for the regulation and restraint of interstate commerce and provided extra-judicial methods for determination and punishment of violations, including denial of access to the Carrier Defendants' networks," SAC ¶ 70. Indeed, the very term Plaintiffs conscript to describe themselves and the putative class members, "CSC Lessees" - - a group they define as "persons transmitting A2P SMS," SAC ¶ 7 -- is premised upon the relationships entered into through the RS Agreement and is a status only conferred to those who have assented to the terms of that agreement. These factual allegations, alone, indicate that the claims premised upon these same facts "arise from the subject matter" of the RS Agreement. *See Lismore*, 2012 WL 3577833, at *7; *c.f. Chikar*, 75 Va. Cir. 337, 2008 WL 6759965, at *7-8.

The specific allegations in Plaintiffs' claims make this all the more clear. In their first claim, Plaintiffs allege that "Defendants have enforced and continue to enforce their combination or conspiracy . . . through the audit process conducted by WMC and other Defendants and by blocking CSCs." SAC ¶ 135. That claim also alleges that, as a result of the alleged conspiracy, "Plaintiffs . . . ha[d] to pay unreasonable, unnecessary and inflated CSC lease fees, per-message fees, program review fees and connectivity fees," and that it "resulted in a number of [putative plaintiffs] losing their connections to the Carrier Defendants and the Aggregator Defendants as punishment for their attempted use of [non-CSC] numbers or for having allegedly improper content." SAC ¶¶ 137, 138. Accordingly, the scheme, the harm, and the damages alleged in the first claim directly relate to and arise from the subject matter of the RS Agreement, which implements the CSC system, sets the fees and costs, and establishes the audit system and the right to sanction violators.

The same is true for Plaintiffs' second and third claims. In the second claim, Plaintiffs allege that Defendants forced "would-be CSC Lessees to lease CSCs through co-conspirator

Neustar at artificially fixed, maintained, inflated or stabilized prices," required "all CSC Lessees

to connect to the Carrier Defendants through the Aggregator Defendants and pay unnecessary

connectivity fees and inflated per-message fees," and charged "program review fees to CSC

Lessees at unnecessary and inflated prices." SAC ¶¶ 142, 143.  In the third claim, Plaintiffs

allege that by requiring prospective A2P users to lease CSCs in order to transmit messages to the

Carrier Defendants' subscribers, Defendants conspired to eliminate competition and establish

monopolistic control over the A2P market, and that they maintained further control of this

monopoly by requiring Lessees to use aggregators and by implementing an onerous and

expensive content auditing process.  SAC ¶¶ 156, 157, 158, 159.  As with the first claim, these

claims are directly related to the CSC system, its use, the systems it creates, and the relationships

that arise as a result of signing the RS Agreement.

Finally, it is telling that Plaintiffs have not included Neustar as a named defendant in this

action.  As Plaintiffs' counsel stated at oral argument, part of their purported rationale for not

naming Neustar was "[b]ecause there is an arbitration clause that might apply to Neustar, and we

didn't want to have to litigate that with Neustar."  Tr. 32:14-16.  The Court will address

additional implications of this statement, *see infra* Sections IV.C.2 and VI, but notes now that

counsel's statement supports the conclusion that the claims at issue fall within the subject matter

of the arbitration clause.  That is, the statement acknowledges that if Plaintiffs had named

Neustar as a defendant, their claims against Neustar -- which are identical to those against the

named Defendants -- would likely fall within the subject matter of the RS Agreement and the

arbitration clause.[7]  Ultimately, as in *Ragone*, the subject matter of the arbitrable dispute between

---

[7] The Court recognizes that Plaintiffs now assert that these claims also would not be arbitrable under their theory as
to the limitation on scope.  That ultimately unavailing argument is likewise weakened by the failure to name Neustar
and the rationale for not doing so, and will be discussed in more detail below.

the signatories is factually intertwined with the dispute between the signatory and the non-signatory and "is, in fact, the same dispute." 595 F.3d at 128.

    2.  *The Relationship Between the Parties*

    "The second prong of the equitable estoppel test looks at whether there exists a sufficiently 'close relationship' between the signatory and the non-signatory who seeks to compel arbitration." *Lismore*, 2012 WL 3577833, at *7 (citing *Sokol Holdings, Inc.,* 542 F.3d at 359, and *Ragone,* 595 F.3d at 127-28). This is a "fact-specific" inquiry: "there must be a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement." *Sokol Holdings, Inc.,* 542 F.3d at 359. In other words, for estoppel to apply, there "must be a relationship among the parties which either supports the conclusion that [the signatory] had consented to extend its agreement to the [non-signatory], or, otherwise put, made it inequitable for [the signatory] to refuse to arbitrate on the ground that it had made no agreement with [the non-signatory]." *Id.* at 361; *see also Lismore*, 2012 WL 3577833, at *8; *Ragone,* 595 F.3d at 128 (equitable estoppel is appropriate where the signatory knew at the start of her employment that she would work with and be supervised by the non-signatory entity).

    Plaintiffs' relationship with the Carrier Defendants, CTIA, and WMC is sufficiently close to justify estopping Plaintiffs from denying their contractual obligation under the RS Agreement to arbitrate disputes of this kind. First, CTIA and Carrier Defendants are "linked textually" to the RS Agreement that Plaintiffs signed. *See Choctaw Generation, Ltd. P'ship*, 271 F.3d at 408. The RS Agreement mentions CTIA over twenty times and the Carrier Defendants (labeled "Participating Carriers" in the Agreement) eighteen times. The RS Agreement does not

specifically mention WMC, but does refer to "agents" of CTIA and anticipates that their role will be precisely the one that WMC in fact played.  RSA ¶¶ 5, 9.  Although neither necessary nor sufficient in itself, *compare id.* ("textual linking" supported equitable estoppel), *with Ragone,* 595 F.3d at 127 (even absent textual linking, plaintiff still equitably estopped), the numerous, prominent references to CTIA and these groups of Defendants supports the application of equitable estoppel in this case.

Second, these Defendants are not only mentioned or referred to in the RS Agreement, they are also vested with rights and responsibilities.  Without addressing the additional question whether these or other Defendants can enforce the RS Agreement as third party beneficiaries, it is nonetheless compelling that they have active roles in the Agreement.  This is particularly clear with regard to CTIA.  For instance, the first line of the second paragraph of the RS Agreement states that "Registry and CTIA reserve the right to modify any of the terms and conditions contained in this Agreement or any terms, policies, or guidelines incorporated by reference at any time and in its sole discretion," RSA p. 1,  and provides that "Registry, CTIA and their agents/subcontractors reserve the right . . . to strictly enforce th[e] Agreement," RSA ¶ 8.  This second provision, then, would also apply to WMC, as an agent of CTIA, as would the separate provision noting that "CTIA or its agents may attempt to notify you in the event of any . . . penalties being imposed," for violations of the AUP.  RSA ¶ 5.

The RS Agreement also provides, among other things, the following with regard to CTIA and Carrier Defendants:  (1) "[CSC Lessees] consent[ed] to the disclosure by Registry to CTIA or to Participating Carriers . . . [of] the Application Information and all data relating to the use of the CSC," RSA ¶ 6; (2) recognition that violations of the acceptable use policy "may result in Participating Carriers restricting [Lessees] ability to use the CSC," RSA ¶ 7(b)(i); and (3) that the

Lessees "agree to indemnify, defend and hold harmless Registry, CTIA, the 'Participating Carriers,' and each of their respective parents, subsidiaries, shareholders, [and] members," RSA ¶ 16. The conferral of these rights and benefits is demonstrative of the fact that Plaintiffs were or should have been aware that CTIA, the Carrier Defendants, and WMC were integral to and part of the RS Agreement.

Overall, the inclusion of these Defendants in the language and effects of the RS Agreement fully supports the application of equitable estoppel in this matter. Plaintiffs cannot claim that they were unaware that by signing onto the Agreement they were entering into a relationship with CTIA, its agents -- to include WMC -- and the Carrier Defendants, whereby disputes between them and related to the content and substance of the RS Agreement could be subject to arbitration through the RS Agreement's arbitration provision. And, indeed, Plaintiffs do not argue that they were anything but aware of this fact. Accordingly, because the claims at issue arise from the subject matter of the RS Agreement and there is a "close relationship" between the parties, and in light of Plaintiffs not denying either of these contentions, Defendants have made the necessary showing for equitable estoppel. Plaintiffs argue that equity should nonetheless preclude Defendants from enforcing the arbitration clause through equitable estoppel, which the Court will now address.

### 3. Unclean Hands

As noted above, in lieu of arguing that equitable estoppel is not appropriate in this case, Plaintiffs argue that Defendants cannot avail themselves of this equitable doctrine because they have unclean hands. Specifically, Plaintiffs argue that Defendants' wrongful actions -- in establishing and maintaining the CSC system -- are "sufficient to invoke the unclean-hands doctrine to block any claim of equitable estoppel." Pls. Opp. 7. Defendants argue that the

unclean hands doctrine only acts as a bar to enforcement of an arbitration agreement under equitable estoppel if the unclean hands relate to the arbitration agreement itself, not to the merits of the underlying dispute. Dkt. No. 189 at 4. For the reasons discussed below, the Court agrees with Defendants that unclean hands is inapplicable to the current dispute.

