# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE A2P SMS ANTITRUST LITIGATION ) ) ) ) | MASTER FILE: 12 CV 2656 (AJN) |
| This Document Relates to: ) ) | |
| ALL ACTIONS ) ) | |

**REDACTED**

### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO COMPEL ARBITRATION OR STAY CASE IN FAVOR OF ARBITRATION

## **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS ............................................................................................................ i

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ..................................................................................................................... 1

ARGUMENT ............................................................................................................................. 2

I.  THE NEUSTAR ARBITRATION CLAUSE PROVIDES NO BASIS FOR
    COMPELLING ARBITRATION OR STAYING ANY CLAIMS AGAINST ANY
    DEFENDANT ............................................................................................................... 2

    A.  The Neustar Arbitration Clause Permits Arbitration Only Of Disputes Arising
        Under Virginia Law And Not Under Federal Statutes ............................................. 3

    B.  Even If The Neustar Arbitration Clause Applied To Federal Claims, The CTIA,
        Carrier Defendants And WMC May Not Invoke It. ............................................... 5

        1.  The Carrier Defendants, CTIA and WMC May Not Invoke Equitable
            Estoppel due to Their Unclean Hands. ......................................................... 6

        2.  The Carrier Defendants, CTIA and WMC Are Not Third-Party
            Beneficiaries of the Neustar Agreement Entitled To Invoke the Arbitration
            Clause. ......................................................................................................... 8

        3.  The CTIA Was Not the Principal of Neustar. ............................................. 13

II. THE MBLOX ARBITRATION AGREEMENTS AND THE OPENMARKET/4INFO
    ARBITRATION AGREEMENT ARE INAPPLICABLE AND THE
    OPENMARKET/TEXTPOWER ARBITRATION CLAUSE APPLIES ONLY TO
    TEXTPOWER FOR A PORTION OF THE CLASS PERIOD ...................................... 15

    A.  The MBlox Agreements Are Inapplicable. ............................................................ 16

    B.  The OpenMarket/4Info Agreement Does Not Apply To Club Texting, And The
        OpenMarket/TextPower Agreement Does Not Apply To ISpeedbuy. .................... 17

    C.  The OpenMarket/TextPower Agreement Does Not Cover Claims During The
        Entire Class Period ............................................................................................... 20

    D.  The Carrier Defendants Are Not Third-Party Beneficiaries And May Not Invoke
        Equitable Estoppel Regarding The OpenMarket/TextPower Agreement. ............... 21

1.  The Carrier Defendants Are Not Third-Party Beneficiaries Entitled To Invoke the Arbitration Clause in the OpenMarket/TextPower Agreement. ........................................................................................ 21

2.  The Carrier Defendants May Not Assert Equitable Estoppel under the OpenMarket/TextPower Agreement. ....................................................... 23

III.  BECAUSE THE COSTS OF ARBITRATION UNDER THE NEUSTAR AND OPENMARKET/TEXTPOWER AGREEMENTS WOULD PREVENT PLAINTIFFS FROM EFFECTIVELY VINDICATING THEIR FEDERAL STATUTORY RIGHTS, THE ARBITRATION CLAUSES ARE UNENFORCEABLE. ..................................... 25

IV.  THIS ACTION SHOULD NOT BE STAYED. ............................................... 29

CONCLUSION.......................................................................................................... 31

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page**

*Alfa Laval U.S. Treasury, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh,*
    857 F. Supp. 2d. 404 (S.D.N.Y. 2012)..............................................................20

*Am. Bur. of Shipping v. Tencara Shipyard S.p.A.,*
    170 F.3d 349 (2d Cir. 1999)..........................................................................20

*Am. Express Co. v. Italian Colors Restaurant,*
    No. 12-133, 2012 WL 3096737 (Sup. Ct. Nov. 9, 2012);
    http://www.supremecourt.gov/qp/12-00133qp.pdf ....................................26

*Am. Shipping Line, Inc. v. Massan Shipping Indus., Inc.,*
    885 F. Supp. 499 (S.D.N.Y. 1995) ...........................................................30-31

*Argus Media Ltd. v. Tradition Fin. Servs. Inc.,*
    No. 09 Civ. 7966(HB), 2009 WL 5125113 (S.D.N.Y. Dec. 29, 2009) .............30

*Arthur Andersen LLP v. Carlisle,*
    556 U.S. 624 (2009)...............................................................................6, 21

*Bank of Am. v. Musselman,*
    240 F. Supp. 2d 547 (E.D. Va. 2003) ...........................................................11

*Blumenstock Bros. Adver. Agency v. Curtis Publ'g Co.,*
    252 U.S. 436 (1920)......................................................................................4

*Bostic v. Global Strategies Group, Inc.,*
    Civ. A. No. 96-1090-A, 1996 WL 729853 (E.D. Va. Nov. 22, 1996).............12

*Church v. Gruntal & Co.,*
    698 F. Supp. 465 (S.D.N.Y. 1988) ...............................................................20

*Cline v. Berg,*
    273 Va. 142, 639 S.E.2d 231 (2007).............................................................6

*Cmty. Bank of Miss. v. Stuckey,*
    52 So.3d 1179 (Miss. 2010)..........................................................................7

*Copenhaver v. Rogers,*
    238 Va. 361, 384 S.E.2d 593 (Va. 1989) ......................................................11

*Crawford v. Feldman,*
    199 A.D.2d 265, 604 N.Y.S.2d 585 (2d Dep't 1993)......................................23

*Dean Witter Reynolds, Inc. v. Byrd,*
    470 U.S. 213 (1985)............................................................................................ 30

*Denney v. Jenkens & Gilchrist,*
    412 F. Supp. 2d 293 (S.D.N.Y. 2005)............................................................... 6

*Doyle & Russell, Inc. v. Roanoke Hosp. Ass'n,*
    213 Va. 489, 193 S.E.2d 662 (1973)................................................................. 4

*Envtl. Staffing Acquisition Corp. v. B & R Constr. Mgmt., Inc.,*
    283 Va. 787, 725 S.E.2d 550 (Va. 2012)........................................................ 10

*FR 8 Sing. Pte. Ltd. v. Albacore Mar. Inc.,*
    794 F. Supp. 2d 449 (S.D.N.Y. 2011)......................................................... 6, 21

*Gibson v. Med. Facilities of Am., Inc.,*
    Civil Docket No. CL09-3289, 2010 WL 7373713 (Va. Cir. Ct. Jan. 22, 2010).............. 11

*Green Tree Fin. Corp.-Alabama v. Randolph,*
    531 U.S. 79 (2000)..................................................................................... 26, 28

*Hard Rock Cafe Int'l, (USA), Inc. v. Hard Rock Hotel Holdings, LLC,*
    808 F. Supp. 2d 552 (S.D.N.Y. 2011)............................................................. 30

*In re Am. Express Merchants' Litig.,*
    554 F.3d 300 (2d Cir. 2009)............................................................................ 26

*In re Am. Express Merchants' Litig.,*
    634 F.3d 187 (2d Cir. 2011)............................................................................ 26

*In re Am. Express Merchants' Litig.,*
    667 F.3d 204 (2d Cir. 2012).............................................................. 25, 26, 29

*In re Elec. Books Antitrust Litig.*
    No. 11 MD 2293(DLC), 2012 WL 2478462 (S.D.N.Y. June 27, 2012) ......... 26, 27

*Levine v. Selective Ins. Co. of Am.,*
    250 Va. 282, 462 S.E.2d 81 (Va. 1995)........................................................... 12

*Life Techs. Corp. v. AB Sciex PTE Ltd.,*
    803 F. Supp 2d 270 (S.D.N.Y. 2011).............................................................. 20

*Lismore v Société Générale Energy Corp.,*
    No. 11 Civ. 6705(AJN), 2012 WL 3577833 (S.D.N.Y. Aug. 17, 2012) ......... 23

*MAG Portfolio Consultant, GmbH v. Merlin Biomed Group LLC,*
    268 F.3d 58 (2d Cir. 2001)........................................................................ 18

*McAllister Bros., Inc. v. A & S Transp. Co.,*
    621 F.2d 519 (2d Cir. 1980)..................................................................... 17

*Miron v. BDO Seidman, L.L.P.,*
    342 F. Supp. 2d 324 (E.D. Pa. 2004) ....................................................... 6

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,*
    473 U.S. 614 (1985).................................................................................. 25

*Montague Mfg. Co. v. Aycock-Holly Lumber Co.,*
    139 Va. 742, 124 S.E. 208 (Va. App. 1924) ............................................ 13

*Motorola Credit Corp. v. Uzan,*
    274 F. Supp. 2d 481 (S.D.N.Y. 2003),
    *aff'd on other grounds*, 388 F.3d 39 (2d Cir. 2004) ......................... 7

*Murphy v. Holiday Inns, Inc.,*
    216 Va. 490, 219 S.E.2d 874 (Va. 1975).......................................... 13, 14

*Necchi S.p.A. v. Necchi Sewing Mach. Sales Corp.,*
    348 F.2d 693 (2d Cir. 1965)..................................................................... 20

*PenneCom B.V. v. Merrill Lynch & Co.,*
    372 F.3d 488 (2d Cir. 2004)..................................................................... 17

*Republic of Iraq v. ABB AG,*
    769 F. Supp. 2d 605 (S.D.N.Y. 2011),
    *aff'd sub nom. Republic of Iraq v. BNP Paribas USA,*
    472 Fed. Appx. 11 (2d Cir. 2012)...................................................... 22, 23

*Richards v. Musselman,*
    221 Va. 181, 267 S.E.2d 164 (1980)......................................................... 6

*Ross v. Am. Express Co.,*
    547 F.3d 137 (2d Cir. 2008)....................................................................... 6

*Sardanis v. Sumitomo Corp.,*
    282 A.D. 2d 322, 723 N.Y.S.2d 466 (1st Dep't 2001) ...................... 18