"The doctrine of 'unclean hands' is an ancient maxim of equity courts," *Richards v. Musselman,* 221 Va. 181, 185 (Va. 1980), and is generally expressed in these terms: "Pursuant to the equitable maxim that 'He who comes into equity must come with clean hands,' . . . the complainant seeking equitable relief must not himself have been guilty of any inequitable or wrongful conduct with respect to the transaction or subject matter sued on." [8] *Cline v. Berg,* 273 Va. 142 (Va. 2007); *see also Bein v. Heath,* 47 U.S. 228, 247 (1848) ("The equitable powers of this court can never be exerted in behalf of one who has acted fraudulently, or who by deceit or any unfair means has gained an advantage."); *c.f. PenneCom B.V. v. Merrill Lynch,* 372 F.3d 488 (2d Cir. 2004) (noting that "New York courts have long applied the maxim that one 'who comes to equity must come with clean hands,'" *Amarant v. D'Antonio,* 197 A.D.2d 432, 434, 602 N.Y.S.2d 837, 838 (N.Y. App. Div.1993)). This doctrine "is not absolute and has its limitations." *Harrell v. Allen,* 183 Va. 722, 732 (Va. 1945). Among these limitations are that "[i]t will not be applied where an inequitable result would be reached," *id.,* and that it "only applies to the particular transaction under consideration . . .[t]he wrong must have been in regard to the matter in litigation." *Perel v. Brannan,* 267 Va. 691, 706 (Va. 2004) (quoting *Richards,* 221 Va. at 187); *Harleysville Mut. Ins. Co. v. Conner,* No. 04 Civ. 93, 2005 WL 2427907, at *10 (E.D. Va. Sept. 30, 2005).

---

[8] The parties agree that Virginia law applies to the determination of unclean hands with regard to the RS Agreement. *Tucker v. Ford Motor Co.,* 72 Va. Cir. 420, 2007 WL 6005306, at *2 (Va. Cir. Ct. Feb. 01, 2007) ("Virginia Courts have found the federal courts' consideration of the Federal Arbitration Act, 9 U.S.C. § 1 et seq., to be instructive when interpreting the Virginia Uniform Arbitration Act, Va. Code § 8.01-581.01 *et seq. McMullin v. Union Land & Mgmt. Co.,* 242 Va. 337, 341 (Va. 1991).

In addition to the general limitations on the application of the unclean hands doctrine, the scope of the Court's review is constrained in two manner.  First, pursuant to the FAA, "in passing upon a [FAA] § 3 application for a stay while the parties arbitrate, a federal court may consider only issues relating to the making and performance of the agreement to arbitrate," and may not consider challenges to the contract generally.  *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967) ("[T]he statutory language [of the FAA] does not permit the federal court to consider claims of fraud in the inducement of the contract generally."); *see also* 9 U.S.C. § 4 ("[U]pon being satisfied that the making of the agreement for arbitration . . . is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.").  Second,  pursuant to both Virginia and federal law, for unclean hands to apply, "[t]he misconduct must relate directly to the matter in litigation." *Musselman*, 221 Va. at 187 (quoting 2 J. POMEROY, A TREATISE ON EQUITY JURISPRUDENCE § 397-404 (5th ed. 1941)); *Cline*, 273 Va. at 147-48 (same); *Specialty Minerals, Inc. v. Pluess-Staufer AG*, 395 F. Supp. 2d 109, 112 (S.D.N.Y. 2005) ("The unclean hands doctrine applies only where the misconduct alleged as the basis for the defense 'has immediate and necessary relation to the equity that [plaintiff] seeks in respect of the matter in litigation.'" *Keystone Driller Co. v. Gen. Excavator Co.,* 290 U.S. 240, 245 (1933)).

Because the Court's subject matter jurisdiction in reviewing a § 3 motion is limited to challenges that "go[] to the 'making' of the agreement to arbitrate," *Prima Paint*, 338 U.S. at 404, it stands to reason that the misconduct allegedly giving rise to the unclean hands must also "relate directly" to the "'making' of th[at] agreement." *See id.*  At oral argument, Plaintiffs acknowledged that they have not made any arguments "explicitly" alleging that Defendants' hands are unclean with regard to the arbitration provision, but claimed that they had done so

implicitly. Tr. 56:23. This implicit allegation, they argued, is that the arbitration clause is what makes the CSC system "unchallengeable." Tr. 57:12. The basis for this argument is that two of the Plaintiffs submitted declarations stating that they "could not and would not" pay the costs associated with arbitrating their claims. Tr. 57:18-25 (referencing Goldman Decl. ¶ 7 ("If TextPower were asked or required to pay or advance filing fees and arbitrator costs . . . it could not and would not do it."), and Ellis Decl. ¶ 6 ("iSpeedbuy . . . could not afford to pay or advance [the arbitration costs].")). This argument is generally unconvincing, as these parties' unwillingness to arbitrate does not make the overall CSC system unchallengeable, and is particularly unconvincing in light of the fact that the third Plaintiff, Club Texting, has made no indication that it too will not arbitrate its dispute.

More persuasive is Plaintiffs argument that because equitable estoppel necessarily looks beyond the arbitration clause, to "the relationship of the parties, the contract they signed, and the issues that had arisen among them," defenses to equitable estoppel should likewise not be constrained to the arbitration provision.[9] Tr. 58:17-18 (citing *JLM Indus., Inc.*, 387 F.3d at 178 (quoting *Choctaw Generation Ltd., P'ship*, 271 F.3d at 406)). However, the fact that an equitable estoppel claim is a predicate to arbitration does not expand the scope of the Court's congressionally authorized review in addressing a § 3 motion to compel arbitration. Indeed, in considering an equitable estoppel argument the Court is directly addressing the question whether there is an agreement to arbitrate, which falls squarely within its scope of review. This is neither different nor broader than the Court's ability to review claims of "fraud in the inducement *of the agreement to arbitrate*," as both issues "go[] to the 'making' of the agreement to arbitrate[,

---

[9] "[I]f you look at their equitable estoppel arguments, it's not . . . based just on the arbitration clause. It's based on the whole agreement. It's based on the relationship of the parties. So, is that the way it works? They use the allegations in the complaint? They can use the entire contract to prove equitable estoppel? And we can't rebut it for the unclean hands doctrine because we're limited just to the arbitration clause. That doesn't seem fair." Tr. 58:19-59:2.

which] the federal court may proceed to adjudicate . . . ." *Prima Paint*, 388 U.S. at 403-04; *c.f.*
*Tucker*, 72 Va. Cir. 420, at *2 (noting that "allegations that the contract generally was procured
by fraud do not eliminate the parties' obligation to arbitrate," where plaintiff "ha[d] not alleged
that the arbitration clause was specifically procured by fraud").

The Supreme Court has firmly established that, pursuant to the statutory language of the
FAA, the Court's ability to review the "making of the agreement to arbitrate," is derived from
the severability of arbitration clauses from the contracts in which they are located. *See Buckeye*
*Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 446 (2006) ("As a matter of substantive federal
arbitration law, an arbitration provision is severable from the remainder of the contract."); *Prima*
*Paint*, 388 U.S. at 402-404. Because arbitration clauses are severable, if adhesion is contested
and ambiguous, ordinary principals of contract law permit the party seeking to enforce the
arbitration clause to look to material beyond the clause itself to prove that the clause is
enforceable. Just as a party seeking to avoid arbitration may challenge arbitration so long as
their challenge relates directly to the agreement to arbitrate, so too can a party seeking to enforce
that agreement look to the legal and equitable grounds for enforcement. *See Prima Paint*, 388
U.S. at 403-404; *c.f.* 9 U.S.C. § 2 (arbitration provisions "shall be valid, irrevocable, and
enforceable, save upon such grounds as exist at law or in equity for the revocation of any
contract").

In that way, it is incorrect to say that equitable estoppel looks beyond the scope of the
arbitration clause or that in applying equitable estoppel the scope of the permissible arguments
with regard to unclean hands is broadened. Rather, in contesting the application of equitable
estoppel, Plaintiffs still must discuss why Defendants' hands are unclean with regard to the
"making of the agreement to arbitrate." *Buckeye Check Cashing, Inc.*, 546 U.S. at 446. And,

whereas Defendants have made a number of strong and ultimately convincing arguments for why

the parties should be viewed as having made an agreement to arbitrate based on the

intertwinedness of the claims and the relationship between the parties, Plaintiffs have failed to

put forward a single argument regarding unclean hands that goes to the agreement to arbitrate

rather than to the contract as a whole.  Contrary to Plaintiffs' assertion, it is not unfair to allow

Defendants to "use the entire contract to prove equitable estoppel," Tr. 58:24-25, as long as their

use of the contract "goes to the 'making' of the agreement." *Prima Point*, 388 U.S. at 404.

Similarly, in arguing against equitable estoppel on the basis of unclean hands, Plaintiffs are not

"limited just to the arbitration clause," Tr. 59:1-2, but they are limited to arguments that the acts

giving rise to the unclean hands relate to the making of the agreement to arbitrate, not to the

overall validity of the contract. *See Prima Point*,  388 U.S. at 404 ("[I]n passing upon a § 3

application for a stay while the parties arbitrate, a federal court may consider only issues relating

to the making and performance of the agreement to arbitrate."); *Musselman*, 221 Va. at 187

("The misconduct must relate directly to the matter in litigation."); *c.f. Buckeye Check Cashing,

Inc.*, ("We reaffirm today that, regardless of whether the challenge is brought in federal or state

court, a challenge to the validity of the contract as a whole, and not specifically to the arbitration

clause, must go to the arbitrator.").