*Sarhank Group v. Oracle Corp.,*
    404 F.3d 657 (2d Cir. 2005)....................................................................... 6

*Schatz v. Blanchard,*
    244 A.D.2d 223, 664 N.Y.S.2d 46 (2d Dep't 1997) ........................................................ 23

*Sierra Rutile Ltd. v. Katz,*
    937 F.2d 743 (2d Cir. 1991) ........................................................................................ 30

*Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship,*
    698 F. Supp. 2d 602 (E.D. Va. 2010),
    *aff'd,* 442 Fed. Appx. 776 (4th Cir. 2011) .................................................................. 6

*Sokol Holdings, Inc. v. BMB Munai, Inc.,*
    542 F.3d 354 (2d Cir. 2008)..................................................................................... 7, 24

*Spear, Leeds & Kellogg v. Cent. Life Ass. Co,*
    85 F.3d 21 (2d Cir. 1996)........................................................................................... 23

*Steichler v. Sidley, Austin Brown & Wood, L.L.P.,*
    382 F. Supp. 2d 580 (S.D.N.Y. 2005)........................................................................ 31

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.,*
    130 S. Ct. 1758 (2010)............................................................................................ 4, 29

*Sutherland v. Ernst & Young LLP,*
    768 F. Supp. 2d 547 (S.D.N.Y. 2011)........................................................................ 26

*Taylor v. Sturgell,*
    553 U.S. 880 (2008)................................................................................................... 31

*Thomson-CSF, S.A. v. Am. Arbitration Ass'n,*
    64 F.3d 773 (2d Cir. 1995).......................................................................................... 17

*Ward v. Ernst & Young,*
    246 Va. 317, 435 S.E.2d 628 (Va. 1993).................................................................... 12

*Wells v. Whitaker,*
    207 Va. 616, 151 S.E.2d 422 (1966)........................................................................... 13

*Winn v. Aleda Constr. Co.,*
    227 Va. 304, 315 S.E.2d 193 (1984)......................................................................... 4, 5

## Statutes

Clayton Act of 1914
    § 4, 15 U.S.C. § 15.................................................................................................... 4

## INTRODUCTION

Five groups of defendants have filed motions concerning arbitration. The CTIA,[1] the Carrier Defendants[2] and WMC[3] each seeks to use derivatively an arbitration clause, which non-defendant Neustar, Inc. ("Neustar") mandates that firms leasing a common short code ("CSC") accept, to compel Plaintiffs[4] to arbitrate with them and to stay this case. Two Aggregator Defendants,[5] OpenMarket and mBlox, have moved to stay this action as a result of arbitration clauses they assert they have with TextPower, Club Texting and others. The Carrier Defendants also seek to take advantage of purported mBlox and OpenMarket arbitration clauses to compel Plaintiffs to arbitrate with them. The remaining eight Aggregator Defendants, essentially conceding that they have no arbitration clause upon which to rely, nevertheless move for a stay of this action until any arbitration is finished. If the motions were granted, the result would insulate the unconscionable and illegal scheme created by the Defendants[6] from any challenge. Therefore, each motion should be denied.

The arbitration clauses on which Defendants rely are inapplicable. The Neustar arbitration clause applies only to claims arising under Virginia law, not to antitrust claims arising under federal law. Moreover, no Defendant may invoke equitable estoppel due to their unclean hands in setting up and running the unconscionable scheme that has prevented Plaintiffs and other transmitters of text messages from using ten-digit numbers for such messages and imposing a wholly unnecessary program-review process.

---

[1] CTIA is CTIA – The Wireless Association.
[2] The Carrier Defendants are AT&T Mobility LLC; Cellco Partnershp d/b/a Verizon Wireless; Sprint Nextel Corporation; T-Mobile USA, Inc.; and U.S. Cellular Corporation.
[3] WMC is Wireless Media Consulting, Inc., d/b/a WMC Global, sued as WMC Global, Inc.
[4] Plaintiffs are TextPower, Inc. ("TextPower"); Club Texting. Inc. ("Club Texting"); and iSpeedbuy LLC ("iSpeedbuy").
[5] The Aggregator Defendants are Air2Web, Inc.; Ericsson Inc.; mBlox Incorporated ("mBlox"); OpenMarket Inc. ("OpenMarket"); Sybase, Inc.; SoundBite Communications, Inc.; Syniverse Technologies LLC (f/k/a Syniverse Technologies, Inc.); Vibes Media, LLC; 2ergo Americas Inc.; and 3Cinteractive, LLC.
[6] Defendants include collectively the Carrier Defendants, Aggregator Defendants, CTIA and WMC.

The two mBlox agreements with an arbitration clause either were terminated without a survival clause before the class period or are with a wholly unrelated party. Neither of the two OpenMarket agreements mention, much less provide a benefit to, non-signatory Plaintiffs Club Texting and iSpeedbuy, so no arbitration may be enforced against them. Only one OpenMarket agreement was with a Plaintiff (TextPower), but it is inapplicable to claims prior to January 2010. No Carrier Defendant signed or was intended to be a party able to enforce the arbitration clause in the OpenMarket agreement with TextPower.

Moreover, the cost of an arbitration in this complex antitrust case prevents individual arbitrations from being a viable alternative to this judicial class action, and Plaintiffs iSpeedbuy and TextPower cannot and will not participate in such an economically irrational arbitration. Because requiring such an arbitration will prevent vindication of their federal statutory rights under the antitrust laws, any arbitration clause is unenforceable against them.

In addition, Defendants cannot carry their burden to show why this case should be stayed in favor of whatever arbitration rights might be recognized. Such a stay would impose a hardship on Plaintiffs due to delay and because any arbitration would be economically irrational.

## ARGUMENT

### I. THE NEUSTAR ARBITRATION CLAUSE PROVIDES NO BASIS FOR COMPELLING ARBITRATION OR STAYING ANY CLAIMS AGAINST ANY DEFENDANT.

The Carrier Defendants, CTIA and WMC may not compel Plaintiffs to arbitrate under the Neustar arbitration clause. The clause, by its express terms, applies only to issues that arise under Virginia law. It is not applicable to claims arising under federal statutes, such as the Sherman Act. While the inapplicability of the Neustar arbitration clause to the claims asserted here is dispositive, the CTIA also is not the principal of Neustar entitled to enforce Neustar's agreements with CSC lessees. In addition, the Carrier Defendants, CTIA and WMC may not

invoke equitable estoppel because they have unclean hands, and they are not third-party beneficiaries of the Neustar arbitration clause.

### A. The Neustar Arbitration Clause Permits Arbitration Only Of Disputes Arising Under Virginia Law And Not Under Federal Statutes.

The motions of the Carrier Defendants, CTIA and WMC to compel arbitration are based on the fact that the Plaintiffs, in order to obtain CSCs to transmit bulk messages (in the only available way left after Defendants conspired to deny them access to ten-digit service), were forced to click on a website program that imposed on all CSC lessees a contract containing an arbitration clause.[7]  Simmons Dec. ¶¶ 3-4.[8]  Accepting the Neustar agreement is a requirement for obtaining service (*id.* ¶ 3) and, therefore, for commercial survival.  Prospective CSC customers are informed in capital letters: "IF YOU DO NOT AGREE TO ALL OF THESE TERMS, DO NOT SUBMIT AN APPLICATION FOR A CSC OR RENEW ANY CSC REGISTRATION." *Id.* ¶ 4; Ex. A at 1; *see also* Ex. B at 1.

The arbitration clause, paragraph 19 of the current Neustar agreement (Simmons Dec. Ex. A ¶ 19),[9] permits arbitration of "[a]ny dispute, controversy or claim arising out of or relating to this Agreement or the breach, termination, non-renewal of this Agreement or CSC, refusal to grant new CSCs, or the validity of this Agreement."  However, the clause then limits the disputes to which it applies: "The arbitrators shall determine the matters in dispute in accordance with the internal law of the Commonwealth of Virginia, without reference to the Convention on Contracts for the International Sale of Goods." *Id.*  Read together, only disputes arising under the internal laws of Virginia are arbitrable.  The CTIA concedes this reading in its memorandum where it

---

[7] Defendants seek to confuse the Court by labeling this agreement as the "CSC Agreement," subtly suggesting that it is the foundation of the CSC system described in the Second Consolidated Amended Class Action Complaint (the "Complaint").  To avoid this confusion, Plaintiffs call the agreement the Neustar agreement.

[8] "Simmons Dec." is the Declaration of Jeffrey J. Simmons, dated August 14, 2012 (ECF No. 164).

[9] The arbitration clause is paragraph 18 of the 2007 Neustar agreement (Simmons Dec. Ex. B).

states that the "arbitration agreement adopts the substantive law of the Commonwealth of Virginia to 'determine [ ] matters in dispute.'" CTIA Arb. Mem. at 7.[10]  The Carrier Defendants adopt this statement of the CTIA in its entirety.  Carr. Arb. Mem. at 4.[11]

Plaintiffs' claims here arise under Section 4 of the Clayton Act of 1914, 15 U.S.C. § 15, not under the internal laws of Virginia.  *See Blumenstock Bros. Adver. Agency v. Curtis Publ'g Co.*, 252 U.S. 436, 440 (1920) ("[t]he action [under 15 U.S.C. § 15] is wholly statutory, and can only be brought in a District Court of the United States").  Therefore, as federal claims such as those asserted here do not arise under the substantive, internal law of Virginia, they are not subject to the Neustar arbitration clause.  *See Doyle & Russell, Inc. v. Roanoke Hosp. Ass'n*, 213 Va. 489, 494, 193 S.E.2d 662, 666 (1973) ("[a] party . . . cannot be compelled to arbitrate a question which, under his agreement, is not arbitrable"); *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1776 (2010) ("parties cannot be compelled to submit their dispute to class arbitration" where the agreement did not authorize class arbitration).[12]

Moreover, even assuming for the purposes of argument that the scope of the Neustar arbitration clause were ambiguous, it must be interpreted as not to encompass federal antitrust claims.  First, "a contract will be construed more strictly against the party who prepared it."  *Winn v. Aleda Constr. Co.*, 227 Va. 304, 307, 315 S.E.2d 193, 195 (1984).  Neustar drafted and imposed this agreement on all CSC lessees, including Plaintiffs.  Simmons Dec. ¶ 4.