   Ultimately, even after being given the opportunity at oral argument to specifically

address this point, none of Plaintiffs' "unclean hands argument[s] implicate[] the making of the

arbitration agreement in any way." *See Wolff v. Westwood Mgmt., LLC*, 503 F. Supp. 2d 274,

283-84 (D.D.C. 2007) ("[R]eject[ing] the argument that equitable principles estop defendants

from invoking the arbitration clause.").  In that way, as in others, Plaintiffs' reliance on Judge

Rakoff's decision in *Motorola Credit Corp. v. Uzan*, 274 F. Supp. 2d 481 (S.D.N.Y. 2003), is

also misplaced.  In that case, Judge Rakoff determined that even if the defendants could have asserted equitable estoppel, which he concluded they could not, equity would have prevented its application.  *Id.* at 505-506.  Importantly, however, his conclusion with regard to equity was based on the facts that the plaintiffs had "demonstrated that defendants . . . acted fraudulently . . . before defendants sought to compel arbitration," and "defendants, through inconsistencies, false representations, and tactical diversions, effectively carried their fraud right into the courtroom."  *Id.* at 505-506.  The current case is thus distinguishable both procedurally and factually:  first, Defendants sought to compel arbitration from the very commencement of proceedings, and second, Defendants have in no way "carried their fraud" into the Court.

As a final note, Plaintiffs' argument fails on practical grounds:  if a plaintiff seeking to avoid being equitably estopped from arbitrating her dispute could rely on nothing more than the allegations in her complaint, the unclean hands doctrine would effectively preclude a defendant from ever compelling such arbitration on equitable grounds.  That is, if any claim of wrongful conduct in a complaint could be used to demonstrate the defendant's unclean hands, no defendant could ever use equitable estoppel -- or any other equitable doctrine -- to enforce an arbitration agreement.  Such a result is unsupported by logic or the law.  It would not only run afoul of the substantial case law allowing defendants to equitably estop plaintiffs from avoiding certain arbitration clauses, but would also be contrary to the underlying rationale for applying equitable estoppel in the arbitration context.  *See AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740, 1748 (2011) ("The 'principal purpose' of the FAA is to ensur[e] that private arbitration agreement are enforced according to their terms." (quoting *Volt Info. Scis., Inc.*, 489 U.S. at 478)).  More broadly, allowing parties to plead around or escape equitable estoppel based solely on the matters alleged in a complaint, regardless of their bearing on the precise issues in

litigation, would run contrary to the long-standing proposition that "courts of equity do not make the quality of suitors the test," but instead "apply the maxim requiring clean hands only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation." *Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 245 (1933).

Accordingly, because Plaintiffs failed to point to any argument or allegation that could be construed, either explicitly or implicitly, as demonstrating that Defendants' hands were unclean with respect to the arbitration clause or the making of the arbitration agreement, the Court concludes that Defendants may equitably estop Plaintiffs from avoiding arbitration pursuant to the RS Agreement. *C.f. Wigglesworth v. Taylor*, 239 Va. 603, 608 (Va. 1990) ("Because application of [the 'unclean hands'] doctrine depends upon the facts of a particular case, it is appropriately left to the sound discretion of the fact finder." (internal citation omitted)).

*4. Conclusion: Equitable Estoppel Applies*

Without addressing the alternate theories under which Defendants could potentially compel arbitration, the Court concludes that Plaintiffs are estopped from avoiding arbitration under the RS Agreement with the Carrier Defendants, CTIA, and WMC. This, alone, does not resolve the pending motions to compel. Rather, the Court must still address whether the dispute at issue falls within the scope of the arbitration agreement, and, eventually, whether Plaintiffs can avoid arbitration of this dispute, as a whole, because the cost of arbitration would deny them effective vindication of their claim. *Infra*, Section VI.

C. Scope of the RS Agreement's Arbitration Clause

Having determined that these Defendants can require Plaintiffs to arbitrate under the RS Agreement, the next question is whether the dispute falls within the scope of the arbitration

clause. Plaintiffs argue that their Sherman Act antitrust claims, and indeed all federal claims, fall outside the scope of the disputes covered by the arbitration clause. Specifically, they argue that the RS Agreement's arbitration provision only covers disputes arising out of the substantive, internal laws of the Commonwealth of Virginia and does not apply to disputes, like this one, that arise under federal statutes. Plaintiffs recognize that the overall scope of the arbitration clause is broad, but argue that the breadth of the clause itself is nonetheless limited by the sentence in it providing that "[t]he arbitrators shall determine the matters in dispute in accordance with the internal laws of the Commonwealth of Virginia, without reference to the Convention on Contracts for the International Sale of Goods." RSA ¶ 19; Pl. Opp. 3-5. This, they argue, means that "only disputes arising under the internal laws of Virginia are arbitrable." Pl. Opp. 3. Defendants argue that Plaintiffs' contentions are meritless because "the provision [Plaintiffs discuss] says nothing about what law the 'matters in dispute' must arise under; rather, it goes to the procedures the arbitrators must employ in resolving arbitrable disputes." Dkt. No. 189 at 2.

For the reasons discussed below, the Court concludes that Plaintiffs' federal antitrust claims fall within the broad scope of the RS Agreement's arbitration provision. Before addressing the parties arguments, however, it first bears noting that with this argument, as with the argument regarding whether the claims arose out of the subject matter of the dispute, Plaintiffs' position is undercut by their original stated rationale for not naming Neustar as a defendant in this action. Specifically, by stating that they did not name Neustar because the arbitration clause "might apply," Tr. 32:15, Plaintiffs again effectively recognize the weakness of their arguments with regard to the scope of the RS Agreement's arbitration clause. Although not conclusive, both the failure to name Neustar and the original explanation for this failure nonetheless color the discussion of scope.

*1.  The RS Agreement Arbitration Provision*

As noted above, the first line of the RS Agreement's arbitration provision states that the provision covers "[a]ny dispute, controversy, or claim arising out of or relating to this Agreement or the breach, termination, non-renewal of this Agreement or any CSC, refusal to grant new CSCs, or the validity of this Agreement . . . ." RSA ¶ 19.  Notwithstanding the expansive language of this initial line, Plaintiffs argue that "only disputes arising under the internal laws of Virginia are arbitrable," based on language in the remainder of the arbitration provision that says:

> The arbitrators shall determine the matters in dispute in accordance with the internal law of the Commonwealth of Virginia, without reference to the Convention on Contracts for the International Sale of Goods.  Except as precluded by the United Nations Convention on the Recognition and Enforcements of Foreign Arbitral Awards, the internal procedural and substantive laws of Virginia and the [FAA] shall govern all questions of arbitral procedure, arbitral review, scope of arbitral authority, and arbitral enforcement.

RSA ¶ 19.  They argue that this language limits the otherwise broad scope of the arbitration agreement to causes of action arising under Virginia law.

*2.  Discussion*

The question whether the parties have submitted a particular dispute to arbitration, *i.e.,* the "question of arbitrability," is "an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise." *AT&T Techs., Inc. v. Commc'ns Workers,* 475 U.S. 643, 649 (1986); *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943 (1995).  Generally, the question "whether an arbitration clause . . . applies to a particular type of controversy is for the court." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) (citing *AT&T Techs., Inc.,* 475 U.S. at 649).  To the extent that this inquiry involves contract interpretation, it is to be answered in accordance with state -- here Virginia -- law governing the construction of contracts.

*Amchem Prods., Inc. v. Newport News Circuit Ct. Asbestos Cases*, 264 Va. 89, 97 (Va. 2002).

However, "the United States Supreme Court has stated that, 'in applying general state law

principals of contract interpretation to the interpretation of an arbitration agreement within the

scope of the [FAA], due regard must be given to the federal policy favoring arbitration." *Bank of

the Commonwealth v. Hudspeth*, 282 Va. 216, 222 (Va. 2011) (quoting *Volt Info. Scis. Inc.*, 489

U.S. at 475-76).

    Pursuant to federal and Virginia state law, although "a party cannot be required to submit

to arbitration any dispute which he has not agreed so to submit," *U.S. Postal Serv. v. Am. Postal

Workers Union, AFL-CIO*, 204 F.3d 523, 528 (4th Cir. 2000) (internal quotation marks omitted),

"the existence of a broad agreement to arbitrate creates a presumption of arbitrability which is

only overcome if 'it may be said with positive assurance that the arbitration clause is not

susceptible of an interpretation that covers the asserted dispute[, and] [d]oubts should be resolved

in favor of coverage." *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir. 1997) (quoting

*Associated Brick Mason Contractors of Greater N.Y., Inc. v. Harrington*, 820 F.2d 31, 35 (2d

Cir. 1987); *Washington Square Sec., Inc. v. Aune*, 385 F.3d 432, 436 (4th Cir. 2004) (same);

*Hudspeth*, 282 Va. at 222 (same).

    Although Virginia contract law applies, pursuant to federal law, "any doubts concerning

the scope of arbitrable issues should be resolved in favor of arbitration," to include issues

regarding "the construction of the contract language itself."[10]  *Moses H. Cone Mem'l Hosp. v.