---

[10] "CTIA Arb. Mem." is the Memorandum of Law of Defendant CTIA – The Wireless Association in Support of Its Motion To Compel Arbitration (ECF No. 163).

[11] "Carr. Arb. Mem." is the Memorandum in Support of Carrier Defendants' Motion To Compel Arbitration (ECF No. 173).

[12] The Neustar agreement is "governed by and construed in accordance with the laws of the Commonwealth of Virginia, without regard to its principles of conflicts of law."  Simmons Dec. Ex. A ¶ 21; Ex. B ¶ 20.  "[T]he internal procedural and substantive laws of Virginia and the United States Federal Arbitration Act shall govern all questions of arbitral procedure, arbitral review, scope of arbitral authority, and arbitral enforcement."  Simmons Dec. Ex. A ¶ 19; Ex. B ¶ 18.

Second, "[n]o word or clause will be treated as meaningless if a reasonable meaning can be given to it." *Winn, supra.* The Carrier Defendants, the CTIA and WMC may argue, contrary to the position they have already taken, that the direction to the arbitrators to "determine the matters in dispute in accordance with the internal law of the Commonwealth of Virginia" is merely a conflict-of-law provision. But, then it would be meaningless, because there is a choice-of-law provision for the entire agreement in ¶ 21 of the Neustar agreement (¶ 20 of the 2007 agreement), as well as a choice-of-law provision for disputes concerning arbitrability in the arbitration clause itself. To be given meaning, this directive must be interpreted to limit arbitrable disputes to those arising under the internal, substantive laws of Virginia, which excludes Plaintiffs' antitrust claims arising under federal statutes.

## B. Even If The Neustar Arbitration Clause Applied To Federal Claims, The CTIA, Carrier Defendants And WMC May Not Invoke It.

None of the Carrier Defendants, CTIA or WMC are parties to the Neustar agreement. The first paragraph of the Neustar agreement states, in block capital letters: "IT IS A LEGALLY BINDING AGREEMENT BETWEEN NEUSTAR, INC., THE COMMON SHORT CODE ("CSC") REGISTRY OPERATOR ("REGISTRY") AND "YOU," THE APPLICANT FOR A LICENSE TO USE CSC(S)." Simmons Dec. Ex. A at 1; Ex. B at 1. To avoid the inapplicability of the Neustar agreement, these Defendants invoke principles of equitable estoppel and third-party beneficiary rights, and the CTIA asserts it is a disclosed principal. *See* Carr. Arb. Mem. at 2-3, 6-17; CTIA Arb. Mem. at 9-12; WMC Arb. Mem. at 1-3, 10-16.[13] Assuming for the sake of argument only that the Neustar arbitration clause applied to Plaintiffs' federal antitrust claims (which it does not), none of these arguments avails these Defendants. "[B]ecause arbitration is of course a matter of contract[,] 'under general principles of contract law[,]' parties should not be

---

[13] "WMC Arb. Mem." is the Memorandum of Law of Defendant Wireless Media Consulting, Inc. in Support of Its Motion To Compel Arbitration (ECF No. 153).

compelled to arbitrate unless 'the totality of the evidence supports an objective intention to agree to arbitrate.'" *Ross v. Am. Express Co.*, 547 F.3d 137, 148 (2d Cir. 2008) (quoting *Sarhank Group v. Oracle Corp.*, 404 F.3d 657, 662 (2d Cir. 2005)). Further, "'[b]ecause arbitration is a matter of contract, exceptional circumstances must apply' before a court will allow a non-contracting party to impose a contractual agreement to arbitrate." *Denney v. Jenkens & Gilchrist*, 412 F. Supp. 2d 293, 297 (S.D.N.Y. 2005) (quoting *Miron v. BDO Seidman, L.L.P.*, 342 F. Supp. 2d 324, 332 (E.D. Pa. 2004)). Exceptional circumstances do not exist here.

### 1. The Carrier Defendants, CTIA and WMC May Not Invoke Equitable Estoppel due to Their Unclean Hands.

Under applicable Virginia law,[14] Defendants are not entitled to invoke equitable estoppel due to their unclean hands. "Pursuant to the equitable maxim that 'He who comes into equity must come with clean hands,' . . . the complainant seeking equitable relief must not himself have been guilty of any inequitable or wrongful conduct with respect to the transaction or subject matter sued on." *Cline v. Berg*, 273 Va. 142, 147, 639 S.E.2d 231, 233-34 (2007) (quoting *Richards v. Musselman*, 221 Va. 181, 185, 267 S.E.2d 164, 166 (1980)); *see also Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship*, 698 F. Supp. 2d 602, 625 (E.D. Va. 2010), *aff'd*, 442 Fed. Appx. 776 (4th Cir. 2011) (defendant "may not receive the benefit of estoppel" due to its unclean hands in violating its contractual duties). Here, since 2003, Defendants have created and engaged in a scheme outside Federal Communications Commission ("FCC") jurisdiction to force transmitters of text messages between businesses or institutions and consumers ("A2P SMS") to use five- and six-digit telephone numbers so as to reap monopoly

---

[14] The Supreme Court has instructed that "'traditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through . . . third-party beneficiary theories . . . and estoppel." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009). "[N]otwithstanding the 'substantive federal law' about the enforceability of arbitration agreements, the question of who was bound by such agreements was treated as a question of state law." *FR 8 Sing. Pte. Ltd. v. Albacore Mar. Inc.*, 794 F. Supp. 2d 449, 455 (S.D.N.Y. 2011).

rents by refusing to deal in ten-digit numbers for A2P SMS and monitoring the volume and usage of ten-digit numbers to eliminate "cheaters." Complaint ¶¶ 2, 3, 5, 6, 11, 55, 62-66, 70, 72, 110, 111, 114-117. In addition, Defendants have imposed on CSC lessees a wholly unnecessary program-review process. Complaint ¶¶ 10, 88-90, 92, 93, 98, 99, 109, 114. These wrongful actions are sufficient to invoke the unclean-hands doctrine to block any claim of equitable estoppel. Otherwise, the illegal scheme would be completely unchallengeable due the arbitration clause in the non-negotiable take-it-or-leave-it Neustar agreement.[15] *See Motorola Credit Corp. v. Uzan*, 274 F. Supp. 2d 481, 505 (S.D.N.Y. 2003), *aff'd on other grounds*, 388 F.3d 39, 53 (2d Cir. 2004) (defendants' unclean hands in acting fraudulently constrained the court "to deny the equitable relief of estoppel that defendants here seek to invoke in aid of arbitration"); *Cmty. Bank of Miss. v. Stuckey*, 52 So.3d 1179, 1183 (Miss. 2010) (refusing to compel arbitration based on equitable estoppel or third-party-beneficiary status due to non-signatory's unclean hands in forging the purported signatory's signature). *Cf. Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 362 (2d Cir. 2008) ("[w]here $y^{l}$ has become aligned or associated with $y$, which is a party to an arbitration contract with $x$, and has done so by wrongfully inducing $y$ to breach its obligation under that contract with $x$, there would be no unfairness in allowing $x$, the victim of the tortious interference, to insist that, while he agreed to arbitrate with his contractual counterparty $y$, he in no way consented to extend that agreement to an entity which tortiously subverted his rights under the agreement").

---

[15] The first paragraph of the Neustar agreement gives a CSC lessee only two choices: "BY CLICKING ON THE "SUBMIT" BUTTON AFTER COMPLETING THE CSC APPLICATION FORM . . . YOU AGREE TO BE BOUND BY THE TERMS AND CONDITIONS IN THIS AGREEMENT." Conversely, "IF YOU DO NOT AGREE TO ALL OF THESE TERMS, DO NOT SUBMIT AN APPLICATION FOR A CSC." Simmons Dec. Ex. A p. 1; *see also* Simmons Dec. Ex. B p. 1.

2.    **The Carrier Defendants, CTIA and WMC Are Not Third-Party Beneficiaries of the Neustar Agreement Entitled To Invoke the Arbitration Clause.**

The CTIA and the Carrier Defendants argue for the right to invoke the arbitration clause because they are mentioned repeatedly in the Neustar agreement and that makes them "integral" to it.[16]  CTIA Arb. Mem. at 9-10; Carr. Arb. Mem. at 8.  This argument is meritless.

Numerous entities, including aggregators, content providers, and "other participating members of the wireless telecommunications industry" are mentioned in the Neustar agreement, because this is a complex industry and describing the history, rights and obligations of the parties often requires mention of other entities.  *See* Simmons Dec. Ex. A ¶¶ 1-2; Ex. B. ¶ 1.  But being mentioned does not make an entity a party or entitle it to the rights, or subject it to the obligations of, a party.  The issue is not how often the CTIA and the Carrier Defendants are mentioned, but whether the references establish that these Defendants were intended by the CSC lessees to be entitled to invoke the arbitration clause as direct beneficiaries.  The references prove precisely the opposite.