Mercury Const. Corp.*, 460 U.S. 1, 24-25 (1983).  Moreover, pursuant to Virginia law, which has

adopted and applied federal principles with regard to determinations of the scope of arbitrable

---

[10] Plaintiffs incorrectly argue that any ambiguity should be read against the drafter.  The Supreme Court has applied
the presumption of enforceability, rather than the rule of *contra proferentem*, when determining questions of
arbitrability.  *See Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25 ("The Arbitration Act establishes that, as a matter
of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration,
whether the problem at hand is the construction of the contract language itself or an allegation of wavier, delay, or a
like defense to arbitrability.").

issues, *Amchem Prods., Inc.*, 264 Va. at 96-97, "[o]nly 'the most forceful evidence, showing the intent by [the parties] 'to exclude the claim from arbitration' can overcome the presumption of arbitrability." *Hudspeth*, 282 Va. at 226 (quoting *Aune*, 385 F.3d at 438 (quoting and applying *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 584-85 (1960))). In light of this, the Supreme Court of Virginia has held that "[the] strong presumption of arbitrability mandates that a court must require the parties to submit to arbitration if the scope of an arbitration clause subject to the federal act is open to question." *Amchem Prods. Inc.*, 264 Va. at 97; *accord Hudspeth*, 282 Va. at 226 ("[W]e agree with the Fourth Circuit's straightforward application of governing United States Supreme Court precedent such as *Volt,* 489 U.S. at 476, that any ambiguities as to the scope of the arbitration clause itself must be resolved in favor of arbitration." (internal quotation marks omitted)). "In the absence of any express provision excluding a particular grievance from arbitration, . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, . . . the arbitration clause [is] quite broad." *Warrior & Gulf Nav. Co.*, 363 U.S. at 584-85; *Hudspeth*, 282 Va. at 222.

The first line of the provision at issue is typical of broad arbitration provisions, which "encompass[] any disputes that touch matters covered by the contract in which the arbitration provision is found." *Robinson Brog Leinwand Greene Genovese & Gluck P.C. v. John M. O'Quinn & Assocs., LLP*, 2013 WL 1707897 (2d Cir. Apr. 22, 2013) ("*Robinson Brog*") (citing *ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.,* 307 F.3d 24, 33-34 (2d Cir. 2002)). As such, the arbitration provision is entitled to the "traditional presumption of arbitrability," *id.*; *Hudspeth*, 282 Va. at 226, and Plaintiffs bear the burden of demonstrating that the remainder of the clause was intended to limit the arbitrable causes of actions to those arising under Virginia

law, such that the current dispute would not be within the scope of the RS Agreement's arbitration provision.

Plaintiffs maintain that the later portion of the arbitration provision is an unambiguous and explicit "clarification of the scope of the arbitration provision," Tr. 39:1-2, but have *at best* put forward a plausible reading of the provision as implicitly limiting the otherwise extraordinarily broad language that opens the paragraph. This reading, plausible though it may be, in no way amounts to an "express provision excluding [all disputes not arising under Virginia substantive law] from arbitration." *See Warrior & Gulf Nav. Co.*, 363 U.S. at 584-85; *c.f. Hudspeth*, 282 Va. at 222. This is particularly true given that Defendants' reading of the clause is just as, if not more, plausible than the one Plaintiffs offer. Specifically, Defendants argue that this is a choice of law provision that defines "what the arbitrator should use to decide matters," the effect of which is to "exclude an international convention on goods, presumably because the CTIA and Neustar did not . . . want these short codes treated as goods." Tr. 8:18-21. That the clause is "susceptible" of this interpretation is grounds for resolving the dispute as to the coverage in Defendants' favor. *See WorldCrisa Corp.*, 129 F.3d at 74; *Aune*, 385 F.3d at 436 (noting that "[t]he Supreme Court directive to resolve doubts and ambiguities in favor of arbitration appears to foreclose recourse to extrinsic evidence of intent," but concluding that arbitration was appropriate, regardless, because the evidence offered was "neither 'forceful' nor 'clear'"). The Court concludes that to the extent the arbitration clause is ambiguous as to coverage of the federal claims at issue, such ambiguity "must be resolved in favor of arbitration," *Hudspeth*, 282 Va. at 226, and the provision cannot then be interpreted as containing the limitation Plaintiffs would have the Court read into it.

Plaintiffs argue that this conclusion renders superfluous the later "Governing Law" paragraph of the arbitration provision. Pls. Opp. 5. Specifically, they argue that if the provision at issue is "merely a conflict-of-law provision," then it would be unnecessary to include a "Governing Law" provision as well. Defendants disagree. They argue that the "Governing Law" provision "is a rule of construction for interpreting the entire contract that ousts ordinary conflict-of law analysis," whereas "the reference to Virginia law in the arbitration clause applies only to the conduct of the arbitrators in resolving disputes." Dkt. No. 189 at 3.

Defendants' readings of the relevant provisions does not render the Governing Law provision superfluous. In applying Virginia contract law, "this Court must construe the contract as a whole," and must do so "from an examination of the *entire* instrument, giving full effect to the words the parties actually used." *Signature Flight Support Co. v. Landow Aviation Ltd. P'ship*, 698 F. Supp. 2d 602, 618 (E.D. Va. 2010) (emphasis in original) (quoting *Layne v. Henderson,* 232 Va. 332, 337-38 (Va. 1986); *id.* ("No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly."). Here, the mention of Virginia law in the arbitration provision says that the "arbitrators shall determine the matters in dispute in accordance with the internal law of the Commonwealth of Virginia," while the Governing Law paragraph states that the "Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia." RSA ¶¶ 19, 21. As Defendants note, by their plain terms, the first clause discusses "the conduct of the arbitrators in resolving arbitrable disputes," while the second clause is "a rule of construction for interpreting the entire contract." Dkt. No. 189. Far from rendering the Governing Law paragraph superfluous, Defendants' reading of the

arbitration clause, more so than Plaintiffs' reading, "giv[es] full effect to the words the parties actually used." *Signature Flight Support Co.*, 698 F. Supp. 2d at 602.

Finally, even if the Court were convinced that the arbitration provision was limited to "[a]ny dispute, controversy or claim," cognizable under substantive Virginia law, and "arising out of or relating to [the RS] Agreement or the breach, termination, non-renewal of this Agreement . . . ," the dispute at issue would nonetheless fall within the scope of that more narrow, exclusive provision. Pursuant to Supreme Court precedent, "the exclusion of some areas of possible dispute from the scope of an arbitration clause does not serve to restrict the reach of an otherwise broad clause in the areas in which it was intended to cover." *Mitsubishi Motors Corp.*, 473 U.S. at 625 n.13. Accordingly, "[i]n determining whether a particular claim falls within the scope of the parties' arbitration agreement, we focus on the factual allegations in the complaint rather than the legal causes of action asserted" *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 846 (2d Cir. 1987); *JLM Indus., Inc.,* 387 F.3d at 177 n.6 ("If the allegations underlying the claims 'touch matters' covered by the parties' agreements, then those claims must be arbitrated, whatever the legal labels attached to them." (quoting *Genesco, Inc.*, 815 F.2d at 846)); *see also Chikar*, 2008 WL 6759965, at *5 n.14 (noting that the Second and Fourth Circuits apply similar tests, the latter Circuit's asking "whether 'a *significant relationship* exists between the asserted claims and the contract in which the arbitration clause is contained'" (quoting *Long v. Silver*, 248 F.3d 309, 316 (4th Cir. 2001))). Read in this manner -- focusing on the facts alleged rather than the claims asserted -- the dispute in this case would plainly fall within the scope of the arbitration agreement even if that agreement were limited in the manner that Plaintiffs propose.

D. Conclusion

For the reasons discussed above, the Court concludes that the dispute at issue falls within the scope of the RS Agreement's arbitration provision.

## V.   ARBITRATION UNDER THE AGGREGATOR AGREEMENTS

Having determined that Plaintiffs must arbitrate their dispute with the Carrier Defendants, CTIA, and WMC, pursuant to the RS Agreement, the Court will now address the joint motion filed by individual aggregator Defendants OpenMarket and mBlox.  Although filed jointly, given the nature of their arguments, the Court will address OpenMarket's and mBlox's arbitration arguments separately.  Ultimately, the Court concludes that OpenMarket may compel arbitration with all Plaintiffs and that mBlox may compel arbitration with Club Texting.

### A.   OpenMarket's Arbitration Arguments

OpenMarket argues that all three Plaintiffs should be required to arbitrate their disputes with it, pursuant to two of its Commercial Service Agreements ("CSA") -- one, between OpenMarket and TextPower (the "TextPower CSA"), and a second, between OpenMarket and non-party 4INFO, Inc. (the "4INFO CSA").  Specifically, OpenMarket argues that it can compel TextPower to arbitrate because the TextPower CSA contains a valid and enforceable arbitration agreement, which this dispute falls within, and that iSpeedbuy and Club Texting should be equitably estopped from avoiding arbitration because, although not signatories to any agreement with OpenMarket, they knowingly received direct benefits from the TextPower CSA and the 4INFO CSA, respectively.  The Court will address these arguments in turn.

#### 1.   The Agreements

By their terms, the TextPower CSA is an aggregator agreement between OpenMarket and TextPower, which took effect on January 1, 2010, and the 4INFO CSA is an aggregator agreement between OpenMarket and non-party 4INFO, Inc. ("4INFO"), which took effect on

April 1, 2011. Emmet Decl. Ex. A 15; *id.* at Ex. B 4. Both agreements contain, among other things, the relevant contractual provisions describing the aggregator services that OpenMarket was to provide as well as the fees, costs, and terms associated with those services. *See generally, id.* at Ex. A, B. In addition, the two agreements contain an identical "Governing Law and Arbitration," clause, which provides:

> This Agreement shall be governed by the laws of the State of New York without reference to its principles of conflicts of laws. Any claim arising out [sic] or relating to this Agreement . . . shall be resolved exclusively by arbitration conducted in New York, NY, by a sole arbitrator ("Arbitrator") in accordance with the rules of the American Arbitration Association ("AAA").