The CTIA asserts that, "[a]s was made clear to Plaintiffs on the Common Short Codes Administration website and in the CSC Agreement itself, CSCs are administered by CTIA."  CTIA Arb. Mem. at 9.  The Neustar agreement says otherwise.  Paragraph 2 (¶ 1 of the 2007 agreement) informs customers that "Registry [*i.e.*, Neustar] administers a method for assignment of CSCs."  Simmons Dec. Ex. A ¶ 2; Ex. B ¶ 1.  The agreement explains that the CTIA delegated its administrative responsibilities to Neustar by contract (*id.*), thereby authorizing Neustar to enter into these lease agreements by itself and relieving the CTIA of the responsibility and

---

[16] Being "integral" to the agreement cannot mean that the Carrier Defendants are "parties" to the agreement, because they are not.  It cannot mean that they are bound by the terms of the agreement, because they are not.  It cannot mean that they have obligations to CSC lessees under the agreement, because they do not.  And, it does not mean that the Carrier Defendants may be compelled to arbitrate under the agreement, because they have not claimed that.

potential liability of doing so.  The CTIA's confirmation that it had assigned Neustar full power to issue CSC leases allows the Neustar agreement to be solely between "Neustar and You."[17] Simmons Dec. Ex. A p. 1; Ex. B p. 1.

Similarly, the Neustar agreement's references to "Participating Carriers" (see, e.g., Simmons Dec. Ex. A ¶ 2; Ex. B ¶ 1) inform the CSC lessees that those carriers are neither bound by the agreement's terms nor have the authority to bind the actual parties to it.  Page 1 of the Neustar agreement informs customers: "PLEASE BE ADVISED THAT THE MERE . . . REGISTRATION OF A CSC WITH THE REGISTRY DOES NOT GUARANTEE THAT A PARTICIPATING CARRIER WILL ACCEPT OR IMPLEMENT THE CSC OR THAT YOU WILL BE ABLE TO USE THE CSC AT ALL." Simmons Dec. Ex. A p. 1; Ex. B p. 1.

The reference to "Participating Carriers" in ¶ 7.f. of the Neustar agreement (¶ 6.e. of the 2007 agreement) further confirms the point.  It states in block letters:  "Registering a CSC in no way guarantees you the right to send or receive communications using your CSC . . . In order to activate your CSC, you must obtain approval from each individual participating carrier through which you would like to transmit content.  *The terms and conditions of all such arrangements with individual participating carriers are at the sole discretion of that participating carrier and shall not in any way involve Registry.*" Simmons Dec. Ex. A ¶ 7.f.; Ex. B ¶ 6.e. (emphasis added).

---

[17] The Carrier Defendants assert that the Plaintiffs admit in the Complaint that the CTIA is a party to the Neustar agreement:  "As alleged, each of Plaintiffs entered into a CSC Agreement with Defendant CTIA and its agent Neustar. SAC ¶¶ 56, 74." (Carr. Arb. Mem. at 4)  The cited paragraphs of the Complaint say nothing of the kind. Paragraph 56 asserts that the Carrier Defendants had the CTIA enter into a contract with Neustar to make Neustar the Registry to lease short codes.  But, CSC lessees are not parties to the contract between the CTIA and Neustar, which is entirely separate from the contracts between Neustar and CSC lessees.  Paragraph 74 states only that Plaintiffs have been forced to lease CSCs from Neustar, because the Carrier Defendants have refused to deal with the CSC lessees directly.  Paragraph 74 never mentions the CTIA and certainly does not assert that the CTIA was a party to the Neustar agreement.

The purpose of these provisions is unequivocal. They advise CSC lessees that the "Participating Carriers" are in no way bound by the grant by Neustar of a CSC lease and that the carriers, in turn, cannot bind Neustar. In short, the Carrier Defendants claim to be beneficiaries of a contract by pointing to provisions that meticulously inform the CSC lessees that participating carriers are not parties to the agreement.

The CTIA and the Carrier Defendants might have made themselves "parties" in the agreement. Certainly Plaintiffs and other CSC lessees would have been in no position to object. But the CTIA and the Carrier Defendants did not do this. To the contrary, included in the agreement were terms that expressly insulated them from obligation or liability. Having insulated themselves from contractual liability by staying aloof from the Neustar agreement, the CTIA and the Carrier Defendants should not be allowed to successfully argue that they really are parties to the agreement entitled to its benefits, including the benefit of arbitration.

WMC's argument is even more attenuated. It admits that it is not a signatory to the Neustar agreement. WMC Arb. Mem. at 10. Indeed, it is not even mentioned in the agreement. *Id.* at 14. Instead, WMC claims a right to invoke the arbitration clause as a subcontractor, although subcontractors are only twice referenced generally in the agreement. *Id.*; *see* Simmons Dec. Ex. A ¶¶ 8, 15; Ex. B ¶¶ 7, 14.[18]

In Virginia, a person is a third-party beneficiary if "the contracting parties clearly and definitely intended that the contract confer a benefit upon him." *Envtl. Staffing Acquisition Corp. v. B & R Constr. Mgmt., Inc.*, 283 Va. 787, 793, 725 S.E.2d 550, 554 (Va. 2012) (citation omitted). "The essence of a third-party beneficiary's claim is that others have agreed between

---

[18] Paragraph 15 of the current Neustar agreement (¶ 14 of the 2007 agreement) mentions "subcontractors" as part of a boilerplate disclaimer of warranty and limitation of liability, including "parents, subsidiaries, shareholders, members, officers, directors, employees, affiliates, subcontractors or agents." Simmons Dec. Ex. A ¶ 15; Ex. B ¶ 14.

themselves to bestow a benefit upon the third party but one of the parties to the agreement fails

to uphold his portion of the bargain." *Copenhaver v. Rogers*, 238 Va. 361, 367, 384 S.E.2d 593,

596 (Va. 1989). A non-party is a third-party beneficiary to a contract, only if the one "overriding

intent" in making the contract was to confer on the non-party the benefit sought to be enforced.

*See Bank of Am. v. Musselman*, 240 F. Supp. 2d 547, 556 (E.D. Va. 2003). That is not the

situation here.

 None of the Carrier Defendants, CTIA or WMC is mentioned in the Neustar agreement

arbitration clause. Simmons Dec. Ex. A ¶ 19; Ex. B ¶ 18. Only "parties" are mentioned, and the

clause clearly contemplates only two parties – Neustar and the CSC lessee. *Id.* ("No claim may

be submitted by a party to arbitration in accordance with this Section 17 [sic] unless notified by

the other party within one (1) year . . .."). The Neustar agreement does not clearly and definitely

intend to confer the benefit of the arbitration clause upon the Carrier Defendants, CTIA or

WMC. Therefore, they are not third-party beneficiaries of the arbitration clause and may not

invoke it.

 Further, "[a] third party beneficiary must directly benefit, not simply incidentally benefit,

from the contract in order to sue." *Gibson v. Med. Facilities of Am., Inc.*, Civil Docket No.

CL09-3289, 2010 WL 7373713, at *5 (Va. Cir. Ct. Jan. 22, 2010). The Carrier Defendants and

the CTIA by incorporation (CTIA Arb. Mem. at 11-12) cite provisions in the Neustar agreement

through which they may at most obtain only incidental benefits under the contract. For example,

the Carrier Defendants cite the fact that, under certain circumstances, a carrier may restrict a

CSC lessee's use of a CSC (Carr. Arb. Mem. at 16), neglecting to mention that the language

follows Neustar's right to suspend or terminate access to a CSC under the same circumstances

(Simmons Dec. Ex. A ¶ 3; Ex. B ¶ 2). The Carrier Defendants also reference a few provisions

concerning indemnification, consent to disclosure, and intellectual property, which all in the first instance apply to Neustar. Carr. Arb. Mem. at 16. The inclusion of such terms does not transform a contract between Neustar and a CSC lessee into an agreement that "exists in large part for the benefit of Carrier Defendants." *Id.* Similarly, WMC only references ¶ 8 of the Neustar agreement, which refers to unidentified subcontractors who purportedly "*reserved* a right" (emphasis added) to "issue[ ] warnings, suspend[ ] or terminat[e]" CSCs, even though only Neustar, not WMC, leases CSCs. WMC Arb. Mem. at 1, 15-16. None of these provisions evidence direct benefits to the CTIA, Carrier Defendants or WMC that would make them third-party beneficiaries of the Neustar agreement entitled to invoke the arbitration clause.

Indeed, the cases cited by the Carrier Defendants and WMC confirm that they should not be treated as third-party beneficiaries. In *Bostic v. Global Strategies Group, Inc.*, Civ. A. No. 96-1090-A, 1996 WL 729853, *2-3 (E.D. Va. Nov. 22, 1996), the defendants were not signatories to the agreement at issue and were not identified in any meaningful way in the contract. Therefore, the court found that defendants were not intended to be third-party beneficiaries and denied defendants' motion to compel arbitration. The same result is appropriate here.

In *Ward v. Ernst & Young*, 246 Va. 317, 320, 331, 435 S.E.2d 628, 629, 636 (Va. 1993), the third-party beneficiary was the sole stockholder of the company that entered into the agreement and therefore was clearly the primary beneficiary of the contract. Likewise, the third-party beneficiaries in *Levine v. Selective Ins. Co. of Am.*, 250 Va. 282, 283-84, 462 S.E.2d 81, 82 (Va. 1995), were owners of the property that was the subject of the construction hazard insurance policy at issue. Although the housing builder, rather than the owners, had entered into the contract with the insurance company, the parties to the agreement expressly understood that the

owners were the beneficiaries of the policy. *Id.* The facts of these cases are clearly distinguishable from the facts here.

There is no basis for allowing the CTIA, the Carrier Defendants or WMC to require Plaintiffs to arbitrate with them as third-party beneficiaries of the Neustar agreement.

### 3.    The CTIA Was Not the Principal of Neustar.

The Neustar agreement nowhere states that Neustar is the agent for principal CTIA. To the contrary, it explicitly states that "CTIA . . . has granted Registry [Neustar] a license to assign CSCs in the manner described in this Agreement."[19]  Simmons Dec. Ex. A ¶ 2; Ex. B ¶ 1. This licensor/licensee relationship does not give rise to a principal/agent relationship under applicable Virginia law, because the CTIA does not control the day-to-day operations of Neustar.