Emmet Decl. Ex. A ¶ 14.5; Ex. B ¶ 21.5. Overall, the general terms of these agreements, though differently numbered, are essentially the same.

### 2. Direct Enforcement

The first question is whether OpenMarket can compel arbitration with TextPower pursuant to the terms of their agreement. As with the RS Agreement, the scope of the arbitration clause is broad and presumptively enforceable. *See Robinson Brog*, 2013 WL 1707897, at *2. Plaintiffs do not contest the validity of the TextPower CSA, as it applies to TextPower, or the application of the arbitration provision to the subject matter of their claims. Instead, Plaintiffs argue that the arbitration clause is inapplicable to the portion of Plaintiffs' claims that arise prior to January 1, 2010, the date the agreement took effect. Pls. Br. 20-21. Based on this, Plaintiffs conclude that "OpenMarket at most is entitled to a stay pending arbitration regarding claims of TextPower for actions after January 2010, but not for claims based on prior actions." Pls. Br. 21.

Because Plaintiffs recognize that some portion of TextPower's claims against OpenMarket are subject to arbitration under the parties' agreement, the Court is required to stay pending arbitration, regardless, and need not reach the question whether the arbitration provision

in the TextPower CSA has retroactive effect such that it would capture the full scope of Plaintiffs' claims in this action. *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) ("By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." (emphasis in original) (citing 9 U.S.C. §§ 3, 4)). Accordingly, the Court concludes TextPower must arbitrate its dispute with OpenMarket, pursuant to § 3 of the FAA.

### 3.  *Equitable Estoppel of a Non-Signatory*

Having determined that TextPower is required to arbitrate with OpenMarket, the Court now turns to Defendants' arguments that:  (1) iSpeedbuy is required to arbitrate its dispute with OpenMarket, also pursuant to the TextPower CSA; and (2) Club Texting is required to arbitrate its dispute with OpenMarket, pursuant to the 4INFO CSA.  Defendants argue that although iSpeedbuy and Club Texting are not signatories to the relevant agreements (the OpenMarket CSA and the 4INFO CSA, respectively), they are nonetheless required to arbitrate under the terms of those agreements because they have knowingly received direct benefits from these agreements.  Specifically, Defendants argue that iSpeedbuy and Club Texting directly benefited by using TextPower and 4INFO -- and thereby those entities' aggregator services, i.e., OpenMarket -- to transmit A2P SMS to their customers, and that they should therefore be equitably estopped from avoiding the arbitration clause in the relevant agreements.  Dkt. No. 166 at 17-20.  For the reasons discussed below, the Court agrees with Defendants.

### i.  Legal Standard

The Second Circuit has "set forth two types of estoppel cases." *Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l*, 198 F.3d 88, 98 (2d Cir. 1999) (citing

*Thomson-CSF, S.A.*, 64 F.3d at 778-79).  One type, described above with regard to the RS

Agreement, arises when the Court is asked "to estop a *signatory* from avoiding arbitration with a

nonsignatory." *Thomson-CSF, S.A.*, 64 F.3d at 779 (emphasis in original).  The other type,

described as "[t]he more typical case," "arises when a signatory to an arbitration agreement seeks

to bind a non-signatory to it." *Smith/Enron Cogeneration Ltd. P'ship*, 198 F.3d at 98.

OpenMarket's disputes with iSpeedbuy and Club Texting fall within this latter category.

   "Under th[is] estoppel theory, a company 'knowingly exploiting [an] agreement [with an

arbitration clause can be] estopped from avoiding arbitration despite having never signed the

agreement.'" *MAG Portfolio, Consultant, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 61

(2d Cir. 2001) ("*MAG Portfolio*") (alterations in quotation in original) (quoting *Deloitte*

*Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993)); *see also*

*Robinson Brog*, 2013 WL 1707897, at *2; *Bank of Am. Nat'l Ass'n v. Sopher*, No. 10 Civ. 8870

(LTS), 2011 WL 2419872, at *3 (S.D.N.Y. June 8, 2011).  "Guided by ordinary principles of

contract and agency, [the Second Circuit] ha[s]concluded that where a company knowingly

accepted the benefits of an agreement with an arbitration clause, even without signing the

agreement, that company may be bound by the arbitration clause." *MAG Portfolio,* 268 F.3d at

61 (quoting *Deloitte Noraudit A/S,* 9 F.3d at 1064 (internal quotation marks and citation

omitted)).

   "The benefits derived through this exploitation must be direct, meaning they flow directly

from the agreement in question." *Sopher*, 2011 WL 2419872, at *3 (citing *Thomson-CSF, S.A.,*

64 F.2d at 779, and *MAG Portfolio*, 268 F.3d at 62); *Adelphia Recovery Trust v. Bank of Am.,*

*N.A.*, No. 05 Civ. 9050 (LMM), 2009 WL 2031855, at *8 (S.D N.Y. July 8, 2009).  Benefits are

considered indirect, if "the nonsignatory exploits the contractual relation of parties to an

agreement, but does not exploit (and thereby assume) the agreement itself." *MAG Portfolio*, 268

F.3d at 62 (citing *Thomson-CSF*, 64 F.2d at 778-79, and *Adelphia Recovery Trust*, 2009 WL

20131855, at *8). "[T]he mere fact of a nonsignatory's affiliation with a signatory will not

suffice to estop the nonsignatory from avoiding arbitration, no matter how close the affiliation

is." *Oppenheimer & Co. Inc. v. Deutsche Bank AG*, No. 09 Civ. 8154 (LAP), 2010 WL 743915,

at *2 (S.D.N.Y. Mar. 2, 2010) (citing *MAG Portfolio*, 268 F.3d at 62).

      ii.    Arbitration Between OpenMarket and iSpeedbuy

Plaintiffs argue that iSpeedbuy cannot be bound to the arbitration agreement because it

did not directly benefit from the TextPower CSA, and, if it did receive a direct benefit, it did not

receive that benefit knowingly.[11]  Pls. Opp. 19-20.  Specifically, Plaintiffs argue that they are in

no way mentioned in the agreement, that the agreement does not confer any benefit to

iSpeedbuy, and that the presence of a secrecy clause in the agreement "means that [iSpeedbuy]

could never have seen the agreement and *knowingly* accepted any benefits." *Id.*

Contrary to Plaintiffs' position, the Court concludes that the benefit iSpeedbuy received

did flow directly from the TextPower CSA.  Specifically, the contractual relationship that the

TextPower CSA established between OpenMarket and TextPower allowed iSpeedbuy to send

A2P text-messages to its customers without having to enter into its own aggregator contract with

OpenMarket.  As Plaintiffs allege in the complaint, aggregator contracts like the TextPower CSA

were required in order for CSC Lessees -- like TextPower and iSpeedbuy -- to actually send

messages through the CSC system.  SAC ¶ 100 ("[A]ll CSC Lessees had to transmit their A2P

SMS through aggregators.").  The uncontested facts show that iSpeedbuy, which did not itself

---

[11] Plaintiffs also argue that neither OpenMarket nor mBlox can avail itself of equitable estoppel because they have unclean hands. Although under these contracts New York rather than Virginia law governs the application of equitable estoppel and unclean hands, Plaintiffs have not established -- and nor does the Court find -- any material difference between the laws of theses states on these matters. Accordingly, Plaintiffs' unclean hands argument is equally inapplicable here and the Court will not bar iSpeedbuy and Club Texting from invoking equitable estoppel.

have a contract with OpenMarket, was able to send its messages to TextPower, which, in turn,
sent the messages to iSpeedbuy's customers through OpenMarket and under the terms of the
TextPower CSA.[12]  But for the contract between TextPower and OpenMarket, TextPower would
have had no service to offer iSpeedbuy, as TextPower itself was required to go through the
aggregator Defendants in order to reach the Carrier Defendants' subscribers.

Based on this, the Court concludes that the benefits to iSpeedbuy from the TextPower
CSA were direct, as they "ar[ose] specifically from the unsigned contract containing the
arbitration clause," and were not "merely incidental to the contract's execution." *See Life Techs.
Corp. v. AB Sciex Pte. Ltd.*, 803 F. Supp. 2d 270, 276 (S.D.N.Y. 2011) (comparing *Tencara
Shipyard*, 170 F.3d at 351-53, and *Deloite Noraudit*, 9 F.3d at 1061-64, with *Thomson-CSF, S.A.*,
64 F.3d at 778-79); *see also Robinson Brog*, 2013 WL 1707897, at *2.  Contrary to Plaintiffs'
position at oral argument, iSpeedbuy is not simply trying to "exploit the contractual relationship
between . . . TextPower and OpenMarket," Tr. 46:18-20, but rather is exploiting the agreement
itself, because without that agreement, not simply the relationship it establishes, iSpeedbuy
would not have been able to send A2P SMS in the way that they did.