Virginia finds a principal/agent relationship where the principal has "control or [the] right to control the methods or details of doing the work" to be carried out by the agent, "not control of the results." *Wells v. Whitaker*, 207 Va. 616, 624, 151 S.E.2d 422, 429 (1966).   In *Murphy v. Holiday Inns, Inc.*, the Virginia Supreme Court found that a licensee of Holiday Inn was not Holiday Inn's agent, because the parties' licensor/licensee arrangement gave Holiday Inn no "control over the day-to-day operation of" the motel. 216 Va. 490, 495, 219 S.E.2d 874, 878 (Va. 1975).  Holiday Inn had decision-making power over numerous elements of the motel's business including the location and look of the motel; the use of its trade name, signs and symbols  in the motel; the advertising of the motel; the training of the motel's employees; the funding of the motel; and the operation of the motel pursuant to Holiday Inn's rules, including a requirement that the licensee "make quarterly reports to licensor concerning operations, and submit to periodic inspections of facilities and procedures conducted by licensor's

---

[19] "The law indulges no presumption that an agency exists, but instead presumes that a person is acting for himself, and not as agent for another." *Montague Mfg. Co. v. Aycock-Holly Lumber Co.*, 139 Va. 742, 124 S.E. 208, 209 (Va. App. 1924).

representatives." *Id.,* 216 Va. at 494, 219 S.E.2d at 877. However, the licensee had the "right to profit and bore the risk of loss" as to the motel. *Id.,* 216 Va. at 495, 219 S.E.2d at 877 (internal quotations omitted).

The Neustar agreement demonstrates that Neustar (the Registry), not the CTIA, controlled the day-to-day operation of CSC licensing. Paragraph 14 of the Neustar agreement explicitly stated, "Registry controls and operates the Service from its headquarters in the United States and makes no representation that the Service is appropriate or available for use in other locations." Simmons Dec. Ex. A ¶ 14; Ex. B ¶ 13. Neustar "reserve[d] the right at any time to modify or discontinue, temporarily or permanently, the Service (or any part thereof) with or without notice." Simmons Dec. Ex. A ¶ 17; Ex. B ¶ 16. Neustar "reserve[d] the right to deny, cancel, transfer or otherwise make unavailable any CSC that it deems necessary, *in its sole discretion*, (1) to protect the integrity and stability of the Service." Simmons Dec. Ex. A ¶ 8; Ex. B ¶ 7 (emphasis added). Neustar had "the right, *in its sole discretion*, to refuse to register any Random or Selected CSC." Simmons Dec. Ex. A ¶ 7.d.; Ex. B ¶ 6.c. (emphasis added). Automatic renewal of a CSC was "subject to the Registry's then-current terms and conditions." Simmons Dec. Ex. A ¶ 7.l(i). In the event a CSC expired and was not renewed, a CSC lessee "may be given an additional thirty (30) day grace period, at *the sole discretion of the Registry*." Simmons Dec. Ex. A ¶ 7.g.; Ex. B ¶ 6.f. (emphasis added). "Registry, *in its sole discretion*, will determine whether or not Your [a CSC lessee's] conduct is consistent with this Agreement and any operating rules or policies." Simmons Dec. Ex. A ¶ 18.b.; Ex. B ¶ 17.b. (emphasis added). "*Registry* may take all remedies to collect fees owed." Simmons Dec. Ex. A ¶ 9; Ex. B ¶ 8 (emphasis added). Further, Neustar has profited under its agreements with CSC lessees, receiving $35 million last year and remitting only a portion as "royalties" to the CTIA.

Complaint ¶¶ 85-86.  In light of the CTIA's lack of control over all the enumerated elements of CSC leasing and Neustar's ability to use its own discretion to make these determinations, it is clear that Neustar was not acting as the CTIA's agent.

The fact that the CTIA exerted some control over Neustar, as alleged in the Complaint (¶ 45), does not render Neustar the agent of the CTIA, given that the control alleged does not involve the day-to-day administration or details of Neustar's CSC leasing.  Neustar's independent day-to-day administration of the CSC service means that it was not an agent of the CTIA.

* * *

Although the Neustar arbitration clause is inapplicable to federal antitrust claims, assuming solely for the sake of argument that it were, the attempt of the Carrier Defendants, CTIA and WMC to invoke principles of equitable estoppel fails due to their unclean hands, and they are not third-party beneficiaries of the Neustar agreement.  Moreover the CTIA is not a principal of Neustar's agency, but a mere licensor without control over Neustar's day-to-day operations.  In brief, none of the Carrier Defendants, CTIA nor WMC may invoke the Neustar arbitration clause to compel arbitration of any of the antitrust claims asserted here.

## II.     THE MBLOX ARBITRATION AGREEMENTS AND THE OPENMARKET/4INFO ARBITRATION AGREEMENT ARE INAPPLICABLE AND THE OPENMARKET/TEXTPOWER ARBITRATION CLAUSE APPLIES ONLY TO TEXTPOWER FOR A PORTION OF THE CLASS PERIOD.

Two Aggregator Defendants, mBlox and OpenMarket, have submitted four contracts under which they claim arbitration rights.  Three of the contracts are wholly inapplicable, and the fourth (OpenMarket/TextPower) does not permit resolution of all the issues between Defendant OpenMarket and Plaintiff TextPower.

### A.    The MBlox Agreements Are Inapplicable.

MBlox submits two agreements – one between mBlox and Mobiworx, dated March 22, 2007, and one between mBlox and Phat Digit Inc., an Australian company, dated June 26, 2006. *See* Cowell Dec. Ex. A;[20] Whichard Dec. Ex. A,[21] respectively.

The Mobiworx contract was cancelled December 20, 2007 (Cowell Dec. Ex. C), and the arbitration clause did not survive its cancellation (Cowell Dec. Ex. A §§ 16 ("Survival"), 18 ("Arbitration")).  Because no Plaintiff asserts any claim prior to April 5, 2008, the Mobiworx agreement is inapplicable.

The Phat Digit contract for CSC 55050 apparently terminated in January 2008.  Whichard Dec. ¶ 6.  Further, TextPower has never used mBlox for transmission of any of its CSCs, and, in particular, not for CSC 55050, and it has never had any relationship with Phat Digit.  Goldman Dec. ¶¶ 2, 5, 6.[22]  CSC 55050 was specifically requested by one of TextPower's utility clients, and TextPower then acquired rights from Neustar, not Phat Digit or mBlox, to use it, but not prior to 2012.  *Id.*  Surely mBlox is not suggesting that TextPower must arbitrate with an entity, mBlox, with which TextPower has never done any business under an agreement (a) to which TextPower has never been a party, (b) under which TextPower has never obtained any rights, and (c) which expired four years before TextPower acquired rights to a CSC from another entity and before any claim in this action accrued.

---

[20] "Cowell Dec." is the Declaration of Damian Cowell in Support of the Joint Motion of Defendants MBlox Inc. and OpenMarket, Inc. To Stay Pending Arbitration and To Dismiss the Second Consolidated Amended Class Action Complaint, dated October 8, 2012.
[21] "Whichard Dec." is the Declaration of Amanda Whichard in Support of the Joint Motion of Defendants MBlox Inc. and OpenMarket, Inc. To Stay Pending Arbitration and To Dismiss the Second Consolidated Amended Class Action Complaint.
[22] "Goldman Dec." is the Declaration of Scott J. Goldman, dated December 1, 2012.

MBlox has no agreement requiring arbitration with any of the Plaintiffs. Therefore, the

Carrier Defendants cannot seek to compel arbitration under these agreements either. *See* Carr.

Arb. Mem. at 17-21.

**B.    The OpenMarket/4Info Agreement Does Not Apply To Club Texting, And The OpenMarket/TextPower Agreement Does Not Apply To ISpeedbuy.**

OpenMarket submits an agreement between it and an entity called 4INFO, Inc.,[23] which

is neither a plaintiff nor a defendant here, and argues that equitable estoppel compels non-

signatory Plaintiff Club Texting to arbitrate under that agreement, because Club Texting has used

4INFO to transmit its messages to OpenMarket. *See* MBlox Mem. at 17-18.[24] Similarly,

OpenMarket argues that equitable estoppel compels non-signatory Plaintiff iSpeedbuy to

arbitrate under OpenMarket's agreement with Plaintiff TextPower (Emmet Dec. Ex. A), because

iSpeedbuy has used TextPower to transmit messages to OpenMarket. *See* MBlox Mem. at 17-

18.

"[A] nonsignatory party may be bound to an arbitration agreement if so dictated by the

'ordinary principles of contract and agency.'" *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64

F.3d 773, 776 (2d Cir. 1995) (quoting *McAllister Bros., Inc. v. A & S Transp. Co.*, 621 F.2d 519,

524 (2d Cir. 1980)).

As discussed above in connection with the Neustar agreement, none of the Defendants

may invoke equitable estoppel due to their unclean hands. *See PenneCom B.V. v. Merrill Lynch*

*& Co.*, 372 F.3d 488, 493 (2d Cir. 2004) ("New York courts have long applied the maxim that

one who comes to equity must come with clean hands . . . where the party asking for the

---

[23] This Commercial Service Agreement is Exhibit B to the Declaration of Edwin Jay Emmet III in Support of the Joint Motion of Defendants MBlox, Inc. and OpenMarket Inc. To Stay Pending Arbitration and To Dismiss the Second Consolidated Amended Class Action Complaint, dated October 8, 2012 ("Emmett Dec.").

[24] The "MBlox Mem." is the Memorandum in Support of Joint Motion of Defendants MBlox Incorporated and OpenMarket, Inc. To Stay Pending Arbitration and To Dismiss the Second Consolidated Amended Class Action Complaint (ECF No. 166).

invocation of an equitable doctrine has committed some unconscionable act that is directly

related to the subject matter in litigation and has injured the party attempting to invoke the

doctrine. . . . [T]he equitable powers of this court can never be exerted in behalf of one who . . .

by . . . any unfair means has gained an advantage.  To aid a party in such a case would make this

court the abettor of iniquity." (Internal quotation marks and citations omitted.)); *Sardanis v.*

*Sumitomo Corp.*, 282 A.D. 2d 322, 324, 723 N.Y.S.2d 466, 469 (1st Dep't 2001) ("plaintiff's

unclean hands preclude him from relying on equitable defenses such as estoppel").[25]

      Assuming *arguendo* that OpenMarket may still invoke equitable estoppel, it is

inapplicable anyway.