As noted, Plaintiffs also argue that because the agreement contained a secrecy provision,
which prohibited either OpenMarket or TextPower from disclosing the agreement to third
parties, "Club Texting could never have seen the agreement and *knowingly* accepted any
benefits." Pls. Opp. 19-20 (emphasis in original) (citing Emmet Decl. Ex. A ¶ 14.8).  This
contention is undercut by the undisputed facts, which show that iSpeedbuy was aware that it was
required to use an aggregator to send A2P SMS to its customers, SAC ¶¶ 100, 101,[13] that it did

---

[12] The only portion of the declaration from OpenMarket's general manager, Jay Emmet, that Plaintiffs contest is the
assertion that "OpenMarket . . . agreed to provide mobile message aggregating services to . . . the entities
represented by TextPower [and 4INFO]." Pls. Opp. 19 n.27, 28.
[13] These same allegations are contained in iSpeedbuy's Class Action Complaint, as filed in one of the now

not have an aggregator contract with OpenMarket, Emmet Decl. ¶¶ 10, 12, that it instead paid a

fee to send A2P SMS through TextPower, *id.* at ¶ 11, and that TextPower used OpenMarket as

an aggregator, pursuant to the TextPower CSA, *id.* Dkt. No. 166 at 8-9, 17-18.  These facts

show that iSpeedbuy knew TextPower had an agreement with an aggregator (indeed, that it had

to have such an agreement) and that it knowingly exploited and directly benefitted from that

agreement by sending its messages through TextPower in lieu of entering its own aggregator

contract.  iSpeedbuy cannot both recognize that the agreement must exist and simultaneously

deny knowledge of its existence.  And tellingly, iSpeedbuy does not argue that it was, in fact,

unaware of the agreement or its terms.  Ultimately, Plaintiffs' argument as to not being able to

*knowingly* receive direct benefits is unavailing and, accordingly, iSpeedbuy cannot avoid

arbitration with TextPower on that basis.

      iii.    Arbitration Between OpenMarket and Club Texting

      Finally, OpenMarket argues that Club Texting should also be required to arbitrate

because it knowingly accepted the benefits of the 4INFO CSA, an agreement between

OpenMarket and non-party 4INFO, to which Club Texting is not a signatory.  Here again, the

uncontested facts show that Club Texting d/b/a/ EZ Texting, does not have an aggregator

agreement with OpenMarket, but was able to send its messages to 4INFO, which in turn sent

those messages to Club Texting's customers through OpenMarket and pursuant to the terms of

the 4INFO CSA.  Indeed, the Court finds no material difference between the factual scenarios,

Defendants' theories of enforcement, or Plaintiffs arguments against enforcement.  Accordingly,

for the same reasons discussed above, the Court concludes that Club Texting, like iSpeedbuy,

although not a signatory to the agreement containing the arbitration provision, knowingly

---

consolidated actions.  *iSpeedbuy LLC v. Cellco P'ship*, No. 12 Civ. 3731, Dkt No. 1 at 16-17, "Class Action
Complaint" (May 10, 2012).

received direct benefits from that agreement and cannot now avoid the arbitration clause contained therein.

## B. mBlox's Arbitration Arguments

Defendants argue that Club Texting must also arbitrate its dispute with mBlox, pursuant to an agreement between mBlox and Mobiworx LLC ("Mobiworx"), a wholly owned subsidiary of Club Texting.[14] Dkt. No. 166 at 4-5; Cowell Decl. Ex. B. Defendants argue that Mobiworx is a wholly owned subsidiary of Club Texting and that the Mobiworx Master Services Agreement (the "Mobiworx MSA") contains a broad, presumptively enforceable arbitration clause and that the claims at issue fall within the scope of that clause. Citing no case law, Plaintiffs argue that the Mobiworx MSA was cancelled on December 20, 2007, that the arbitration clause did not survive cancellation, and that because no Plaintiff asserts any claim prior to April 5, 2008, the Mobiworx MSA is inapplicable. Pls. Opp. 16. In reply, Defendants argue that the arbitration clause survived the termination of the agreement and that the agreement is applicable because, although the damages claims post-date the termination of the agreement, Plaintiffs' theory of liability extends the temporal scope of the allegations such that their claims do in fact fall within the scope of the Mobiworx MSA. There are two questions, then, that the Court must answer: (1) did the arbitration clause in the Mobiworx MSA survive the termination of that agreement; and (2) if so, do the claims fall within the scope of that arbitration clause or did they arise after the agreement was cancelled. For the reasons discussed below, the Court concludes that the arbitration clause survived the termination of the Mobiworx MSA and that Plaintiffs' claims fall

---

[14] mBlox initially asserted that TextPower was also required to arbitrate its claims with mBlox pursuant to the Master Services Agreement between mBlox and non-party Phat Digit (the "Phat Digit MSA"). mBlox did not reassert this position in its reply, and, at oral argument, defense counsel, speaking on behalf of all Aggregator Defendants, stated that Defendants "don't rest on [the Phat Digit MSA] any longer and [that] there is a footnote to that effect in [their] reply papers." Tr. 24:22-24. Although the Court can locate no such footnote, it considers mBlox to have conceded that it may not compel arbitration with TextPower under the Phat Digit MSA. mBlox asserts no grounds for compelling arbitration of its dispute with iSpeedbuy.

within the scope of that agreement.

    *1. The Agreement, Termination, and Survival*

    The effective date for the Mobiworx MSA is listed as March 22, 2007.  Cowell Decl. Ex.

A p. 1.  As noted, mBlox and Mobiworx are the two signatories of the Mobiworx MSA, *id.* at ¶

26, but on or about November 14, 2007, Mobiworx validly assigned all of its rights and

obligations under that agreement to Club Texting.  Cowell Decl. ¶ 4; *id.* at Ex. B.  Shortly

thereafter, on December 20, 2007, Club Texting sent a letter to mBlox "inform[ing] [mBlox] that

effective immediately Club Texting Inc. [was] cancelling [sic] its account" and requesting that

this happen "as soon as possible."  Cowell Decl. Ex. C.  By its terms, the Mobiworx MSA is

governed by the laws of the State of California.  *Id.* at Ex. A ¶ 24.

    The parties do not dispute these facts or the validity of Club Texting's cancelation, but

instead dispute the effects of the cancelation on the arbitration provision in the agreement.  In

relevant part, that provision states:

> The parties agree to attempt to settle any claim, controversy, or dispute arising out
> of or relating to this Agreement ("Dispute") through good faith settlement
> negotiations.  To the extent such settlement negotiations have not resulted in a
> mutually agreeable resolution of any Dispute . . . the Parties agree that such
> dispute shall be settled by binding arbitration before the American Arbitration
> Association ("AAA").

Cowell Decl. Ex. A. ¶ 18.  It is undisputed that this provision, as with the previous provisions, is

a "prototypical broad arbitration provision," *Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 76

(2d Cir. 1998), and entitled to the presumption of enforceability.  *See WorldCrisa Corp.*, 129

F.3d at 127.

    As a general rule, "[w]e presume as a matter of contract interpretation that the parties did

not intend a pivotal dispute resolution provision to terminate for all purposes upon expiration of

the agreement." *Litton Fin. Printing Div. v. Nat'l Labor Relations Bd.*, 501 U.S. 190, 208

(1991); *see also Carpet Et Cetera, Inc. v. Forde*, No. 06 Civ. 6993(BSJ), 2006 WL 2959063, at

*5 (S.D.N.Y. Oct. 16, 2006); *Beach Air Conditioning and Heating, Inc. v. Sheet Metal Workers

Int'l Ass'n*, 55 F.3d 474, 476 (9th Cir. 1995). Rather, the Supreme Court has recognized a

"presumption in favor of postexpiration arbitration of matters unless 'negated expressly or by

clear implication.'" *Litton Fin. Printing Div.*, 501 U.S. at 204 (internal citation omitted) (quoting

*Nolde Bros., Inc. v. Local No. 358, Bakery & Confectionary Workers Union, AFL-CIO*, 430 U.S.

243, 255 (1977)). This presumption is limited, however, "to matters and disputes arising out of

the relation governed by the contract." *Id.*

Plaintiffs argue that the clause here did not survive because it is not included in the

"Survival" provision of the Mobiworx MSA. That provision states:

> Notwithstanding anything to the contrary in th[e] Agreement, the provisions of
> this Section and Sections 1, 4.2, 4.3, 5, 11, 12 ,13, 14, 15, 17, 19, 20, 21, and 23
> will survive the termination of this Agreement. Further, all accrued payment
> obligations, and any other provisions that by their nature are intended to survive,
> also will survive the termination of this Agreement.[15]

Cowell Decl. Ex. A ¶ 16. Although this provision does not expressly negate survival of the

arbitration clause -- Section 18 -- it would be reasonable to infer from the conspicuous absence

of this section in the broad survival provision that the parties did not intend for the arbitration

provision to survive. However, it would also be reasonable to infer that, in light of the

presumption that arbitration provisions generally survive termination, the parties did not

specifically list Section 18 because it fell within the category of "other provisions that by their

nature are intended to survive." *Id.* Because both of these are reasonable inferences, the Court

cannot say that there is a "clear implication" that the parties did not intend for the provision to

---

[15] Defendant mBlox has requested that this Section, among many others, be redacted in full. That request does not
address the Second Circuit's decision in *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006), as it is
required to do under Rule 4A of this Court's Individual Practices in Civil Cases. Moreover, in light of the Court's
reliance on this section, the Court concludes that the presumption of access outweighs the asserted interest in
maintaining the confidentiality of this section. By separate order, the Court will address the remainder of the
outstanding redaction requests.

survive. *Litton Fin. Printing Div.*, 430 U.S. at 255; *see also Int'l Imaging Materials, Inc. v. Oliverio*, No. 88 Civ. 638 (JTE), 1988 WL 137717, at *1 (W.D.N.Y. Dec. 20, 1988) (rejecting defendant's argument that survival clause "terminate[d] by negative implication all other clauses" that were not included).