> Under the estoppel theory, a company *knowingly* exploiting an agreement with an
> arbitration clause can be estopped from avoiding arbitration despite having never
> signed the agreement. . . . [W]here a company *knowingly* accepted the benefits of
> an agreement with an arbitration clause, even without signing the agreement, that
> company may be bound by the arbitration clause. The *benefits must be direct –*
> which is to say, flowing directly from the agreement. . . . By contrast, the benefit
> derived from an agreement is *indirect where the nonsignatory exploits the*
> *contractual relation of parties* to an agreement, but does not exploit (and thereby
> assume) the agreement itself.

*MAG Portfolio Consultant, GmbH v. Merlin Biomed Group LLC*, 268 F.3d 58, 61 (2d Cir. 2001)

(internal quotation marks and citations omitted; emphasis added).[26]  At most, Club Texting and

iSpeedbuy are exploiting the contractual relationship between OpenMarket and 4INFO and

TextPower, respectively, and thereby deriving only indirect benefits that will not give rise to an

estoppel.  Further, neither Club Texting nor iSpeedbuy can be said to have *knowingly* exploited

the respective agreements, because they could not have been shown them.

---

[25] Both the OpenMarket/4INFO and the OpenMarket/TextPower agreements are governed by New York law
without reference to principles of choice of law.  Emmet Dec. Ex. A § 14.5; Ex. B § 21.5.

[26] The *MAG Portfolio* court pointed out that estoppel of a non-signatory to an arbitration agreement is based on
much different grounds than estoppel of a signatory to an arbitration agreement. *Id.* at 62.

A review of the entire unredacted OpenMarket/4INFO agreement reveals that there is not a single mention or reference to Club Texting or even to any category of entity that includes Club Texting.[27]

# REDACTED

This agreement confers no benefit of any kind on Club Texting.  Moreover, the secrecy provision in this agreement, on which OpenMarket has relied to request that the full agreement be placed under seal in this action, *id.* § 21.8 ("[b]oth Parties agree that mention of this Agreement or the relationship created by this agreement, other than for purposes of effectuating the Service is not permitted unless written consent is received"), means that Club Texting could never have seen the agreement and *knowingly* accepted any benefits.

The OpenMarket/TextPower agreement is similar to the OpenMarket/4INFO agreement. There is not a single mention or reference to iSpeedbuy or to any category of entity including iSpeedbuy in the unredacted agreement.[28]  The customer is TextPower.  Emmet Dec. Ex. A pp.

---

[27] OpenMarket's general manager Jay Emmet inaccurately asserts that in this agreement "OpenMarket agreed . . . to provide mobile message aggregation services to . . . the entities represented by 4INFO." Emmet Dec. ¶ 15.
[28] OpenMarket's general manager Jay Emmett again inaccurately asserts that in this agreement "OpenMarket agreed . . . to provide mobile message aggregation services to . . . the entities represented by TextPower." Emmet Dec. ¶ 5.

1, 15.  Operator, Subscriber, Message, and, most importantly, Service correspond to the

OpenMarket/4INFO definitions. *Id.* §§ 3.13, 3.23, 3.33, 3.38.  The secrecy provision is identical.

*Id.* § 14.8.  ISpeedbuy received no benefits under this agreement and could not *knowingly* have

accepted any benefits.

Equitable estoppel may not be invoked by OpenMarket against non-signatories Club

Texting and iSpeedbuy.[29]  The OpenMarket/4INFO agreement is inapplicable to any Plaintiff in

this case, and, therefore, the Carrier Defendants cannot seek to compel arbitration under it either.

*See* Carr. Arb. Mem. at 17-21.

### C.    The OpenMarket/TextPower Agreement Does Not Cover Claims During The Entire Class Period.

The Class Period begins April 5, 2008.  Complaint ¶ 121.  TextPower began operating in

February 2009 (Goldman Dec. ¶ 1), but the OpenMarket/TextPower agreement was not executed

until January 2010 (Emmet Dec. Ex. A at 15).   The arbitration clause in the

OpenMarket/TextPower agreement applies to "[a]ny claim arising out or relating to this

agreement." Emmet Ex. A § 14.5.  Putting aside the missing preposition, this is the precise

language Judge Griesa held cannot be applied retroactively to disputes based on actions prior to

the date of the agreement. *Church v. Gruntal & Co.*, 698 F. Supp. 465, 469 (S.D.N.Y. 1988).

*See Necchi S.p.A. v. Necchi Sewing Mach. Sales Corp.*, 348 F.2d 693, 697-98 (2d Cir. 1965)

(1961 arbitration agreement inapplicable to actions prior to that agreement and to matters arising

---

[29] The cases cited by OpenMarket only illustrate much different situations where there was a direct benefit.  In *Am. Bur. of Shipping v. Tencara Shipyard S.p.A.*, 170 F.3d 349, 351, 353 (2d Cir. 1999), the nonsignatory owners of a yacht received significantly lower insurance rates and the ability to sail under the French flag as a result of the classification of the yacht pursuant to the contract between the yacht's builder and the classification society. In *Life Techs. Corp. v. AB Sciex PTE Ltd.*, 803 F. Supp 2d. 270, 276-77 (S.D.N.Y. 2011), the contract for the sale of a business (containing an arbitration clause) required the execution of an agreement licensing trademarks in connection with the business so that the nonsignatory to the purchase agreement who received the benefit of the use of the trademarks with the business could be required to arbitrate. In *Alfa Laval U.S. Treasury, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 857 F. Supp. 2d. 404, 414 (S.D.N.Y. 2012), indemnity agreements (with an arbitration clause) were "the source of National Union's obligation to issue the insurance policies through which the non-signatory plaintiffs obtained coverage," a direct benefit.

under a predecessor 1958 agreement).  Accordingly, OpenMarket at most is entitled to a stay

pending arbitration regarding claims of TextPower for actions after January 2010, but not for

claims based on prior actions.

**D.    The Carrier Defendants Are Not Third-Party Beneficiaries And May Not Invoke Equitable Estoppel Regarding The OpenMarket/TextPower Agreement.**

The Carrier Defendants are not signatories to the OpenMarket/TextPower agreement,

only OpenMarket and TextPower, the Customer, are.  Emmet Dec. Ex. A p. 15.  Nonetheless, the

Carrier Defendants seek to invoke the arbitration clause as third-party beneficiaries or under

equitable estoppel.  *See* Carr. Arb. Mem. at 17-23.  Under applicable New York law,[30] neither

applies.

**1.    The Carrier Defendants Are Not Third-Party Beneficiaries Entitled To Invoke the Arbitration Clause in the OpenMarket/TextPower Agreement.**

The Carrier Defendants argue that they are third-party beneficiaries generally because the

"Carrier Defendants have their own defined term in the [OpenMarket/TextPower] agreement,

and that term is used *61 times* . . . to assign numerous economic and non-economic rights and

benefits to the Carrier Defendants," which "reveals the intent of the parties to benefit wireless

carriers."[31]  Carr. Arb. Mem. at 22 (emphasis in original).  Importantly, none of the 61 times the

defined term "Operator" is used in the OpenMarket/TextPower contract is in the arbitration

clause.  *Cf. id.*; *see* Emmet Dec. Ex. A § 14.5.

---

[30] The question of whether non-signatories may enforce an arbitration clause against a signatory under third-party beneficiary or estoppel theories is a question of state law.  *Arthur Andersen*, 556 U.S. at 631; *FR 8 Sing.*, 794 F. Supp. 2d at 455.  The OpenMarket/TextPower "[a]greement shall be governed by the laws of the State of New York without reference to its principles of conflicts of laws."  Emmet Dec. Ex. A § 14.5.

[31] Plaintiffs take issue with this characterization of the use of the term "Operator" in the OpenMarket/TextPower agreement.  Because the objective of the agreement was for the Customer TextPower to use the aggregator OpenMarket's Network to connect to the Operator wireless carriers to reach Subscribers of the Operator with text messages, in describing the service and its limits, the term Operator was used without creating any "benefits" in favor of the Carrier Defendants.  *See, e.g.*, Emmet Dec. Ex. A §§ 3.3, 3.20, 3.23, 3.31, 3.33, 3.35, 3.38, 5.2, 6.1.2, 8.2, and 9.2 (capitalized terms are defined in the agreement).

Judge Stein's analysis in *Republic of Iraq v. ABB AG*, 769 F. Supp. 2d 605 (S.D.N.Y.

2011), *aff'd sub nom. Republic of Iraq v. BNP Paribas USA*, 472 Fed. Appx. 11 (2d Cir. 2012),

is highly instructive.  In that case, the district court denied the motion of the Republic of Iraq to

compel arbitration of claims for damages due to corruption in the United Nations' Oil-for-Food

humanitarian aid program as a third-party beneficiary of a contract between BNP Paribas's

corporate predecessor and the United Nations. *Id.* at 607-08, 615.  The Republic there, as do the

Carrier Defendants here, "insist[ed] that a third-party beneficiary can assert any and all

provisions of a contract." *Id.* at 612.  Judge Stein ruled to the contrary.

> Two principles of New York law put the lie to that notion.  First, under New York
> law it is well settled that a third party beneficiary is entitled only to those rights
> which the original parties to the contract intended the third party to have . . . and
> the parties can obviously intend for a third party to benefit from certain promises
> in a contract and not others.  Second, . . . if a signatory to an agreement is to be
> required to arbitrate with a nonsignatory party, the agreement must so provide in
> express language.