    *2. Scope*

    Plaintiffs' argument that the claims fall outside the relevant scope of the agreement is unavailing. Plaintiffs argue that their claims cannot arise out of the Mobiworx MSA because the claims date back to April 2008, while the Mobiworx MSA terminated in December 2007. As Defendants note, however, the factual basis for the claims as asserted in the complaint clearly falls within the scope of the broad arbitration clause in the Mobiworx Agreement. Parties to arbitration agreements cannot be permitted to plead their way around arbitration requirements by asserting predicate facts that fall within the scope of the agreement, but limiting the temporal scope of their damages so as to avoid the agreements. *See Litton Fin. Printing Div.*, 430 U.S. at 255. Rather, here, as in scope determinations generally, the Court looks to the facts alleged in the complaint, not the specific legal claims. *See supra* Section IV.C.

  C. <u>Conclusion</u>

    For the reasons discussed above, the Court concludes that all Plaintiffs must arbitrate their disputes with OpenMarket, and that Club Texting must also arbitrate its dispute with mBlox.

## VI.   ARBITRATION COST AND EFFECTIVE VINDICATION

    Plaintiffs argue that if Defendants can enforce the relevant arbitration provisions, and if the claims at issue do fall within the scope of those provisions, Defendants' motions should nonetheless be denied because the clauses in the agreements do not allow for class-wide

arbitration.[16]  Specifically, Plaintiffs argue that the arbitration agreements are unenforceable

because the costs of individually arbitrating the complex antitrust claims in their complaint

would preclude them from bringing this action, thus denying them "effective vindication."[17]  Pl.

Opp. 25-29 (quoting *Mitsubishi Motors Corp.*, 473 U.S. at 637 n.19).  Since Plaintiffs originally

filed their opposition brief, the Supreme Court issued a ruling that is directly applicable to this

matter.  *See Am. Express Co. v. Italian Colors Rest. ("American Express")*, 133 S.Ct. 2304

(2013).  In light of that decision, on June 24, 2013, the Court ordered the parties to submit

supplemental briefs describing the impact of that case on the current litigation.  Dkt. No. 203.  In

their supplemental briefing, Plaintiffs argue that the *American Express* decision has "little effect

on the pending motions concerning arbitration," Dkt. No. 205 at 1, while Defendants argue that

the decision "directly forecloses Plaintiffs' effort to avoid arbitration," Dkt. No 206 at 1.  For the

reasons discussed below, the Court concludes that Plaintiffs cannot rely on "effective

vindication" to avoid arbitration.

A.  The Supreme Court's Decision in *American Express*

In *American Express*, the Supreme Court answered in the affirmative the question

"whether  a contractual waiver of class arbitration is enforceable under the [FAA] when the

plaintiff's cost of individually arbitrating a federal statutory claim exceeds the potential

recovery."  133 S.Ct. at 2308.  The plaintiffs in *American Express* were merchants who accepted

American Express credit cards and who were seeking to avoid individual arbitration of their

---

[16] The clauses do not specifically disallow class-wide arbitration, but the Supreme Court has held that arbitration clauses will not be read to implicitly authorize class-wide arbitration unless such a provision is explicitly contained in the agreement. *Stolt-Nielsen S.A.*, 559 U.S. at 685 ("An implicit agreement to authorize class-action arbitration, however, is not a term that the arbitrator may infer solely from the fact of the parties' agreement to arbitrate.").

[17] Plaintiffs' effective vindication argument, as with their arguments regarding subject matter and scope, are once again weakened by their failure to name Neustar as a defendant and by their stated rationale for not so doing.  *See supra* Sections IV.B.1 and IV.C.2.  As before, although this point is not conclusive, it does suggest an overall weakness as to these specific arguments, and as to Plaintiffs' overall argument in opposition to arbitration.

antitrust claims against the credit card company.  Considering American Express' motion to compel arbitration, the district court concluded that the broad arbitration provision was presumptively enforceable, that the plaintiffs' argument regarding the preclusive cost of arbitration were "unpersuasive," and that "[t]he enforceability of the collective action waivers [w]as a claim for the arbitrator to resolve." *In re Am. Express Merch. Litig.*, No. 03 Civ. 9592 (GBD), 2006 WL 662341, at *4-6 (S.D.N.Y. Mar. 16, 2006).

The Second Circuit disagreed.  Relying heavily on the "effective vindication" language from *Mitsubishi Motors Corp.*, 473 U.S. 614, the Second Circuit overruled the district court's decision and held that the particular class action waiver at issue was unenforceable "because to [enforce it] would grant [American Express] de facto immunity from antitrust liability by removing the plaintiffs' only reasonably feasible means of recovery." *In re Am. Express Merch. Litig.*, 554 F.3d 300, 320 (2d Cir. 2009).  The Circuit Court based its decision on economic reports the plaintiffs submitted, which showed that the cost for an individual plaintiff to arbitrate this type of antitrust claim would far exceed any possible recovery to that plaintiff.  *Id.* at 315-16. It is this decision that Plaintiffs primarily relied upon in their opposition brief and that the Supreme Court struck down in *American Express*.  *See* 133 S.Ct. 2304.

The Supreme Court first concluded that there was no "contrary congressional command" in the Sherman and Clayton Acts or Federal Rule of Civil Procedure 23 that would override Congress' command in the FAA that "courts must 'rigorously enforce' arbitration agreements according to their terms" and, thus, prohibit individual arbitration of claims like those at issue.[18] *American Express*, 133 S.Ct. at 2309 (quoting *Dean Witter Reynolds Inc.*, 470 U.S. at 221).  The Supreme Court then addressed the "effective vindication" exception and "declined to apply it to

---

[18] Because this ruling is directly on-point to the current dispute, the Court will not further address the question of contrary congressional command.

invalidate the arbitration agreement at issue." *Id.* at 2310; *see also Shetiwy v. Midland Credit Mgm't*, No. 12 Civ. 7068 (SAS), 2013 WL 3530524, at *3 (S.D.N.Y. July 12, 2013) (describing the Supreme Court in *American Express* as having "rejected a 'judge made ["effective vindication"] exception to the FAA' as a basis for invalidating class action waivers").

To reach this conclusion, the Supreme Court first noted that "the [effective vindication] exception finds its origins in the desire to prevent 'prospective waiver of a party's *right to pursue* statutory remedies.'" *American Express*, 133 S.Ct. at 2311 (emphasis in original) (citing *Mitsibushi Motor Corp.*, 473 U.S at 637 n.19). The exception, the Court said, would "certainly cover a provision in an arbitration agreement forbidding the assertion of certain rights," "[a]nd it would perhaps cover filing and administrative fees attached to arbitration that are so high as to make access to the forum impracticable." *Id.* at 2310-11 (citing *Green Tree Fin. Corp.-Ala.*, 531 U.S. at 90). The Court stressed, however, that "the fact that it is not worth the expense involved in *proving* a statutory remedy does not constitute the elimination of the *right to pursue* that remedy." *Id.* at 2311 (emphasis in original).

B. Application to the Current Case

Plaintiffs argue that, even after *American Express*, the arbitration agreements at issue are unenforceable in this case because the "filing and administrative fees attached to arbitration . . . are so high as to make access to the forum impracticable." Dkt. No. 205 (citing *Am. Express*, 133 S.Ct. at 2310-11). In support of their position, Plaintiffs' point to the declaration of Plaintiff TextPower's CEO Scott Goldman, in which he concluded, "If TextPower were asked or required to pay or advance filing fees and arbitrator costs of approximately $40,000 for an arbitration of its claims in this action, it could not and would not do it." Dkt. No. 205; *see also* Ellis Decl. ¶ 6 ("iSpeedbuy . . . could not afford to pay or advance [the costs] to commence and participate in an

AAA arbitration."). Plaintiffs conclude that this statement, in conjunction with an expert

declaration claiming that "TextPower would be required to incur at least such arbitration filing

fees and costs," Dkt. No. 205 1, "demonstrate[] that th[e] narrower exception [articulated in

*American Express*] is applicable here to the [TextPower CSA] agreement." Dkt. No. 205 at 2.

The Court disagrees.

Assuming that filing fees and administrative costs could in fact render a forum

impracticable, and that these costs in this case would be as high as Plaintiffs claim, this "does not

constitute the elimination of [Plaintiffs'] *right to pursue*" their claims in arbitration in this case.

*American Express*, 133 S.Ct. at 2311 (emphasis in original) (citing *In re Am. Express Merch.*

*Litig.*, 681 F.3d 139, 147 (2d Cir.) (Jacobs, *C.J.*, dissenting from denial of rehearing en banc).

Indeed, in light of the antitrust provisions allowing for attorney's fees and treble damages,

Plaintiffs' fees would not even approach the potential recovery were Plaintiffs to prevail on their

claims.[19] *See Sutherland v. Ernst & Young LLP*, 2013 WL 4033844, at *6 (2d Cir. Aug. 9, 2013)

(interpreting *American Express* as "holding that the 'effective vindication doctrine' cannot be

used to invalidate class-action waiver provisions in circumstances where the recovery sought is

exceeded by the costs of individual arbitration"); *Shetiwy*, 2013 WL 3530524, at *3 n.40 (noting

that the claims, particularly when trebled, were well in excess of the costs of arbitration); *see*

*also Morris v. Ernst & Young LLP*, No. C-12-4964, 2013 WL 3460052, at *5-6 (N.D. Cal. July

9, 2013) (noting that plaintiff's individual financial inability to pursue his claim was not

"outcome-determinative" and he had not met the necessary standard from *American Express*);

*Byrd v. SunTrust Bank*, No. 12 Civ. 2314, 2013 WL 3816714, at *19 (W.D. Tenn. July 22, 2013)

---

[19] There is much dispute between the parties as to what the fees and administrative costs associated with arbitration would actually amount to in this case. This dispute is ultimately immaterial as, even were the filing and administrative costs as high as Plaintiffs argue they could be, they would still be less than the recovery sought. *See* *Sutherland*, 2013 WL 4033844, at *6.