*Id.* (quotations, brackets and citations omitted).  Reiterating that "[w]hether the Republic is a

third-party beneficiary of the Banking Agreement in a general sense does not dispose of the

arbitration question," the court examined the arbitration clause, which spoke in terms of the

"parties," and concluded that "[t]he emphasis on the 'Parties' to the arbitration agreement

indicates that the United Nations and BNP intended the right to compel arbitration to be

exclusive to them." *Id.* at 613.

Here, too, the arbitration clause speaks only in terms of the "parties."  Emmet Dec. Ex. A

§ 14.5.  Here, too, the use of the term implies only two parties: "if the parties fail to agree upon

the arbitrator within 30 days of notice of arbitration provided by *either* party, the AAA shall

appoint the arbitrator." *Id.*  Further, the use of the term "parties" throughout the

OpenMarket/TextPower agreement references expressly or impliedly the signatories and does

not include the defined term Operator. *See id.* §§ 4.7 ("[b]oth parties"); 12.4; 14.1 ("each party .

. . undertakes to retain in confidence . . . all . . . non-public information . . . of the other party");

14.4 ("[n]either party"); 14.6 ("[e]ach party"); 14.8 ("[b]oth parties"); 14.11 ([n]either party").

"[H]ad the parties intended to extend the right of arbitration, they would not have drafted an

arbitration provision that singled out the 'Parties' and omitted any mention whatsoever of

[Operators], as they did." *Iraq*, 769 F. Supp. 2d at 614. The arbitration clause in the

OpenMarket/TextPower agreement does not apply to the Carrier Defendants as third-party

beneficiaries.[32]

### 2. The Carrier Defendants May Not Assert Equitable Estoppel under the OpenMarket/TextPower Agreement.

As discussed above, any argument for equitable estoppel by the Carrier Defendants is

defeated by their unclean hands.

Nonetheless, for the purpose of further argument only, the Carrier Defendants may not

invoke equitable estoppel under the OpenMarket/TextPower agreement in any event, because

they do not have a close enough relationship with TextPower to do so.[33] This Court has stated

that, "in order for estoppel to apply, there 'must be a relationship among the parties which either

supports the conclusion that [the signatory] had consented to extend its agreement to the [non-

signatory], or, otherwise put, made it inequitable for [the signatory] to refuse to arbitrate on the

ground that it had made no agreement with [the non-signatory].'" *Lismore*, 2012 WL 3577833,

---

[32] The Carrier Defendants' cases are irrelevant. In *Spear, Leeds & Kellogg v. Cent. Life Ass. Co*, 85 F.3d 21, 26 (2d Cir. 1996), the New York Stock Exchange Constitution explicitly provided for non-members to submit for arbitration any controversy arising out of the business of a member. In both *Schatz v. Blanchard*, 244 A.D.2d 223, 224, 664 N.Y.S.2d 46, 47 (2d Dep't 1997), and *Crawford v. Feldman*, 199 A.D.2d 265, 266, 604 N.Y.S.2d 585, 587 (2d Dep't 1993), the third parties were intended beneficiaries of the arbitration clause.
[33] The Carrier Defendants focus on the requirement of "intertwinement," *see Lismore v Société Générale Energy Corp.*, No. 11 Civ. 6705(AJN), 2012 WL 3577833, at *7 (S.D.N.Y. Aug. 17, 2012), not on the separate requirement of a "close relationship." *See* Carr. Arb. Mem. at 18-21.

at *8 (quoting *Sokol Holdings*, 542 F.3d at 361). No consent by TextPower to extend its agreement with OpenMarket to the Carrier Defendants may be inferred here.

While the defined term Operator, which encompasses the Carrier Defendants, may have been used 61 times in the OpenMarket/TextPower agreement (Carr. Arb. Mem. at 20), that was because the purpose of the agreement was for the customer TextPower to use OpenMarket's network to connect to the operators to reach the operators' subscribers with text messages. Emmet Dec. Ex. A §§ 3.33, 7.2. Therefore, in describing the services that OpenMarket was performing as an aggregator, it was necessary for the agreement to include references to the carriers.

For example, in §§ 9.1 and 9.2, specifically referenced by the Carrier Defendants (Carr. Arb. Mem. at 20), Customer TextPower agreed to supply OpenMarket with an accurate and complete Short Code Program Form (as provided by OpenMarket) and keep it updated. Emmet Dec. Ex. A § 9.1. In this section, OpenMarket also warned the Customer that a CSC would not be activated until OpenMarket had approved the program and also received approvals from relevant operators. *Id.* Further, if an operator did not approve, then TextPower was given the option to cancel the program and receive a refund of all or a portion of the Set-Up Fees, which were paid to OpenMarket. *Id.* §§ 4.1.1, 9.2. Thus, while the OpenMarket/TextPower agreement describes the Carrier Defendants' role in program review, it does not make that role subject to the agreement.[34] Moreover, any remedy is only between OpenMarket and TextPower.

---

[34] Similarly, § 3.31, also referenced by the Carrier Defendants (Carr. Arb. Mem. at 20), states only that *OpenMarket* will submit the Customer's program documentation to the operators for consideration, monitoring and approval. Emmet Dec. Ex. A § 3.31.

In short, the OpenMarket/TextPower agreement does not contain provisions that would enable TextPower to bring a claim against the Carrier Defendants or vice versa.[35] The closest provision is

# REDACTED

Plainly, the OpenMarket/TextPower agreement evinces no consent by TextPower to extend its agreement with OpenMarket to the Carrier Defendants. Therefore, the Carrier Defendants may not invoke equitable estoppel.

III. **BECAUSE THE COSTS OF ARBITRATION UNDER THE NEUSTAR AND OPENMARKET/TEXTPOWER AGREEMENTS WOULD PREVENT PLAINTIFFS FROM EFFECTIVELY VINDICATING THEIR FEDERAL STATUTORY RIGHTS, THE ARBITRATION CLAUSES ARE UNENFORCEABLE.**

Arbitration has been recognized as an effective vehicle for vindicating statutory rights, but only "so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum. . . ." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 637 (1985). "[A]n agreement which in practice acts as a waiver of future liability under federal antitrust statutes is void as a matter of public policy." *In re American Exp. Merchants' Litig.,* 667 F.3d 204, 214 (2d Cir. 2012) ("*Amex III*") (citation omitted).

---

[35] To the contrary, § 10.1.1. specifically exempts operators from liability to TextPower for any failure to deliver a message. Emmet Dec. Ex. A § 10.1.1.

*In re Elec. Books Antitrust Litig.* No. 11 MD 2293(DLC), 2012 WL 2478462, at *2 (S.D.N.Y.

June 27, 2012) ("*E-Books*"). Neither Plaintiff iSpeedbuy nor Plaintiff TextPower may

effectively vindicate their statutory federal antitrust claims in an arbitral forum because "a

pragmatic accounting of the likely costs and benefits of bringing an individual arbitration and the

incumbent risks" shows that "it would be economically irrational for them to pursue their claims

through individual arbitrations." *Id.* at *4.[36]

      Chief Justice Rehnquist in *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 90

(2000), recognized that "[i]t may well be that the existence of large arbitration costs could

preclude a litigant . . . from effectively vindicating her federal statutory rights in the arbitral

forum." Building upon this instruction, the Second Circuit in the context of whether a class

action waiver in an arbitration agreement should be invalidated has issued three opinions in *In re

Am. Express Merchants' Litig.*, 554 F.3d 300 (2d Cir. 2009) ("*Amex I*"), 634 F.3d 187 (2d Cir.

2011) ("*Amex II*"), and 667 F.3d 204 (2d Cir. 2012) ("*Amex III*").[37] The Second Circuit analyzed

whether, and found that, plaintiffs had shown that their costs in individually arbitrating their

dispute with Amex would be so prohibitive as to invalidate the arbitration clause. *Amex II*, 634

F.3d at 197-98; *Amex III*, 667 F.3d at 212, 219.

      In *E-Books*, based on affidavits "demonstrat[ing] that it would be economically irrational

for any plaintiff to pursue his or her claims through an individual arbitration," Judge Cote denied

---

[36] *See also Sutherland v. Ernst & Young LLP*, 768 F. Supp. 2d 547, 552 (S.D.N.Y. 2011) (quoting *In re Am. Express Merchants' Litig.*, 554 F.3d 300, 320 (2d Cir. 2009) ("[t]he court . . . embraced a functional approach, which depends upon a showing that the size of the recovery received by *any* individual plaintiff will be too small to justify the expenditure of bringing an individual action" (emphasis in original)).

[37] *Certiorari* was granted on the last opinion to review the question of "[w]hether the Federal Arbitration Act permits courts, invoking the 'federal substantive law of arbitrability,' to invalidate arbitration agreements on the ground that they do not permit class arbitration of a federal-law claim." *Am. Express Co. v. Italian Colors Restaurant*, No. 12-133, 2012 WL 3096737 (Sup. Ct. Nov. 9, 2012); http://www.supremecourt.gov/qp/12-00133qp.pdf. The grant of *certiorari* was not to determine whether the existence of large arbitration costs making it economically irrational to pursue an individual arbitration invalidates an arbitration clause that covers a statutory claim.



one defendant's motion to compel arbitration and stay the proceedings. *Id.*, 2012 WL 2478462, at *1, *3. The affidavits showed that plaintiffs "face[d] several hundred thousand dollars to millions of dollars in expert expenses," "significant expenses in securing, organizing, and maintaining documents, deposing witnesses, and in attorneys' fees, . . . [with] no guaranty of recovering any or all of these expenses." *Id.* at *3. The court also found that "plaintiffs [could] expect at most a median recovery of $540 in treble damages." *Id.*

Here, Plaintiffs have submitted similarly detailed affidavits. ISpeedbuy's principal Michael Ellis states that iSpeedbuy since 2009 has paid approximately        for the use of CSCs. Ellis Dec. ¶¶ 1, 5.[38] TextPower's CEO Scott J. Goldman states that, from January 2010 through September 2012, the duration of the OpenMarket/TextPower agreement, TextPower has incurred          in costs for CSCs, connection fees, message fees and program-review fees. Goldman Dec. ¶ 4. Economic consultant Dr. Michael A. Williams estimates that perhaps 75% of these costs might be considered damages in this action. Williams Dec. ¶ 16.[39] After trebling, this results in potential estimated damages for iSpeedbuy of        and for TextPower of

Experienced antitrust litigator Joseph C. Kohn describes how this complex antitrust litigation with 18 conspirators will likely involve millions of pages of documents, which will likely require the creation of an electronic document storage and retrieval system at the cost of hundreds of thousands of dollars. Kohn Dec. ¶¶ 7, 11.[40] It will also likely include tens of depositions to obtain testimony covering an at least 10-year period. *Id.* ¶ 12. In addition, it will require a large amount of attorney time. *Id.* at ¶¶ 9. Attorneys' fees might range from $5.5 million to $38 million, with costs from $950,000 to $3.4 million. *Id.* ¶¶ 13-14.