("Plaintiffs have not met the burden of showing that increased costs associated with the expense-shifting provisions will be more than their projected recovery, much less the burden of showing that those increased costs will be so high as to act as a de facto elimination of their right to pursue their statutory claim.").

Finally, although TextPower and iSpeedbuy have asserted that they will not proceed in arbitration because of the fees associated with doing so, the fact that Club Texting has made no similar claim further belies any potential argument that the fees and administrative costs associated with arbitrating these disputes would be "so high as to make access to the forum impracticable." *American Express*, 133 S.Ct. at 2310-11. While certain Plaintiffs may conclude that it is not "worth the expense involved in *proving*" the alleged statutory violation, this is the insufficient to give rise to the "effective vindication" protection recognized in *Mitsubishi Motors Corp.*, 473 U.S. 614.

C. Conclusion

Under these facts, and in light of the Supreme Court's ruling in *American Express*, the Court concludes that Plaintiffs have failed to demonstrate that the administrative costs and filing fees associated with arbitration would amount to a statutory deprivation of their right to pursue their claims.

VII.   **SUMMARY OF THE MOTIONS TO COMPEL ARBITRATION**

To this point, and for the reasons stated above, the Court has concluded that all Plaintiffs are required to arbitrate their disputes with the Carrier Defendants, CTIA, WMC, and OpenMarket, and that Plaintiff Club Texting is required to arbitrate its dispute with Defendant mBlox. These Defendants have all moved to "compel" arbitration, but have done so under § 3 of the FAA, which discusses stays, rather than § 4, which allows for the Court issue an "order to

compel arbitration." 9 U.S.C. §§ 3, 4.  On a number of occasions during oral argument,

Plaintiffs noted this as an irregularity, but gave no indication as to why this was irregular or what

effect any such irregularity would have on the outcome of the motions.

Given the posture, the Court concludes that moving under § 3 was permissible and that it

was logical insofar as Defendants position is not that they are interested in arbitrating these

disputes, but rather in having the Court conclude that if Plaintiffs are interested in bringing the

disputes, they must do so through the agreed upon arbitration procedures.  *C.f. J.P. Morgan Sec.*

*Inc. v. Louisiana Citizens Prop. Ins.*, 712 F. Supp. 2d 70, 81-82 (S.D.N.Y. 2010) (noting that

there is a circuit split, which the Second Circuit has not addressed, regarding the question

whether a district court may compel arbitration if there is a forum selection clause calling for

arbitration in a "specified venue [that] is in a district other than where the petition to compel was

filed").  Pursuant to § 3, "the [C]ourt must stay any suit or proceeding until arbitration has been

completed if the action concerns 'any issue referable to arbitration' under a written agreement."

*In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 249 (S.D.N.Y. 2005)

(Pauley, *J.*).  "By its terms, the [FAA] leaves no place for the exercise of discretion by a district

court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on

issues as to which an arbitration agreement has been signed."  *Dean Witter Reynolds, Inc.*, 470

U.S. at 218 (emphasis in original) (citing 9 U.S.C. §§ 3, 4).

Although the Court may dismiss when all of the issues raised in a complaint are subject

to arbitration, *see Lismore*, 2012 WL 3577833, at *9 n.3, the ordinary remedy contemplated by

the FAA is to stay proceedings pursuant to § 3.  *See* 9 U.S.C. § 3.  Under the facts and

circumstances of this case, and in light of the remaining non-arbitrable claims against Aggregator

Defendants, the Court concludes a stay -- rather than dismissal -- is appropriate as to the Carrier

Defendants, CTIA, WMC, and OpenMarket. Having thus concluded, the Court must now address the Aggregator Defendants' Motion to Stay Pending Arbitration.[20] *See Oldroyd*, 134 F.3d at 45-76 (after determining that the parties have "agreed to arbitrate," "the scope of th[e] agreement," and that there is no contrary congressional command, Court must determine "whether to stay the balance of the proceedings pending arbitration").

## VIII.  THE REMAINDER OF THE ACTION WILL BE STAYED

The final motion that the Court will address on its merits is the Aggregator Defendants' Motion to Stay Pending Arbitration. The Aggregator Defendants "have not executed arbitration agreements with Plaintiffs," but move to "stay proceedings on Plaintiffs' claims against [them] pending the outcome of any arbitration between Plaintiffs and the other Defendants in this case." They argue that a stay is warranted because the arbitrable claims substantially overlap with the remainder of the claims -- both legally and factually -- and it would promote judicial economy and reduce the danger of inconsistent results to stay all claims pending the mandatory arbitration.

If, as here, a court concludes "that some, but not all, of the claims in [a] case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration." *Guyden v. Aetna*, 544 F.3d 376, 382 (2d Cir. 2008) (quoting *Oldroyd*, 544 F.3d at 75-76). The party seeking a stay must first demonstrate that 'there are issues common to the arbitration and the court proceeding," and then show that "those issues will be finally determined by arbitration." *Am. Shipping Line, Inc. v. Massan Shipping Indus., Inc.,* 885 F. Supp. 499, 502 (S.D.N.Y.1995) (citing *Sierra Rutile Ltd. v. Katz,* 937 F.2d 743, 750 (2d Cir. 1991)); *Alghanim v. Alghanim,* 828 F. Supp. 2d 636, 655 (S.D.N.Y. 2011). Aggregator Defendants have easily borne their initial burden as to showing common issues -- given that (with minor exceptions) Plaintiffs'

---

[20] For efficiency, and unless otherwise noted, the Court will include mBlox with the remainder of the Aggregator Defendants in addressing the motion to stay.

complaint alleges the same claims as to all Defendants -- and Plaintiffs do not oppose the stay on this basis.

If, as here, the movant can make this initial showing, it then bears the burden of demonstrating:  (1) that a stay will not "hamper the progress of the proceeding," *Sierra Rutile Ltd.*, 937 F.2d at 750; (2) that the arbitration "is expected to conclude within a reasonable time," *id.*; and (3) that the stay will not impose an "undue hardship" on the non-moving party, *id.  See also Hard Rock Café Intern., (USA), Inc. v. Hard Rock Hotel Holdings, LLC*, 808 F. Supp. 2d 552, 563 (S.D.N.Y. 2011).  Although the moving party bears this burden, in making a decision on a motion to stay, the Court has "substantial discretion," *id.*, to "stay a case pursuant to 'the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.'" *WorldCrisa Corp.*, 129 F.3d at 75 (quoting *Nederlandse Erts-Tankersmaatschappij, N.V. v. Isbrandtsen Co.*, 339 F.2d 440, 441 (2d Cir. 1964)).

Plaintiffs concede that a stay will not "hamper the progress of the proceeding," and the Court concludes that Aggregator Defendants have borne their burden as to the other two required showings.  First, there is no indication that Aggregator Defendants have impeded the progress or timely resolution of this dispute through arbitration, and Plaintiffs can move to have the stay lifted in the event that progress stalls. *See WorldCrisa Corp*, 129 F.3d at 76.  Second, although there is perhaps some minimal prejudice to Plaintiffs in light of the allegedly ongoing conspiracy, in this case, as in *WorldCrisa*, the prejudice to Aggregator Defendants in having to defend against these antitrust claims -- in which their role is, at best, tertiary -- would be substantially prejudicial to them. *See id.*  Moreover, as in the numerous cases Defendants cite, allowing the case to go forward as to the Aggregator Defendants alone would be a highly

ineffective use of judicial resources given the substantial, if not complete, overlap in the claims that must proceed to arbitration and those that would be before this Court. *See* Dkt. No.150 p. 5 (citing, *inter alia*, *Alghanim*, 828 F. Supp. 2d at 664 (collecting cases)).

Plaintiffs argue, however, that because iSpeedbuy and TextPower have indicated that they will not participate in arbitration, the arbitration necessarily will not conclude within a reasonable time (as it will never begin). Novel though this argument is, in light of the facts that Club Texting has not similarly indicated its unwillingness to proceed with arbitration and for the reasons discussed above, the Court concludes that staying the matter as to Aggregator Defendants is appropriate under the circumstances.

## IX.  CONCLUSION

For the reasons discussed above, Defendants' motions to compel and stay proceedings, pending arbitration Docket Numbers 149, 151, 162, 165, and 171, are GRANTED insofar as previously indicated.  The action is hereby stayed as to all Defendants pending arbitration.  In light of this, the pending motions to dismiss, Docket Numbers 144, 146, 154, 156, and 168 are administratively denied, without prejudice to refiling.  Finally, Plaintiffs' procedurally flawed motion to file a sur reply, Docket Number 194, is DENIED and Defendants' motion to strike that sur reply, Docket Number 195 is GRANTED:  Plaintiffs motion is substantially non-compliant with the Court's Individual Practices, it does not respond to "new issues which are material to the disposition of the question before the [C]ourt," *U.S. v. Int'l Bus. Mach.*, 66 F.R.D. 383 (S.D.N.Y. 1975), and Plaintiffs had ample opportunity at oral argument to respond to Defendants' positions.

This Order resolves Docket Numbers 144, 146, 149, 151, 154, 156, 162, 165, 168, 171, 194, and 195.

SO ORDERED.


Dated: September __, 2013
        New York, New York

_____
ALISON J. NATHAN
United States District Judge