---

[38] "Ellis Dec." is the Declaration of Michael Ellis, dated December 7, 2012.
[39] "Williams Dec." is the Expert Declaration of Michael A. Williams, Ph. D., dated November 30, 2012.
[40] "Kohn Dec." is the Declaration of Joseph C. Kohn, dated December 4, 2012.

Professor George A. Bermann, an arbitrator and AAA director, describes the range of "filing fees, arbitrators' costs, and other arbitration expenses," *Randolph*, 531 U.S. at 84, that might be expected to be incurred in an individual arbitration of this action. *See* Bermann Dec. ¶¶ 8, 15-57.[41]  For a claim of $100,000, such as one that might be asserted by iSpeedbuy, the filing fee would be $1,850 (plus an additional final fee of $750), and for a claim of $600,000, such as one that might be asserted by TextPower, the initial fee would be $6,200 with a final additional fee of $2,500. *Id.* ¶¶ 22-23.  For a three-arbitrator tribunal under the Neustar agreement, the range of arbitrator fees is $192,500 to $512,000, and, for a single-arbitrator tribunal under the OpenMarket/TextPower agreement, it is $60,000 to $163,200. *Id.* ¶¶ 28-40, 52-53.  Each of the parties would be required to make an advance deposit of up to half of the expenses for the arbitration (*id.* ¶ 25), and, while at the end of the proceedings, it is common for the tribunal to allocate costs and fees between the parties in consideration, in large part, of the outcome of the case, a winning claimant may not recover all of the fees it paid, and a losing claimant has a real likelihood of having to bear the costs and attorneys' fees not only of itself, but also of its adversary (*id.*¶ 41).

Based on his experience in antitrust cases, Dr. Williams has also considered the economic analysis that might be expected to be conducted in this case and estimated the economist fees for that analysis as being in the range of $400,000 to $600,000.  Williams Dec. ¶¶ 7-15.

Dr. Williams also concluded that the damages that iSpeedbuy "could expect to recover are substantially less than [just] the expected economics consulting fees," so that "an economically rational individual plaintiff likely would find it impractical to pursue the present matter in an individual arbitration." *Id.* ¶ 17.  When the arbitration costs and attorneys' fees are

---

[41] "Bermann Dec." is the Declaration of George A. Bermann Regarding Arbitration Issues, dated November 29, 2012.

piled on top of the economics consulting costs, it is not surprising that Mr. Ellis declares that "it would be impractical and unaffordable for iSpeedbuy on its own to pursue its claims against any of the defendants through arbitration" and that "it would not do so." Ellis Dec. ¶ 12.

While it is a closer call for TextPower in light of the size of its potential damages, when the risk of losing is factored in, *Amex III*, 667 F.3d at 218, Mr. Goldman's conclusion is that, "[i]f TextPower were asked or required to pay or advance filing fees and arbitrator costs of approximately $40,000 for an arbitration of its claims in this action, it could not and would not do it." Goldman Dec. ¶ 7. "The company is still in startup mode and does not make enough money to invest such sums in such an arbitration." *Id.*

Thus, Plaintiffs have demonstrated that iSpeedbuy's and TextPower's claims cannot reasonably be pursued as individual arbitrations. The Second Circuit's conclusion in *Amex III* is equally applicable here:

> Since the plaintiffs cannot pursue these claims as [a] class arbitration,[42] either they can pursue them as [a] judicial class action or not at all. If they are not permitted to proceed in a judicial class action, then, they will have been effectively deprived of the protection of the federal antitrust-law. The defendant will thus have immunized itself against all such antitrust liability by the expedient of including in its contracts of adhesion an arbitration clause . . ..

*Id.*, 667 F.3d at 219 (footnote added).

## IV.   THIS ACTION SHOULD NOT BE STAYED.

The Aggregator Defendants, including mBlox and OpenMarket separately, the CTIA, the Carrier Defendants and WMC seek to stay this action pending arbitration, although the CTIA and Carrier Defendants only seek stays while arbitrations with themselves proceed. No stay should be granted.

---

[42] The Neustar and OpenMarket/TextPower arbitration clauses are silent about any class arbitration. *See* Simmons Dec. Ex. A § 19; Ex. B. § 18; Emmet Dec. Ex. A § 14.5. Therefore, no class arbitration is available. *Stolt-Nielsen*, 130 S. Ct. at 1775.

First, there is no basis for any arbitration.   Therefore, no stay is needed.

However, assuming for the purpose of argument that some portion of this action is subject to arbitration, staying any other portion of this action is unnecessary. "A court has 'substantial discretion' in determining 'whether to stay the remainder of the proceedings pending arbitration as a means to promote judicial efficiency and to control [its] docket.'" *Hard Rock Cafe Int'l, (USA), Inc. v. Hard Rock Hotel Holdings, LLC*, 808 F. Supp. 2d 552, 564 (S.D.N.Y. 2011) (quoting *Argus Media Ltd. v. Tradition Fin. Servs. Inc.*, No. 09 Civ. 7966(HB), 2009 WL 5125113, at *3 (S.D.N.Y. Dec. 29, 2009)). "The party seeking a stay 'bears a heavy burden of showing necessity' by demonstrating that a stay will not 'hamper the progress of the arbitration proceeding,' that the arbitration is 'expected to conclude within a reasonable time,' and that there will be no 'undue hardship' imposed on the opposing party." *Hard Rock Cafe* (quoting *Sierra Rutile Ltd. v. Katz*, 937 F.2d 743, 750 (2d Cir. 1991)).   The second and third factors favor not issuing a stay.

Any arbitration involving iSpeedbuy or TextPower will either never conclude because they will not participate (*see* Ellis Dec. ¶ 12; Goldman Dec. ¶ 7) or will be over immediately for the same reason.   In either event, there is no reason to issue a stay of the remaining claims here.

There will be undue hardship to the Plaintiffs if there is any stay.   Because the conspiracy is on-going, so long as the boycott lasts, Defendants are able to extract supracompetitive and unnecessary charges from Plaintiffs.   Further, it is an open question whether any determination in an arbitration between OpenMarket and TextPower or involving iSpeedbuy would have any preclusive effect in this action.   *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 222 (1985) ("it is far from certain that arbitration proceedings will have any preclusive effect on the litigation of nonarbitrable federal claims"); *Am. Shipping Line, Inc. v. Massan Shipping Indus.*,

30

*Inc.*, 885 F. Supp. 499, 502 (S.D.N.Y. 1995) (same).[43] Thus, any stay is pure delay, because this action will not proceed and the arbitration will not necessarily make any resolution in this action more efficient. *See Steichler v. Sidley, Austin Brown &Wood, L.L.P.*, 382 F. Supp. 2d 580, 592 (S.D.N.Y. 2005) (refusing to stay action against third group defendants after compelling arbitration with two other groups of defendants where the claims were "clearly related . . . [but] not identical").

## CONCLUSION

For all the foregoing reasons, Defendants' various motions to compel arbitration and to stay this action pending arbitration should be denied.

Dated: December 10, 2012

Respectfully submitted,

**KAPLAN FOX & KILSHEIMER LLP**

By: *Gregory K. Arenson*

Robert N. Kaplan
Richard J. Kilsheimer
Gregory K. Arenson
Elana Katcher
850 Third Avenue
14th Floor
New York, NY 10022
Telephone:  (212) 687-1980
Facsimile: (212) 687-7714
Emails: rkaplan@kaplanfox.com
    garenson@kaplanfox.com
    rkilsheimer@kaplanfox.com
    ekatcher@kaplanfox.com

*Plaintiffs' Lead Counsel*

---

[43] Even assuming, contrary to the fact, that TextPower were to arbitrate with OpenMarket, the arbitration would only concern the period after January 2010.  If OpenMarket won, there would be no preclusion against any other Defendant. *See Taylor v. Sturgell*, 553 U.S. 880, 892-93 (2008) ("[t]he application of claim and issue preclusion to non-parties thus runs up against the deep-rooted historic tradition that everyone should have his own day in court").  TextPower would have to relitigate its claims here against the remaining Defendants and even against Open Market for claims prior to January 2010.

**CUNEO GILBERT & LADUCA, LLP**

Jonathan W. Cuneo
Joel Davidow
Victoria Romanenko
507 C Street, N.E.
Washington, D.C.  20002
Telephone: (202) 789-3960
Facsimile: (202) 789-1813
Emails:  jonc@cuneolaw.com
              joel@cuneolaw.com
              vicky@cuneolaw.com

Michael Flannery
Cuneo Gilbert & LaDuca, LLP
300 North Tucker Boulevard
No. 801
St. Louis, MO 63101
Phone: (202) 789-3960
Fax: (202) 789-1813
Email: Mflannery@cuneolaw.com


**KOHN SWIFT & GRAF, P.C.**

Joseph C. Kohn
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
Fax: (215) 238-1968
Email: jkohn@kohnswift.com


*Attorneys for Plaintiffs*